EXHIBIT D

# RECORD OF DECISION
# FINAL ENVIRONMENTAL IMPACT STATEMENT
# SACRAMENTO, DRY CANYON, AND DAVIS GRAZING ALLOTMENTS

## SACRAMENTO RANGER DISTRICT
## LINCOLN NATIONAL FOREST

## 1. INTRODUCTION

The Forest Service (FS) has prepared a Final Environmental Impact Statement (FEIS) to disclose the potential effects of authorizing livestock grazing activities and associated range improvements on the Sacramento, Dry Canyon and Davis Grazing Allotments. The Sacramento Allotment is the primary focus of the analysis documented in the Environmental Impact Statement (EIS). In response to administrative action and to potentially alleviate management problems on the Sacramento Allotment, an unused portion of the Dry Canyon Grazing Allotment and the previously closed Davis Grazing Allotment were included in some of the alternatives considered in the FEIS.

The FEIS was prepared in compliance with the National Environmental Policy Act (NEPA) and other relevant Federal and State laws and regulations. The project area is located south, east, and west of Cloudcroft, New Mexico, and is within the Sacramento Ranger District, Lincoln National Forest (LNF). The FEIS discloses the direct, indirect, and cumulative impacts and any irreversible commitment of resources that would result from the proposed action and alternatives.

### 1.1 Background

The present Sacramento Grazing Allotment is the result of combining 10 historical allotments. In the late 1970's, the High Nogal Ranches, Inc., acquired grazing permits on the 10 historical allotments. The control of livestock management on the 10 small allotments by one business interest made it possible to combine them into one large allotment. Combining these allotments provided an opportunity to improve resource management as well as administrative and economic efficiency. An Environmental Assessment (EA) and Allotment Management Plan (AMP) were approved in 1979 for the newly consolidated allotment. The AMP prescribed implementation of an intensive rotation grazing system along with a very extensive range improvement development program. Under the 1979 AMP, the allotment was fully stocked for about two years. However, in 1983 the permittee filed for bankruptcy. Because of the bankruptcy, implementation of the AMP was only partially completed. Between 1983 and 1989, the allotment saw periods of very light use or non-use by livestock.

In 1989, the current permittee (Sacramento Grazing Association) was issued a Term Grazing Permit on Sacramento Allotment. The new permittee acquired only the grazing permit and did not acquire the private lands, which were an integral part of the livestock operation when the original combination took place. In addition, the long period of nonuse on the allotment resulted in deterioration of many of the existing range improvements. Because of the changed private land base and many of the range improvements being nonfunctional, the 1979 AMP is not functional.

An EA, Decision Notice (DN), and Finding of No Significant Effect (FONSI) were completed on a new Sacramento Grazing Allotment AMP on March 1, 1995. Two appeals were filed protesting the decision to implement the new AMP. Both appeals alleged violations of the NEPA and the National Forest Management Act (NFMA). The appeals requested that the decision be set aside and that a new EA or EIS be prepared for the AMP.

After reviewing the appeals, the Appeal Deciding Officer remanded the decision on May 31, 1995. The remand instructed the LNF to prepare a supplement to the EA and include stocking rates for each alternative, clarify forest plan consistency, clarify effects on cultural resources, and complete consultation with the State Historic Preservation Officer (SHPO). After preparation, the supplement was to be circulated for comment, a new DN prepared and a new term grazing permit issued.

A supplement to the EA was completed on May 3, 1996, and offered to the public for a 30-day review period. Comments received on the supplemental EA highlighted a need to gather more data before a decision could be issued on the new AMP. A private consultant carried out additional grazing capacity studies and additional monitoring of elk/livestock interactions was initiated.

After review of the troubled history of the NEPA process on this project, the LNF Supervisor decided in November 1998 to have an EIS prepared. A Notice Of Intent (NOI) was published in the Federal Register on May 5, 1999. The NOI was amended in January 2000 and again in May 2002 to update expected completion dates.

The Dry Canyon Allotment, adjacent to the northwest corner of the Sacramento Allotment, is a community allotment (an allotment used by more than one permittee) with three separate term grazing permits. Two of the grazing permits are presently active. The third permit was canceled in 1995 because of permit violations and retained by the FS for future use. The FS completed an EA disclosing the environmental effects of issuing new permits on the Dry Canyon Allotment and made a decision to issue three new permits in 1999.

The two presently active permits were issued for 10 and 20 head of cattle from November 1 to May 15. The third permit for 75 head of cattle from November 1 to May 15 was not issued to a permittee at that time. Issuing the third permit for the 75 head of cattle to the Sacramento Grazing Association was considered in the FEIS.

The Davis Allotment adjoins the Sacramento Allotment on the east side. Two permits were issued for grazing on the Davis Allotment in the early 1980's. One of these permits was issued to High Nogal Ranches and was used in conjunction with the Sacramento Allotment. In 1983, High Nogal Ranches removed all of its livestock from the Davis Allotment and never used it again. The other permit remained in effect and passed through a succession of different permittees. In 1992, the permit was transferred to Angel Canyon Ranch Partnership. In May 1992, discussions between Angel Canyon Ranch Partnership and the Forest Service about the resource and management problems on the allotment resulted in a Memorandum of Understanding to close the allotment to livestock grazing.

Recent litigation filed by the Sacramento Grazing Association claims that the Association should be allowed to graze the Davis Allotment as part of the Sacramento Allotment based on historical use by its

predecessor, High Nogal Ranches. Reauthorization of livestock grazing on the Davis Allotment was considered in the FEIS.

## 1.2 Purpose and Need

After acquisition of the Sacramento Allotment grazing permit in 1989, the current grazing permittee began to gradually stock the Sacramento Allotment to full permitted numbers. When the Sacramento Allotment was fully stocked in 1991, forage utilization began to exceed acceptable levels. Excessive forage utilization has been a continual concern since then. An adequate or functional AMP does not presently cover the Sacramento Grazing Allotment. Present management is not consistent with the standards and guidelines of the Forest Plan in some areas.

A sound, effective AMP is needed to authorize continued grazing, guide proper resource management on the Sacramento Allotment, repair specific resource problems, bring the Sacramento Allotment into compliance with the LNF Plan, and provide the basis for a new or revised Term Grazing Permit for the next 10 years. Unallocated forage capacity is available on the Dry Canyon Allotment that may help alleviate problems on the Sacramento Allotment by shifting some of the grazing use to the Dry Canyon Allotment.

Authorized grazing on the allotments is consistent with the following:

- Where it is consistent with other multiple use goals and objectives, Congressional intent is to allow grazing on suitable lands. (Multiple Use Sustained Yield Act of 1960, Wilderness Act of 1964, Forest and Rangeland Renewable Resources Planning Act of 1974, Federal Land Policy and Management Act of 1976, and NFMA of 1976).
- The allotments contain lands identified as suitable for domestic livestock grazing in the LNF and continued domestic livestock grazing is consistent with the goals, objectives, standards, and guidelines of the Forest Plan.
- FS policy is to make forage from lands suitable for grazing available to qualified livestock operators, consistent with land management plans (FSM 2203.1).
- FS policy is to continue contributions to the economic and social well being of people by providing opportunities for economic diversity and by promoting stability for communities that depend on range resources for their livelihood (FSM 2202.1).
- By regulation, forage producing lands will be managed for livestock grazing where consistent with land management plans (36 CFR 222.2 (c)).

This Page Intentionally Left Blank

# 2. Decision and Rationale

## 2.1 Decision

My decision is to implement Alternative B as described in the FEIS for the Sacramento, Dry Canyon, and Davis Grazing Allotments, with minor modifications as described in this Record of Decision (ROD).

Alternative B, with the modifications described in this decision document, best meets the purpose and need for the proposed action (FEIS Chapter 1) by authorizing continued grazing of the allotments consistent with Congressional intent under the Multiple-Use Sustained Yield Act, implementation of an efficient allotment plan, addressing identified resource problems and conflicts, and providing a sound basis for a new or revised term grazing permit.

Alternative B best moves toward all of the desired future conditions described for the area in FEIS Chapter 1 by improving unsatisfactory range conditions (FEIS Chapter 3.9), improving riparian conditions (FEIS Chapter 3.6) , improving watershed conditions, improving stream bank stability and water quality (FEIS Chapter 3.6), balancing grazing use with other resource uses (FEIS Chapter 3), maintaining viability of listed and rare plants and animals (FEIS Chapter 3.8), and maintaining a viable livestock operation (FEIS Chapter 3.10).

Alternative B best balances the five issues identified for the proposed action (FEIS Chapter 1) by balancing the needs of the livestock operation with the needs of listed and rare plant and animal species, elk populations, conflicts with recreation, and riparian conditions (FEIS Chapter 3). While the alternative does not eliminate all aspects of all issues, it at least partially addresses all the issues.

My decision to implement Alternative B will:

- Implement an elk/livestock monitoring plan in cooperation with affected parties.
- Require completion of a noxious weed assessment prior to all ground disturbing or site altering range improvement projects to determine the risk of increasing the spread of noxious weeds.
- Rotate salt locations to reduce impacts caused by concentration of livestock around salt grounds.
- Prohibit use of salt or mineral supplements within ¼ mile of riparian areas or within sight of the Cloudcroft to Sunspot Highway #6563 and the Sacramento River Road #537.
- Exclude livestock grazing with temporary fencing on future revegetation projects and on sites where livestock grazing is hindering natural revegetation.
- Develop a collaborative approach with the ~~permittee and New Mexico Department of Game and~~ Fish to make water available for wildlife use at all existing and future water development projects in pastures where livestock are present. Leave storage tanks full, where feasible, when livestock are removed from a pasture.
- Issue a Term Grazing Permit on the Sacramento Allotment with variable stocking from 200 to 412 cattle and 5 horses from May 15 to October 31 on the summer range and 200 to 335 cattle and 5 horses from November 1 to May 14 on the winter range. Issue a Term Grazing Permit for

up to 75 cattle from November 1 to May 14 on the Dry Canyon Allotment. Stocking will be varied within the permitted ranges of livestock numbers based on forage production and utilization monitoring. Annual stocking rate will be determined in the annual operating plan.

- Exclude livestock from unfenced emergent wetlands in the Sacramento River drainage above Sacramento Lake and near the mouth of McAfee Canyon with new fencing (FEIS Table 2). Currently the sites in question are dry due to extended drought conditions. Implementation of these proposed exclosures will be deferred until it is determined that wetland components exist outside the existing exclosures.
- Exclude livestock from known Philadelphia wood lily (*Lilium philadelphicum)* populations with permanent fencing (FEIS Table 2).
- Implement a 35% forage use guideline for all key areas on the summer range and the Dry Canyon Allotment.
- Implement a 40% forage use guideline for all key areas on the winter range.
- Allow 70% forage use guideline of current growth in existing and proposed livestock holding traps.
- Allow no livestock forage use in grazing exclosures.
- Construct additional range improvements having an estimated cost for materials of $97,000 funded by the FS and $74,000 in permittee labor contributions. (FEIS Table 2).
- Continue use of 465 acres of six existing livestock holding traps (FEIS Table 2).
- Install 35 acres of new livestock holding traps in three locations (FEIS Table 2).
- Maintain the existing 264 acres in six grazing exclosures (FEIS Table 2).
- Install proposed exclosures in the Peñasco Trap to protect *Circium* and *Rumex* (FEIS Table 2).
- Install proposed exclosures in Wills Canyon within the Wills Trap to protect *Circium* (FEIS Table 2).
- Install ¾ mile of new fence along the west side of Forest Road 164 in the Upper Peñasco riparian exclosure to prevent incidental use during trailing. This is a modification of an existing riparian exclosure.
- Construct ½ mile extension of existing pipeline in Dry Canyon Allotment and install one new water trough.
- Reconstruct four trick tanks in Dry Canyon Allotment.
- Provide seasonal deferment of summer pastures in two-year cycles. Pastures in the North Pasture and South Pasture will be grazed under a deferred rotation system with each pasture being grazed half of the summer season and alternating early and late use each year. The Atkinson and Nelson Pastures will also be used for up to 40 replacement heifers or equivalent capacity under a deferred

rotation system with each pasture being grazed half of the summer season and alternating early and late use each year.

- Graze the four winter pastures (Alamo, Mule, Pasture Ridge, and Grapevine) annually. Livestock will be divided and distributed in Mule, Pasture Ridge and Grapevine Pastures for the entire winter season.

- Remove livestock from the Alamo Pasture by February 1 for two years to protect the Sacramento Mountains prickly poppy *(Argemone pleiacantha ssp. pinnatisecta)*. Grazing will be permitted in the Alamo Pasture from November 1 to January 31 during the first two years. In the subsequent years of the permit, livestock use in the Alamo Pasture will be monitored each December or January to determine whether an adjustment to the number of livestock is necessary commensurate with the potential for livestock impacts on the poppy from grazing or trampling. In consultation with United States Fish and Wildlife Service (USFWS) it was identified that cattle would be removed February 1 for the first two years of the new term permit. The expected date of the ROD was December 2003. The two years of the proposed February 1 exit date were planned to be 2004 and 2005. Since livestock were removed from the Alamo pasture by February 1, 2004, credit will be given for meeting the first year of the two-year requirement. Collaborative work with USFWS, Otero County, and the permittee will continue with the implementation of the recovery plan for the poppy. This modification in the proposed use of Alamo Pasture to a shorter season will affect the permittee to some degree economically. The removal of cattle from the Alamo Pasture by February 1 and the distribution of those cattle to other pastures within the winter range will require additional investment of manpower and time by the permittee. This will result in some negative economic impact to the permittees for as long as this requirement is in place.

- Graze up to 75 head of cattle on the Dry Canyon Allotment during the winter season. Full stocking of the 75 head will not be authorized until the proposed improvements are complete. Incremental stocking of the Dry Canyon Allotment may be authorized as individual improvements become functional.

- Conduct regular scheduled and unscheduled allotment inspections to determine the condition and efficiency of range improvements, forage utilization, livestock distribution patterns, and locations of salt and mineral supplements.

- Perform monitoring visits prior to the entry of cattle to the winter and summer pastures, at approximately the ~~mid-point of the grazing season on the summer pastures, and within 15 days~~ after the end of the permitted grazing season on both the winter and summer pastures. As part of this process, consider the effect of elk and deer on the allotments. Monitoring will be accomplished in a collaborative effort involving the New Mexico State University (NMSU) Range Improvement Task Force and the New Mexico Department of Game and Fish.

- Measure long-term condition and trend on key sites during the 10-year life of the Term Grazing Permit.

- Range management activities may be adjusted as a result of monitoring data collected. These modifications would not require additional NEPA analysis if the effects would still be within the range of effects analysis disclosed in FEIS Chapter 3 and did not change the basic decisions as identified in the Decision To Be Made in FEIS Chapter 1.
- Establish two new key monitoring areas for prey base cover within the Hubble and Bluff Springs Mexican Spotted Owl (MSO) *(Strix occidentalis)* Protected Activity Centers (PACs).
- Assess adherence to the prescribed forage use guidelines using measurements on key forage species. Monitoring on key areas will determine compliance with forage/range utilization guidelines.
- Monitor Sacramento prickly poppy *(Argemone pleiacantha ssp. pinnatisecta)* populations in Alamo Canyon during the life of the 10-year permit.

## 2.2 Rationale

All practicable means to avoid and/or minimize environmental harm have been considered. To this end, required mitigation measures, as described in FEIS Chapter 2, have been identified.

Alternative A was not selected because it does not meet the purpose and need of the proposed action. It does not resolve any of the existing conflicts with other resources. Alternative A would nearly eliminate elk from the allotment and further exacerbate conflicts with recreation and wildlife resource uses. Alternative A does not move in the direction of the desired future conditions described for the area. Alternative A resolves or partially resolves only the one issue related to viability of a livestock operation on the allotments.

Alternative C was not selected because it would completely eliminate grazing from the allotments and would not be consistent with the purpose and need to maintain a viable livestock operation consistent with Congressional intent.

Alternative D was not selected because it maintains the status quo on the allotment and does not meet the purpose and need, desired future conditions, or resolve the issues connected with the proposed action.

Alternative E was not selected because it would use the previously closed Davis Allotment and this would not be consistent with the purpose and need to eliminate resource conflicts associated with previous use of the Davis Allotment.

## 2.3 Public Involvement and Scoping

Why?

The Sacramento Grazing Association acquired the term permit for the Sacramento Allotment in 1989. Because of a changed private land base and ineffective existing improvements, the existing 1979 allotment management plan was not viable. A new management plan had to be prepared.

An EA, DN, and FONSI were completed on a new Sacramento Grazing AMP on March 1, 1995. A large number of public comments were received and analyzed during the EA process. Two appeals were filed protesting the decision to implement the new AMP. Both appeals alleged violations of NEPA and the

NFMA. The appeals requested that the decision be set aside and that a new EA or an EIS be prepared for the AMP.

After reviewing the appeals, the Appeal Deciding Officer remanded the decision on May 31, 1995. The remand instructed the LNF to prepare a supplement to the EA and include stocking rates for each alternative, clarify forest plan consistency, clarify effects on cultural resources, and complete consultation with the SHPO. After preparation, the supplement was to be circulated for comment, a new DN prepared and a new term grazing permit issued.

A supplement to the EA was completed on May 3, 1996, and offered to the public for a 30-day review period. Comments received on the supplemental EA highlighted a need to gather more data before a decision could be issued on the new AMP. A private consultant carried out additional grazing capacity studies and additional monitoring of elk/livestock interactions was initiated.

There was substantial public involvement leading to the decision to permit grazing on the Dry Canyon Allotment. In addition to the public comments received during scoping and on the draft EA, the decision was appealed and additional comments from the public were received.

The public has been heavily involved in development of an AMP for the Sacramento Grazing Allotment. Public scoping was done during the beginning stages of the initial EA. The draft EA was sent to the public for comment. The final EA, DN, and FONSI were distributed to the public for comment and appeal. Two appeals were filed and also serve as public comment on this project. As a result of the appeals, a supplement to the EA was circulated for public comment. Based on the comments received on the EA supplement, the Forest Supervisor decided in November 1998 to have an EIS prepared rather than make a decision on the EA supplement. An NOI to prepare an EIS was published in the *Federal Register* on January 25, 1999 and previously involved people were notified by letter and encouraged to provide further comment, which many did. The LNF received several Congressional inquiries and comments. A number of comments were received on various parts of the process, such as the Grazing Capacity Report. The NOI was amended in January 2000 and again in May 2002 to update expected completion dates.

About 150 Draft Environmental Impact Statements (DEIS) were distributed to individuals and agencies for comment during the comment period which began on November 29, 2002, and ended January 27, 2003. As a result, 32 letters were received commenting on the DEIS. These 32 letters contained 68 comments.

In response to the comments, several changes to correct factual errors or further explain the analysis were made in the final document. My responses to each of the comments can be found in Appendix D in the FEIS.

This Page Intentionally Left Blank

# 3. ALTERNATIVES

## 3.1 Alternatives Considered

The alternatives considered in detail included a no action alternative and four action alternatives to respond to the significant issues and purpose and need for the proposal.

- Alternative A: Maintains present grazing levels and recommends reducing wildlife populations to eliminate conflict for available forage. Uses the Dry Canyon and Davis Allotments.
- Alternative B: **FS Preferred Alternative.** Reduces livestock use to balance with capacity and maintain wildlife populations at levels consistent with management goals of the New Mexico Department of Game and Fish. Uses the Dry Canyon Allotment.
- Alternative C: Eliminates grazing from the allotment.
- Alternative D: Is the **No Action Alternative** required by the NEPA and continues the present situation into the future.
- Alternative E: Is similar to B but considers use of both the adjacent Davis and Dry Canyon Allotments.

## 3.2 Alternatives Not Selected For Detailed Study

Five other alternatives were initially studied but were eliminated from detailed consideration because they were outside the scope of the project, were not within reason, were not feasible, and/or did not address the purpose and need for action described in FEIS Chapter 1.

- An alternative for extensive development of riparian pastures was considered.
- An alternative proposing allotment-wide grazing with use of a full-time herder was considered.
- An alternative to implement a four-pasture deferred rest-rotation system on both the summer and winter ranges was initially proposed.
- An alternative proposing long-term rest (5 years minimum) for selected pastures within the summer range was initially proposed.
- An alternative which proposed allotment-wide grazing on the summer and winter pastures was initially proposed.

## 3.3 Findings Required By Other Laws

This decision complies with the area-specific management direction contained in the LNF Land and Resource Management Plan. In addition, specific direction from the 1996 Region-wide amendment to forest plans is integrated into this decision. My decision is consistent with the LNF Plan as amended.

The cultural resource clearances have been completed with concurrence from the SHPO.

The FS has completed biological consultation for this project. The USFWS issued a Biological Opinion on the project on February 4, 2004.

The Biological Opinion considered the potential impacts on the MSO, Sacramento Mountains prickly poppy, and Sacramento Mountains thistle and rendered an opinion that the project is not likely to jeopardize the continued existence of these species. I agree with and will implement as part of this decision all of the Reasonable and Prudent Measures and Terms and Conditions prescribed for the MSO as follows.

1. Conduct all proposed activities in a manner that will minimize disturbance to the MSO.
   a. Fences, corrals, trick tanks, livestock traps, or other livestock management construction activities that occur within PACs will be constructed outside the MSO breeding season or after non-nesting status has been determined.
   b. Within PACs, FS employees and the permittee will strictly limit activities, vehicles (including off-highway vehicles), equipment, and construction materials to the open roads and motorized trails or appropriate livestock management areas/activities such as livestock traps. Exceptions will be made to monitor key areas.
   c. PAC boundaries will be discussed with the permittee to ensure that livestock concentrations and associated activities such as salt or mineral supplement sites will not occur within PACs. Salting guidelines from the EIS will be followed. Exceptions will only include salting within those areas of some PACs such as ridge tops and open canopied areas when used as a range management tool to decrease impacts in riparian and MSO high use areas. Annual Operating Instructions (AOIs) will indicate areas that are appropriate for salting to minimize impacts to PACs.
   d. The FS will attempt to eradicate noxious weeds in all livestock traps and a 100-yard buffer immediately adjacent to the traps as needed. This will be accomplished through implementation of currently planned noxious weed control projects.
2. Conduct all activities in a manner that will minimize modification or loss of MSO habitat.
   a. The final AMP will be submitted to the New Mexico Ecological Services Field Office within 3 months from the date this action is completed (i.e., after administrative and legal challenges are cleared). The AMP will not differ significantly from the proposed action.
   b. All unauthorized activities that affect the baseline of the MSO (i.e., impacts outside the proposed project description) will be reported to the USFWS.
   c. The FS will prepare a report documenting how the project is in compliance with the proposed action. The FS will provide the USFWS with the forage/range monitoring information, annual operating plan, other related documents, and an annual implementation progress report. Monitoring information, including any management actions taken as a result of monitoring will be submitted within 30 days of the monitoring period. The AOI and annual report will be submitted to USFWS within one month of issuing the AOI.

d. Consistent with the LNF Plan and ongoing monitoring of other grazing allotments, the FS will apply forage/range guidelines allotment-wide, including attaining forage/range guidelines in all key areas. The FS will adjust livestock grazing, as appropriate, to achieve forage/range guidelines within all key areas. Compliance will be attained if the forage/range guidelines are met in key areas.

e. During periods when forage production may be low in summer pastures, the FS will monitor forage/range guidelines and manage the allotment consistent with FS range management regulations 36 CFR 222.

f. The FS will establish two additional key areas within the Hubble and Bluff Springs PACs to monitor prey base cover only. Monitoring of these and other key areas will follow the appropriate monitoring methods during appropriate time frames.

I also agree with and will implement conservation recommendations from the Biological Opinion for each species as follows:

1. MSO – The FS will

   a. Emphasize and implement the restoration of lowland riparian habitats for the MSO.

   b. Reduce possible effects of grazing on the MSO prey base by improving upland range conditions in pastures in and adjacent to protected and restricted habitat.

   c. Work with other entities in studies to gain a comprehensive understanding of how ungulate grazing affects the MSO and its prey species.

2. Sacramento Mountains Prickly Poppy – The FS will

   a. Cooperate with the City of Alamogordo and other entities to restore the hydrological processes required by the poppy and restoration of developed spring habitat throughout the Sacramento Allotment.

   b. Work with other entities to initiate germination studies of poppy seeds and reintroduction program(s) into current and historically occupied sites.

3. Sacramento Mountains Thistle – The FS will

   a. Continue to pursue restoration of hydrological processes throughout the Sacramento Allotment that are required by the thistle.

   b. Continue to explore and pursue control of exotic competitors to the thistle such as teasel. The FS will seek opportunities with other entities to monitor the potential range expansion of weevil to determine the impending threat to the thistle.

   c. Continue monitoring of thistle occurrences.

## 3.4 Environmentally Preferable Alternative

The environmentally preferable alternative is the alternative that best meets the goals of Section 101 of the NEPA and is required to be identified by 40 CFR 1505.2 (b). Ordinarily, this is the alternative that causes the least damage to the biological and physical environment and best protects, preserves and enhances historical, cultural, and natural resources.

Alternative C is the environmentally preferable alternative because it is the only alternative that completely resolves the issues related to the biological and physical environment. However, Alternative C does not even partially address the economic and social issue and does not address the purpose and need to continue a viable livestock industry in the area. Therefore, I did not select Alternative C to be implemented. Alternative B is environmentally sound and at least partially addresses all of the issues and the purpose and need for the proposal.

# 4. IMPLEMENTATION

## 4.1 Implementation Date

This project will not be implemented sooner than 5 business days following the close of the appeal filing period established in the Notice of Decision published in the *Alamogordo Daily News*. If an appeal is filed, implementation will not begin sooner than 15 calendar days following a final decision on the appeal.

## 4.2 Decision Subject to Appeal

This decision is subject to administrative review pursuant to 36 CFR Part 215. The appeal must be filed (regular mail, fax, email, hand-delivery, or express delivery) with the Appeal Deciding Officer. Written comments must be submitted to: Appeal Deciding Officer, 1101 New York Ave., Alamogordo, NM 88310.

The office business hours for submitting hand-delivered appeals are Monday through Friday from 7:30 a.m. to 4:30 .pm., excluding holidays. Electronic comments must be submitted in a format such as an email message, plain text (.txt), rich text formats (.rtf), or word (.doc) to appeals-southwestern-lincoln@fs.fed.us. The appeal must have an identifiable name attached or verification of identity will be required. A scanned signature may serve as verification on electronic appeals.

The Sacramento Allotment permittees may appeal the Decision under 36 CFR 215 or 36 CFR 251, but not both. Under 36 CFR 251, a Notice of Appeal must be consistent with 36 CFR 251.90 and filed simultaneously with Forest Supervisor Mr. Jose Martinez, Appeal Deciding Officer (at above listed address) and Sacramento Ranger District Ranger, Mr. Frank Martinez (PO Box 288, Cloudcroft, NM 88317; fax (505)682-3394) within 45 days from the date of publication of legal notice in the *Alamogordo Daily News*.

Appeals, including attachments, must be filed within 45 days from the publication date of this notice in the *Alamogordo Daily News*, the newspaper of record. The publication date in the newspaper of record is the exclusive means for calculating the time to file an appeal. Those wishing to appeal this decision should not rely upon dates or timeframe information provided by any other source.

Individuals or organizations who submitted substantive comments during the comment period specified at 215.6 may appeal this decision. The notice of appeal must meet the appeal content requirements at 36 CFR 215.14. When appeals are filed, implementation may occur on, but not before, the 15th business day following the date of the last appeal disposition.

## 4.3 Contact Person

This decision is subject to administrative review pursuant to 36 CFR Part 215. The appeal must be filed (regular mail, fax, email, hand-delivery, or express delivery) with the Appeal Deciding Officer. Written comments must be submitted to: Appeal Deciding Officer, 1101 New York Ave., Alamogordo, NM 88310.

For additional information concerning this decision or the FS appeal process contact:

Frank R. Martinez, District Ranger
Sacramento District Ranger
P.O. Box 288
Cloudcroft, NM 88317
Telephone: (505) 682 2551

Frank R Martinez

28 July 2004

Frank R. Martinez, District Ranger
Lincoln National Forest
Sacramento Ranger District

Date

The United States Department of Agriculture (USDA) is a diverse organization committed to equal opportunity in employment and program delivery. USDA prohibits discrimination on the basis of race, color, national origin, sex, religion, age, disability, political affiliation, and familial status. Persons believing they have been discriminated against should contact the Secretary, USDA, Washington, DC 20250, or call (202) 720-7327 (voice) or (202) 720-1127 (TDD).