# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| Sacramento Grazing Association, Inc., et al.,<br><br>Plaintiff,<br><br>v.<br><br>United States,<br><br>Defendants. | No. 04-786<br><br>Judge Susan G. Braden |

## PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT, OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND MEMORANDUM IN SUPPORT THEREOF

Michael J. Van Zandt
Hanson Bridgett LLP
425 Market Street, 26th Floor
San Francisco, CA 94105
Tel: (415) 777-3200
Fax: (415) 995-3566

## TABLE OF CONTENTS

Page


I. INTRODUCTION ........ 1

II. PROCEDURAL HISTORY ........ 2

III. STATEMENT OF FACTS ........ 3

IV. ARGUMENT ........ 14

A. The Summary Judgment Standard ........ 17

B. Fifth Amendment Takings Law ........ 19

C. PLAINTIFFS CROSS MOTION FOR SUMMARY JUDGMENT ........ 20

1. The Use of Exclosures and Denial of Access to Vested Water Sources is A Physical Taking and Summary Judgment Should Be Awarded In Favor of SGA ........ 21

2. The Government Has Taken The Water in the Exclosures for Its Own Purposes Effectuating a Physical Taking ........ 24

3. The Government Has Taken SGA's Water Rights in The Alamo Pasture ........ 27

D. OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ........ 29

1. The Government Has Restricted Not Just Grazing, But Also Access to Water in The Enclosures Where SGA Owns A Vested Water Right ........ 29

2. The Defendant Has Unreasonably Limited Access to SGA's Water Rights ........ 32

V. Conclusion ........ 39

# TABLE OF AUTHORITIES

Page

## Cases

*767 Third Ave. Assoc. v. United States*, 48 F.3d 1575, 1580 (Fed. Cir. 1995) .............20
*767 Third Ave. Assoc. v. United States*, 48 F.3d 1575, 1580 (Fed. Cir. 1995) .............20
*Allstate Ins. Co. v. Occidental Int'l, Inc.*, 140 F.3d 1, 2 (1st Cir. 1998).........................19
*Anderson* v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) ........................................15
*Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) ..........................................................................................................................19
*B.F. Goodrich Co. v. United States Filter Corp.*, 245 F.3d at 593 ................................19
*Bradshaw v. United States*, 47 Fed. Cl. 549, 552 (2000).............................................15
*Bradshaw v. United States*, 47 Fed. Cl. 549, 553 (2000).............................................15
*Broder v. Natomas Water Co.*, 101 U.S. 274, 276 (1879) ............................................33
*Broder v. Water Co.*, 101 U.S. 274, 275 (U.S. 1879)....................................................16
*Caterpillar, Inc. v. Deere & Co.*, 224 F.3d 1374, 1379 (Fed. Cir. 2000) .......................18
*Celotex Corp. v. Catrett*, 477 U.S. 317 ........................................................................18
*Colvin Cattle Co. v. United States*, 468 F.3d 803 (2006) ..............................................28
*Curtin v. Benson*, 222 U.S. 78, 86 (1911)......................................................................33
*DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1322 (Fed. Cir. 2001) .................19
*Elko County Bd. of Supervisors v. Glickman*, 909 F. Supp. 759, 764 (D. Nev. 1995)....33
*Estate of Hage v. United States*, 82 Fed. Cl. 202 (Fed. Cl. 2008) ...............................24
*Estate of Hage v. United States*, 82 Fed. Cl. at 212-213 ..............................................39
*First State Bank of Alamogoro v. McNew*, 33 N.M. 414, 269 P. 56, 56 (1928) .............16
*Foster v. United States*, 221 Ct. Cl. 412, 425 (1979) ....................................................23
*Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed. Cir. 1995) ..18
*Hage v. United States*, 51 Fed. Cl. 570 (2002) .............................................................34
*Hendler v. United States*, 952 F.2d 1364, 1373-74 (Fed. Cir. 1991)............................19
*Jennison v. Kirk*, 98 U.S. 453 (1878) ............................................................................33
*Jennison v. Kirk*, 98 U.S. 453, 456-457 (1878) .............................................................33
*Joyce Livestock Co. v. United States* (In re SRBA Case No. 39576) ...........................27
*LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692 (4th Cir. 1968)................................................................................................................19
*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 430 (1982)..........20, 29
*Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992) .........................................20

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1015 (1992) .......................15
*Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1031 (1992) ..................15, 20
*Massey v. Del Labs., Inc.*, 118 F.3d 1568, 1573 (Fed. Cir. 1997)................................19
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1987) ..............18
*Miller v. Campbell County*, 945 F.2d 348, 352 (10th Cir. 1991)...........................20, 33
*Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed. Cir. 1987).......19
N.M. Const. Art. XVI, §§ 1 & 2 ..........................................................................16
*Novartis Corp. v. Ben Venue Labs.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001) ..................18
*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)........................................20
*Posey v. Dove*, 57 N.M. 200 ...............................................................16, 22
*Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed. Cir. 1988)................19
*Reading & Bates Corp. v. United States*, 40 Fed. Cl. 737, 748 (1998) .........................19
Saab *Cars USA, Inc. v. United States*, 434 F.3d 1359, 1369 (Fed. Cir. 2006) ..............18
*Store Safe Redlands Associates v. United States*, 35 Fed. Cl. 726, 728 (1996) ...........20
*Transp. Co. v. Chicago*, 99 U.S. 635, 642, (1878)..........................................20, 29
*Tulare Lake Basin v. United States*, 49 Fed. Cl. 313 (Fed. Cl. 2001) ...........................29
*Tulare Lake Basin Water Storage Dist. v. United States*, 49 Fed. Cl. 313, 318 (2001)..20
*United States v. General Motors Corp.*, 323 U.S. 373, 378 (1945)..............................22
*United States v. New Mexico*, 438 U.S. 696 (1978).....................................................14
*United States v. New Mexico*, 438 U.S. 696, 707-708 (1978).......................................27
*United States v. Rio Grande Dam & Irrigation Co.,* 174 U.S. 690 (1899) ......................27
*United States v. Rio Grande Dam & Irrigation Co.,* 9 N.M. 292, 303 , 51 P. 674, 677-678 ((N.M. 1898)..................................................................27
*v. Logitech, Inc.*, 254 F.3d 1334, 1338-39 (Fed. Cir. 2001) ........................................19
*Walker v. United States,* 142 N.M. 45, 56...................................................................16
*Walker v. United States*, 69 Fed. Cl. 222, 229 (2005) ..................................................31
*Walker v. United States*, 69 Fed. Cl. 222, 229 (Fed. Cl. 2005).....................................16
*Walker v. United States*, 79 Fed. Cl. 685 (2008) ...........................................................31
*Washoe County v. United States*, 319 F.3d 1320 (Fed. Cir. 2003)................................38
*Washoe County v. United States*, 319 F.3d 1320, 1326 (Fed. Cir. 2003).......................23

**Statutes**

16 U.S. C. § 1538(a)..........................................................................................34

## TABLE OF AUTHORITIES
## (continued)

**Page**

16 USC § 1538(a) .......... 26
43 U.S.C. § 661 .......... 16, 33
43 U.S.C. §§ 1769(a) .......... 33

**Other Authorities**

Act of July 26, 1866, ch. 262, § 9, 14 .......... 15
Const. Art. XVI, §§ 1 & 2 .......... 16
NMSA § 72-1-3 .......... 17
U.S. Const. art. IV, §3, cl.2 .......... 33

## I. INTRODUCTION

This is a taking case brought by plaintiffs, Sacramento Grazing Association ("SGA"), James Goss, Frances Goss, Justine Goss, and Brenna Goss (Collectively "Plaintiffs") to recover compensation for the taking of property associated with their ranching operation in southeastern New Mexico.**1** On the issue of whether a taking of water rights has occurred, SGA herein files a Cross-Motion for Partial Summary Judgment and an Opposition to Defendant's Motion for Summary Judgment. SGA specifically reserves the issue of whether there has been a taking of the Goss Ranch.

Regarding the taking of vested water rights, the issue before the court is:

> Can the Federal Government physically exclude, deny access, and deny the transfer of vested water rights, appropriating the water for its own use, without paying just compensation for depriving the owner of the use of its water rights?

The answer to this question must be no. Here, the government has constructed fences and otherwise physically prevented SGA from accessing water rights in the Lincoln National Forest, ostensibly for the protection of *Cersium vinaceum* (Sacramento Mountains Thistle), *Strix occidentalis lucida (*Mexican spotted owl), and *Argemone pleiacantha ssp pinnatisecta* ( Sacramento Mountains prickly poppy). Moreover, the United States has refused to allow and, under directives from United States Fish and Wildlife Service, cannot allow SGA to move its water to an area where it can be beneficially used. This has resulted in an injury separate and distinct from the deprivation of any right to graze on federal land. Because SGA was physically and practically ousted from the exclosures, and the water used for the government's own purposes, SGA's water rights were physically taken. On this issue alone, SGA's Cross Motion for Partial Summary Judgment should be granted and the Defendant's Motion for Summary Judgment denied.

---

1 For a description and background of the allotments at issue in this case, SGA refers the Court to Chapter 1 of the Final Environmental Impact Statement for the Sacramento, Dry Canyon, and Davis grazing Allotments. Van Zandt Decl. ¶ 3, Exhibit A.

## II. PROCEDURAL HISTORY

This original compliant for just compensation and damages in this matter was filed by SGA on May 4, 2004 (Doc No. 1). An Answer was filed by Defendant, United States, on September 30, 2004 (Doc No. 8). On October 5, 2004 the Defendant filed a Motion to Partially Dismiss the Complaint or, in the Alternative, Motion for Summary Judgment, (Doc. No 9), which was opposed by SGA on November 22, 2004 (Doc No. 12).

This Court issued an Opinion on June 30, 2005 (Doc No 14; 66 Fed. Cl. 221), wherein the Court found the complaint alleges sufficient facts to state a claim that the government may have taken all economically viable use of the ranch. The Court dismissed with prejudice SGA's First Cause of Action concerning the alleged taking of Plaintiffs grazing rights, and dismissed without prejudice SGA's claim for compensation pursuant to 43 U.S.C. §1752(g). Finally, the Court allowed SGA to amend the complaint to state with specificity the water rights allegedly taken by the Defendant. On September 6, 2005 SGA filed an Amended Complaint containing an attachment listing the location and legal basis for each vested water right claimed to be taken by the Defendant (Doc No. 15).

This case was stayed pending the determination of the New Mexico Supreme Court in the case *Walker v. United States*, no. 29,577 ("Walker") (Doc No. 23). That case addressed issues related to the grazing rights and was decided on June 21, 2007. *See* 142 N.M. 45, 162 P.3d 882 (2007). As a result of the *Walker* decision, the parties in this matter agreed that SGA lacks a forage right implicit in any vested water right or in any right-of-way for the maintenance and enjoyment of vested water rights based upon state law. *See* Joint Status Report, July 26, 2007 (Doc No. 27). The Defendant filed a Motion for Summary Judgment on April 29, 2008 (Doc No. 25).

## III. STATEMENT OF FACTS

Plaintiffs are a ranching family who live and raise livestock in southern New Mexico in an area where cattle have grazed since the 1880s. Together the four named plaintiffs are the sole shareholders of the Sacramento Grazing Association ("SGA"), an association incorporated under the laws of the State of New Mexico. SGA is the preference grazing right holder of the Sacramento Allotment, located within the exterior boundaries of the Lincoln National Forest in New Mexico. For a complete statement of the facts SGA refers the Court to its Amended Complaint (Doc No. 15) and Memorandum in Opposition to Defendant's Motion to Partially Dismiss the Compliant or, Alternatively, for Summary Judgment (Doc No. 120). Further, this Court's Opinion of June 30, 2005 (66 Fed. Cl. 211) sets out the facts in this dispute, which will not be repeated here, other then facts specifically related to the remaining issue of the exclosures and denial of access to vested water rights.

The predecessors-in-interest of the Goss Family entered upon and were in possession of the area now known as the Sacramento Grazing Allotment in the 1880s, before the Lincoln National Forest was reserved. Goss Decl. ¶ 4. In 1989 SGA began purchasing property known as the Goss Ranch, and on November 27, 1989, the United States Forest Service ("USFS") issued SGA a 10-year term Grazing Permit No. 08-1105 authorizing 553 head of cattle to graze on the Sacramento Allotment. Exhibit B to Defendant's Motion for Summery Judgment. The grazing permit was for the Sacramento, Dry Canyon and Davis allotments, all within the Lincoln National Forest in New Mexico. Grazing Permit No. 08-1105 contained no mention of exclosures designed to exclude cattle from riparian or sensitive habitats where Plaintiffs' water rights are situated. Goss Decl. ¶ 3; *See* also Exhibit B to Defendant's Motion for Summery Judgment. The chain of title to the property and water rights held by the SGA establishes the predecessors in interest of the SGA held water rights as far back as the 1880's. Goss Decl. ¶ 4.

On the Sacramento Allotment, the USFS has constructed, reconstructed, modified, and expanded several exclosures around certain riparian areas prior to and during the time that SGA has possessed a grazing permit. Goss Decl. ¶ ¶10, 33, 34; Exhibit I; see also Exhibit 2 (indicating that "new grazing enclosures are scheduled for construction") These exclosures remain in place today, and are designed to exclude cattle ostensibly for the protection of *Cirsium vinaceum* (Sacramento Mountains Thistle) ("cirsium"). This plant was proposed for listing as a Federally Endangered Species in 1984 and was listed on June 16, 1987. Goss Decl. ¶ 35, Exhibit 3.

Importantly, in 1993 the United States Fish and Wildlife Service ("USFWS") issued the Sacramento Mountains Thistle Recovery Plan ("Recovery Plan"), which provides that "[t]he major threat to the Sacramento Mountains Thistle is the potential appropriation and development of water rights directly from spring habitats." *See* Declaration of Michael J. Van Zandt ("Van Zandt Decl.") ¶ 4, Exhibit B.

The Sacramento Mountains Thistle Recovery Plan states the following: "Another land use that has been identified as a threat to this thistle is grazing. The Sacramento Mountains thistle occurs on four grazing allotments in the Lincoln National forest.." Van Zandt Decl ¶ 4, Exhibit B, p. 5. The Sacramento Mountains Thistle Recovery Plan also states the following under Recovery Objective and Criteria: "1. Acquire water rights specifically for the maintenance of travertine spring habitats at a minimum of 30 percent of the occupied spring localities, including at least 1 occupied spring locality in each of the known canyons of occurrence. . . . There are 20 min canyon systems that have suitable habitat occupied by the Sacramento Mountains thistle. The largest and best representative spring habitat in each canyon system should have the water rights acquired for habitat maintenance by the management agency. At present, there is no mechanism to acquire these rights without a developed point of diversion and stated beneficial use. Therefore, until the State of New Mexico adopts instream-flow or similar legislation, the Sacramento Mountains thistle must remain listed as threatened under

the Act." Van Zandt Decl ¶ 4, Exhibit B, p. 9.

Under Recovery Tasks, the Sacramento Mountains Thistle Recovery Plan states: "12. Monitor and encourage legislation for a state instream-flow statute and acquire water rights. Van Zandt Decl ¶ 4, Exhibit B, p. 10. Under Narrative Outline of Recovery Actions in the Sacramento Mountains Thistle Recovery Plan the following is stated: "12. **Monitor and encourage legislation for a state instream-flow statute and acquire water rights.** . . . The water right should encompass the total flow from the spring source to the point where the water leaves the travertine deposit." Van Zandt Decl ¶ 4, Exhibit B, p. 11.

Under Narrative Outline of Recovery Actions in the Sacramento Mountains Thistle Recovery Plan the following is also stated: **Livestock Grazing Management.** . . . Plants along streams should be afforded greater protection from the impact of frequent livestock grazing and trampling during the grazing years or seasons. This will require dispersing livestock from riparian areas or creating small pastures to divert cattle from these areas when necessary. No livestock facilities or holding traps should be constructed on or near occupies habitat. Van Zandt Decl ¶ 4, Exhibit B, p. 12. Under the recovery actions addressing monitoring and study, the Sacramento Mountains Thistle Recovery Plan states: "23. **Begin experimental grazing treatments.** . . . . Grazing intensity and duration should be controlled by either herding operations or constructing a fence around manageable units or pasture." Van Zandt Decl ¶ 4, Exhibit B, p. 13.

In February 2004, the USFWS issued a Biological Opinion for the Sacramento Allotment related to endangered species, including the Sacramento Mountains Thistle. Van Zandt Decl ¶ 5, Exhibit C. The Biological Opinion recognizes the existence of the current exclosures within the SGA's grazing allotments, including Sacramento lake, Hubbell, Upper Mauldin, Lower Mauldin, Western Riparian, Upper Penasco, and Bluff Springs, as part of the proposed action that must be continued to allow a no jeopardy

opinion from the USFWS. Van Zandt Decl ¶ 5, Exhibit C, p. 11.

The Biological Opinion also states that the thistle has a recovery priority of 2 out of 18, with 1 being the highest priority and restates the Recovery Criteria in the Recovery plan as follows "1) acquire water rights for the purpose of maintaining travertine habitats and protecting at least 30 percent of the occupied spring localities, including a least one occupied spring in each of the 20 occupied main canyon systems, 2) ensure permanent protection for the thistle in at least 75 percent of the known occupied habitat, both spring and riparian sites, under established management plans, and 3) establish a 10-year monitoring and research program to demonstrate effectiveness of management plans." Van Zandt Decl ¶ 5, Exhibit C, p. 27.

The Biological Opinion also states that as to the Sacramento Mountains prickly poppy: "Livestock grazing is currently authorized on the winter unit of the Sacramento Allotment from November 1 to May 14. However, the lack of consistent application of previous forage/range guidelines has likely historically, and currently continues, to adversely affected the poppy. . . .The Forest Service acknowledged that damage could occur to poppies after February 1 in Alamo pasture from grazing activity and associated trampling. (Forest Service 2002, 2003, 2003g). subsequently, the AOI for the current winter grazing season (i.e. November 2003 through May 14, 2004) included a provision that livestock would be removed from the Alamo pasture prior to February 1, 2004. . . ." Van Zandt Decl ¶ 5, Exhibit C, p. 35. The USFS has prevented use of SGA's water rights in the Alamo Pasture each year since 2005 after February 1; exactly when water is available during spring runoff. This includes, but is not limited to, the following water sources: Upper Alamo #1, Mud Springs, Caballero #1, Caballero #2, Caballero #3, Wood Spring #1, and Wood Spring #2. This action was taken to protect the Sacramento Mountain Prickly Poppy. Goss Decl. ¶ 11.

The Biological Opinion addresses the need for water by the Sacramento

Mountains thistle by stating: "The thistle is an obligate riparian species that requires surface or immediately sub-surface water flows. Spring dessication at thistle sites has contracted occurrence boundaries, reduced the number of individuals, and in some cases, caused a loss of all plants at previously occupied sites (Forest Service 2003a). . . . Trampling by livestock, wildlife, or humans can cause damage to travertine formations or out-flow creek beds in ways that may alter water flow to sites." Van Zandt Decl ¶ 5, Exhibit C, p. 35.

Concerning the Sacramento Mountains thistle, the Biological Opinion states: "Monitoring of the thistle has shown a simple and direct relationship between water availability in the suitable habitat and numbers and extent of plants in occurrences (Forest Service 2003a). As water flow has been observed to decline at springs, decreases in plant numbers and the size of the sites have occurred. The situation reverses when increased water is available. Van Zandt Decl ¶ 5, Exhibit C, p. 63. For the three species of concern, the Mexican Spotted Owl, Sacramento Mountains thistle and Sacramento Mountains prickly poppy, the Biological Opinion determined that the proposed action to graze by SGA "is not likely to jeopardize the continued existence of the [species]," based on full implementation of the project as described in the Description of Proposed Action. Van Zandt Decl ¶ 5, Exhibit C, pp. 65-67.

The no jeopardy opinion in the Biological Opinion for the three species is based on a finding that there will be reduced stocking levels for livestock; for the poppy, the Alamo Pasture will closed to livestock by February 1 of each year; and for the thistle: "[t]he continued construction of exclosures will protect isolated occurrences of the thistle. Continued maintenance of existing exclosures will continue to protect some thistle occurrences from livestock impacts." Van Zandt Decl ¶ 5, Exhibit C, pp. 66-67. The Biological Opinion then imposes Reasonable and Prudent Measures and Terms and Conditions that include limitations on activities by the livestock permittee near Mexican Spotted Owl protected activity centers. Van Zandt Decl ¶ 5, Exhibit C, p. 69.

The effect of the Biological Opinion is to preclude the use of the exclosures for cattle grazing and to prevent the movement of the water outside of the exclosures.

In 2004, the USFS completed an environmental review process for the Sacramento, Dry Canyon, and Davis Allotments related to the issuance of grazing permits. As part of this process the USFS adopted the determinations, findings, reasonable and prudent measures and terms and conditions of the USFWS Biological Opinion under the Endangered Species Act for the allotments related to endangered species including the Sacramento Mountains thistle, which presumed that "[e]xclosures will have no livestock use at any time." Van Zandt Decl. ¶ 5, Exhibit C, p. 12. The Record of Decision ("ROD") for the Final Environmental Impact Statement ("FEIS") for the allotment was issued by the USFS on July 28, 2004. The selected alternative reduced livestock levels permanently on the allotments, excluded livestock from existing exclosures, protected the water resources inside the exclosures, required the installation of additional exclosures in the Penasco Trap and Wills Canyon to protect *cirsium*, and the modification and installation of 3/4 mile of new fence in the upper Penasco riparian exclosure to prevent incidental use during cattle trailing. Van Zandt Decl. ¶ 6, Exhibit D, pp. 5-6. Further, the ROD required the removal of livestock from the Alamo Pasture by February 1 for two years to protect Sacramento Mountains prickly poppy. *Id.* at p. 7. However, SGA is still prohibited from using the Alamo Pasture after February 1, 2008. See Goss Decl ¶

The exclosures were first removed from the SGA Allotments in 1998. Because the exclosures limited operations, SGA asked each year from 1998 to allow access to the fenced areas. Goss Decl. ¶ 14. In 1989 and 1990 SGA was allowed access to the exclosure on the upper Penasco. Goss Decl. ¶ 36, 37 ; Exhibits 4 & 5 The Interim Summer Grazing Plan in 1992 for the Sacramento Allotment provided that "[i]deally livestock should be allowed in riparian areas for short times during the seasons that are compatible stream bank stability and plant phenology." Van Zandt Decl. ¶ 7, Exhibit E at

Section III.C.3. The Annual Operating Plans ("AOP") (now known as the Annual Operating Instructions ("AOI")) for the allotment up to May 5, 1998 provided protection for *cirsium* by requiring that the permittee not attract "cattle into areas known to have Sacramento Thistle," by providing salt 1/2 mile from the plant, and monitoring. Goss Decl ¶ ¶ 38, 390, Exhibits 6 (Section B), 7 (Section D & F) Grazing was generally maintained at 553 head of cattle.

However, on May 5, 1998 the AOP for the Sacramento Allotment was amended to include for the first time a provision that exclosures were incorporated into the grazing permit, which "officially excluded livestock grazing activities." Goss Decl. ¶ 40, Exhibit 8. Further, the amendment requires that SGA promptly "remove livestock from these areas when they are found inside an exclosure," and failure to do so is a violation of grazing permit which could result in possible suspension or cancellation. *Id.* This effectively precluded use by SGA of the following water sources, all of which are owned by SGA: Penasco Head Waters, Charles Spring, Water Canyon Spring, Bluff Springs, Bluff Springs West, 3 Hubble Springs, Mauldin Springs (Wills Canyon), West Mauldin, Bluff North Springs, Kingsbury Springs, and Sacramento Lake. *Id.*

On November 23, 1999, the USFS issued SGA Grazing Permit No. 08-1250 for an additional 10 years. *See* Defendant's Exhibit C to Motion for Summary Judgment. This permit for the first time addressed the exclosures in the USFS management practices for the allotment and states that "[e]xclosures designated on the attached Sacramento Allotment Range Improvement/Allotment Map are considered special emphasis areas and not part of the Sacramento Allotment. *Livestock use is not permitted* within the exclosures and will be removed in a timely manner." *Id.* at p. 6 (emphasis added). Thereafter, the AOIs for the Sacramento Allotment contained a provision that plant exclosures described in the Term Grazing Permit are closed to grazing. This excluded approximately 264 acres from the allotment. Frank Martinez Declaration at ¶ 14, Exhibit A to Defendant's motion for Summary Judgment.

After the May 5, 1998 exclusion of these vested water sources, SGA made several inquiries into accessing water within the exclosures, not only to allow cattle access to the water, but also attempts to transfer water from the exclosures to other areas within the Allotment. Goss Decl. ¶ 41, Exhibit 9. ("We have asked many times that you allow our cattle to access our water right to water on the Sacramento River and the Penasco Headwaters."). The Gosses beginning in 1998 made annual requests to use the Penasco head waters and were denied by Max Goodwin, Rick Newman and Frank Martinez. Goss Decl. ¶ 14. The denial by the USFS of the use of the exclosures was both a denial of use of water and a denial to move water to accessible areas. Given the determinations by the USFWS with regard to the endangered species in the Recovery Plan, movement of the water outside the exclosures was not a viable or feasible option. Van Zandt Decl ¶ 4, Exhibit B, p. 11.

On or about October 12, 2000 SGA requested permission to transfer water out of the Penasco exclosure. Goss Decl. ¶ 17. In a letter dated October 16, 2000, Assistant Regional Attorney, Mary Ann Joca, informed SGA that the "Upper Penasco Exclosure which may have formally been a livestock trap is no longer available for the rounding up of cattle," even though this use was previously allowed. Goss Dec. ¶ 37, Exhibit 5. Anytime SGA cattle were found within one of the exclosures, even if through the fault of the USFS, the USFS immediately sent a notice of non-compliance and ordered to remove the cattle or face potential suspension or cancellation of the grazing permit. *See* Exhibits Goss Decl. ¶ ¶ 42, Exhibit 10, 43, Exhibit 11. The USFS took these actions despite the fact that the fences designed to exclude cattle, which are the responsibility of USFS, are frequently in disrepair. *Id.* At one point the inadvertent presence of cattle in the enclosure prompted a suspension of 20% of SGA's livestock numbers ( Goss Decl. ¶ 45, Exhibit 13 which was later withdrawn (Goss Decl. ¶ 46, Exhibit 14).

SGA acknowledged they could not graze in the exclosures, and requested access to water only, not forage. Goss Decl. ¶ 19. This was explained in a May 29,

2002 letter to Frank Martinez where Frances Goss stated that:

> having our water fenced off from the cattle that are passing through our south summer pasture has forced us to open the gate on the river as we are daily keeping track of the cattle as they move to maintain pastures. *We are not trying to graze cattle exclosures* you have exclosed on our allotment, and we have taken cattle off as soon as they came up as the weather warmed up and they began to drift. (emphasis added).

Goss Decl. ¶ 47, Exhibit 15. Again on June 16, 2002 Frances Goss explained that because the USFS has fenced off the Sacramento River leaving the cattle no place to water, SGA had to open the gate "in order to access water right . . ." Goss Decl. ¶ 48, Exhibit 16. Later that month Justin (Spike) Goss participated in an inspection of the allotment with the USFS. He explained the presence of cattle in an exclosure was because "it was the only water available" for the cows. Further, the possible option of providing water outside the exclosure was discussed. Goss Decl. ¶ 18, 49, Exhibit 17. SGA explained that they had a right to access water while holding cattle in a trap and they were "not intentionally grazing the exclosure." Goss Decl. ¶ 50, Exhibit 18.

In 2001, SGA was instructed by the USFS to move cattle into a pasture across the road approximately 400 feet from the Penasco headwaters. Goss Decl. ¶ 18. This pasture has no water source, and in order to provide water to the relocated cattle, SGA requested to pipe its water at its own expense from the Penasco headwaters approximately 400 feet through a culvert to the other pasture. The USFS was fully aware of the impact to SGA's operation by denying access to their vested water rights. In a letter to Frank Martinez dated September 20, 2001, SGA explains that

> we asked to pipe water at our expense from our own water right, across our allotment only 400 feet through a culvert beneath a road that would keep us from having to haul water to the cattle. Even though you told us you had no problem with that, someone at the Forest Service did and we were refused this request. . . . After your refusal, we leased pasture on Fennimore Canyons and Karr Canyon adjoining our Atkinson pasture and sawmill Canyon and purchased water to water our cattle [resulting in ] great monetary expense to us as well as very much added man power to keep our cattle operation a float.

Goss Decl. ¶ 51, Exhibit 19. On September 13, 2001 Frank Martinez denied Plaintiffs'

request to pipe water at the Penasco headwaters. *Id.* On June 20, 2002 in a telephone conversation with Frank Martinez, SGA explained they owned the water in the Rio Penasco enclosure and the USFS needed to make provisions to transfer the water to an accessible area. Goss Decl. ¶ 20. In the summer of 2002 Otero County Deputy John Braziel witnessed Bobby Gomez, USFS Law Enforcement Officer, closing the gate to the Pensaco exclosure. He informed the Mr. Gomez that closing the gate and preventing the cattle access to water is cruelty to animals. The gate was left open, however the USFS continued to threaten non-compliance if cattle were found within the exclosure. Goss Decl. ¶ 22. On June 16, 2006, SGA again discussed with the USFS the opportunity to pipe water out of the Penasco exclosure. Goss Decl. ¶ 52, Exhibit 20. Finally, on February 19, 2007, SGA again requested permission to transfer water from the Penasco exclosure to an accessible area of the Allotment, this time requesting the ability to move the water into a drinker in Atkinson Canyon. Goss Decl. ¶ 23, 53, Exhibit 21.

On June 16, 2006, SGA met at the Sacramento Exclosure with Frank Martinez, Lou Woltering, Forest Supervisor, Mr. Doug Moore and Mr. Mike Nivison, Otero County Commissioners, and Dr. Redd Baker and Dr. John Fowler of the Range Improvement Task Force ("RITF"), as well as neighboring allotment owners. Goss Decl ¶ 52, Exhibit 20. There was agreement among all parties, including Frank Martinez, to move the west fence of the Sacramento exclosure back a few hundred feet to allow access for cattle. The fence was to be constructed the following week. However, Mr. Martinez inexplicably contacted an environmental group the Forest Guardian, that had filed a 60 day citizen suit notice against the USFS. Goss Decl. ¶ 64 Exhibit 32, 41, 54, Exhibit 22. Mr. Martinez changed his mind, not allowing the movement of the fence, and thus

continuing to deny access to the water. Goss Decl. ¶ 52, Exhibit 20.

On May 13, 15, and 19 of 2008 there were a series of meeting held between SGA, USFS, Otero County Commissioners, and the RITF regarding cattle access to water on Sacramento Lake. Goss Decl ¶ 30. SGA wanted the gates to remain open so cattle would have access to the water. At the May 13, 2008 meeting Gary Zieh agreed to leave the gate open. However, at the May 15, 2008 meeting Mr. Zieh of the USFS stated that New Mexico Game and Fish would not allow the gates to remain open. Initially USFS closed the gate and decided to haul water from Sunspot Observatory to a trough near the Sacramento exclosure. This only lasted 2-3 weeks. Then, USFS decided to implement a suggestion by Forest Supervisor Jackie Buchannan and construct a lane to allow cattle to access water at Sacramento Lake. The lane was constructed on the west end of the Lake and provides an approximate 40 foot access to the water without the cattle grazing within the exclosure.

During the time the Gosses have grazed the Sacramento Allotment the number of cattle has been systematically reduced from 553 head to a low of 230 in 2003 and 2004-2005. Goss Decl. ¶ 28. These determinations to reduce numbers has led to numerous appeals by SGA, ultimately leading to this takings action. The 2004 AOI for the Sacramento Allotment states that the "Forest service does not recognize any 'easement' associated with water rights upon which you have recently filed declarations. As a result, no clearing of trees or excavation associated with said easements are authorized without approval by the District Ranger." Exhibit Goss Decl. ¶ 55, Exhibit 23. In 2005 SGA again complained to the USFS, opposing the AOP for 2005, and informing the USFS that SGA owns the water rights on the spring that is piped to the watering trough in the Penasco corrals, as well as an easement to maintain water rights. Goss Decl. ¶ 56, Exhibit 24. At a June 16, 2006 meeting, Forest Supervisor Lou Woltering stated that the Forest service owns the water within the Sacramento Exclosure. Goss Decl. ¶ 28.

As the Gosses were put under increasing pressure by the new LNF management structure, their business began steadily to decline in profitability. The result is that the Gosses own a host of documented, vested water rights that they cannot use because the USFS has physically prevented SGA from accessing the water rights and has systematically refused to allow transfer of the water rights to other assessable areas. It is this limitation, the prohibition of the use of vested rights, that forms the core of the Goss's complaint before this court.

## IV. ARGUMENT

The Defendant here does not challenge SGA's contention of ownership of vested water rights in the Sacramento Allotment prior to the establishment of Lincoln National Forest for purposes of summary judgment. *See* Summary Judgment Motion at p. 8. Nor could they. *See United States v. New Mexico*, 438 U.S. 696 (1978).**2** Plaintiffs have provided the Court with an extensive description of the chain of title and declaration of water rights associated on the grazing allotments in this case. *See* Declaration of Francis Goss filed with Plaintiffs' Opposition to Defendants Motion to Partially Dismiss on November 22, 2004 (Doc. No. 12.). There is no genuine issue of material fact related to whether or not the SGA owns vested water rights. *See Anderson* v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) (All reasonable inferences and presumptions must be resolved in favor of the non-moving party). Since vested rights exist, the United States can extinguish them only after paying just compensation. *Lucas v. South*

---

2 *United States v. New Mexico*, 438 U.S. 696 (1978) is a general adjudication of water rights on the Rio Mimbres River in New Mexico. The United States claimed reserved water rights in the Rio Mimbres for use in the Gila National for the purposes of recreation, aesthetics, wildlife-preservation, and cattle grazing. The Supreme Court found that Congress intended national forests to be reserved for only two purposes -- to conserve the water flows, and to furnish a continuous supply of timber for the people; and not for aesthetic, environmental, recreational, or wildlife-preservation purposes. *Id.* at 707-708. Further, Congress did not intend for "the Forest Service to allocate water for stockwatering purposes, a task to which state law was well suited." *Id.* at 717. Finally, "Congress has assured that the waters which flow through national forests are available for use by state appropriators by authorizing rights-of-way for ditches to carry the water to agricultural, domestic, mining, and milling uses." *Id.* at 713.

*Carolina Coastal Council,* 505 U.S. 1003, 1015 (1992); *Bradshaw v. United States*, 47 Fed. Cl. 549, 552 (2000). Further, the Defendant acknowledged the presence of the exclosures, which occupy 264 acres of National Forest land. (*See* Declaration of Frank R. Martinez, Exhibit A to Defendant's Motion for Summary Judgment) Since May 5, 1998 the Defendant has fenced off and otherwise denied SGA's access to the following vested water sources: Penasco Head Waters, Charles Spring, Water Canyon Spring, Bluff Springs, Bluff Springs West, 3 Hubble Springs, Mauldin Springs (Wills Canyon), West Mauldin, Bluff North Springs, Kingsbury Springs, and Sacramento Lake. Further, SGA has been prevented from using the Alamo pasture after February 1 since 2005 for the protection of Sacramento Mountains prickly poppy.

The Court must therefore determine the scope of the water rights, and whether government's actions have deprived SGA of those rights. *Bradshaw*, 47 Fed. at 552-553. Regarding the scope of the water rights, it is the Mining Act of 1866 that provides SGA's water rights based on state law. *See* Act of July 26, 1866, ch. 262, § 9, 14 Stat. 251, 253 (codified at R.S. § 2339, recodified at 43 U.S.C. § 661). The 1866 Act confirms three possessory rights: (1) the right to the use of water for mining, agricultural, manufacturing, or other purposes, (2) a right of way for the construction of ditches and canals for the purposes specified, and (3) a right-of-way away across public land. *Broder v. Water Co.,* 101 U.S. 274, 275 (U.S. 1879); *Bradshaw*, 47 Fed. Cl., at 552-553. The scope of these rights is a matter of New Mexico State law. *See Walker v. United States*, 69 Fed. Cl. 222, 229 (Fed. Cl. 2005)

> Therefore, as a matter of federal law, the law of the Territory of New Mexico and the law of the State of New Mexico, local customs, laws, and the decisions of courts, governs the determination, validity, scope, and nature of Plaintiffs' alleged water, access, and forage rights in the Allotments at issue in the Gila National Forest, including the appropriation of non-reserved water on land reserved from the public domain.

Water rights in New Mexico are based on the doctrine of prior appropriation for beneficial use. N.M. Const. Art. XVI, §§ 1 & 2. Use of water for domestic purposes,

including stock watering, is a beneficial use of water in New Mexico. *First State Bank of Alamogoro v. McNew*, 33 N.M. 414, 414, 269 P. 56, 56 (1928); (Overruled in part) *Walker v. United States,* 142 N.M. 45, 56;162 P.3d 882, 893 (2007). Water rights are treated as real property, *Posey v. Dove*, 57 N.M. 200, 210 , 257 P.2d 541, 547 (N.M. 1953), and are a separate and independent property interests, the ownership of which is not dependent on possessing an interest in an associated surface estate. *Walker,* 142 N.M. at 54, 162 P.3d at 891.

The predecessors-in-interest of the Goss Family entered upon and were in possession of the area now known as the Sacramento Grazing Allotment in the 1880s, before the Lincoln National Forest was reserved. *See* Goss Decl. ¶ 4. The chain of title to the property and water rights held by the SGA establishes the predecessors in interest of the SGA held water rights as far back as the 1880's. *Id.* For evidence of the chain of title in this case SGA points the court to the Appendix of Exhibits to Plaintiff's Memorandum in Opposition to Defendant's Motion To Dismiss (Doc No. 12), which sets forth an exhaustive a chain of title in this case that includes range rights and water rights now associated with the Sacramento Grazing Allotment. Further, the Declarations of Ownership of Water Rights Perfected Prior to March 19, 1907 (Goss Exhibit 25) filed with the New Mexico State Engineer are prima facie evidence of ownership of such rights. NMSA § 72-1-3.3

The key issue here is whether the governments actions have deprived SGA of vested water rights. The Defendant argues that SGA has no property interest in forage, therefore the government restrictions on grazing cannot constitute a taking of water rights. However, the Defendant's actions in fencing off water sources, denying SGA's repeated request to access the exclosures (for water and not forage) and requests to

3 NMSA § 72-1-3.3 states that "[s]uch declarations so filed shall be recorded at length in the office of the state engineer and may also be recorded in the office of the county clerk of the county wherein the diversion works therein described are located. Such records or copies thereof officially certified shall be prima facie evidence of the truth of their contents."

transfer the water clearly amounts to a deprivation of property. It is a physical taking, and SGA's Cross-Motion for Summary Judgment should be granted. Further, the Defendant has appropriated the water for its own purposes, and transferring the water out of the exclosures would violate the USFWS requirements for the protection of riparian areas, habitat and endangered species within the enclosures. 16 U.S.C. §1538

The Defendant's arguments fail to address the split estate concept of water rights. The actions by SGA, who still maintains a valid grazing permit, clearly show they have an interest in the water in the exclosures separate and distinct from any interest in grazing within the exclosures. Therefore the Defendant's Motion for Summary Judgment should be denied.

## A. THE SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c). The burden of demonstrating the absence of any genuine issue of material fact is on the party moving for summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (holding that the moving party may meet its burden "by 'showing'--that is, pointing out to the [trial court] that there is an absence of evidence to support the nonmoving party's case."). A trial court is required to resolve all doubt over factual issues in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1987); *see also Caterpillar, Inc. v. Deere & Co.*, 224 F.3d 1374, 1379 (Fed. Cir. 2000) ("When ruling on a motion for summary judgment, all of the nonmovant's evidence is to be credited, and all justifiable inferences are to be drawn in the nonmovant's favor."); *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed. Cir. 1995) (requiring the trial court to view the evidence in a light most favorable to the non-moving party and to draw all reasonable inferences in favor of the non-moving party).

A dispute over a material fact is "genuine" where a reasonable fact-finder could find for the non-movant. *See Anderson*, 477 U.S. at 247-48. Once the moving party demonstrates the absence of a genuine issue of material fact, however, the burden shifts to the non-movant to show the existence of a genuine issue for trial. *See Novartis Corp. v. Ben Venue Labs.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001) (explaining that, once the movant has demonstrated the absence of a genuine issue of material fact, "the burden shifts to the non-movant to designate specific facts showing that there is a genuine issue for trial."). However, "a non-movant is required to provide opposing evidence under Rule 56(e) only if the moving party has provided evidence sufficient, if unopposed, to prevail as a matter of law." Saab *Cars USA, Inc. v. United States*, 434 F.3d 1359, 1369 (Fed. Cir. 2006).

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed. Cir. 1988) (*citing Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed. Cir. 1987)). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689, 692 (4th Cir. 1968), (cert. denied, 393 U.S. 1083 (1969)); *see also B.F. Goodrich Co.,* 245 F.3d 587, 593 (6th Cir. 2001); *Massey v. Del Labs., Inc.*, 118 F.3d 1568, 1573 (Fed. Cir. 1997). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. *B.F. Goodrich Co. v. United States Filter Corp.*, 245 F.3d at 593; *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000); *Allstate Ins. Co. v. Occidental Int'l, Inc.,* 140 F.3d 1, 2 (1st Cir. 1998); *Reading & Bates Corp. v. United States*, 40 Fed. Cl. 737, 748 (1998). The court must evaluate

each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration or otherwise stated in favor of the non-moving party. *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1322 (Fed. Cir. 2001); *see also Gart v. Logitech, Inc.*, 254 F.3d 1334, 1338-39 (Fed. Cir. 2001) (cert. denied, 534 U.S. 1114 (2002)).

## B. FIFTH AMENDMENT TAKINGS LAW

The Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." *U.S. Const. amend. V.* This has been interpreted to mean that the government owes compensation whenever it takes private property rights, whether by regulation or by physical presence on the land. *See e.g. Hendler v. United States*, 952 F.2d 1364, 1373-74 (Fed. Cir. 1991). In a takings case, the Court must determine the following issues: whether a plaintiff holds the claimed property rights; the scope of those rights; and whether governmental action has deprived the plaintiff of those rights. *Bradshaw* 47 Fed. Cl. at 552; *See also Store Safe Redlands Associates v. United States*, 35 Fed. Cl. 726, 728 (1996). "The Fifth Amendment does not prohibit the government from taking its citizens' property; it merely prohibits the government from taking property without paying just compensation." *Miller v. Campbell County*, 945 F.2d 348, 352 (10th Cir. 1991).

There are two types of takings; physical takings and regulatory takings. The Supreme Court has made it clear that a "physical taking occurs when the government's action amounts to a physical occupation or invasion of the property, including the functional equivalent of a 'practical ouster of [the owner's] possession.'" *Transp. Co. v. Chicago*, 99 U.S. 635, 642, (1878); *See also Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 430 (1982). When an owner has suffered a physical invasion of his property, courts have noted that "no matter how minute the intrusion, and no matter how weighty the public purpose behind it, we have required compensation." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992); see also *Tulare Lake Basin Water*

*Storage Dist. v. United States*, 49 Fed. Cl. 313, 318 (2001); *Hage v. United States*, 51 Fed. Cl. 570, 576 (Fed. Cl. 2002) A permanent physical occupation constitutes a per se taking, "without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." *Loretto,* 458 U.S. at 434. "A physical taking occurs when the government actually seizes or does the equivalent of seizing the property." *Store Safe Redlands Assocs.* 35 Fed. Cl. at 728.

A taking may occur as a result of a regulatory action that is neither a physical invasion nor a physical restraint by the government when the regulatory action goes "too far." *767 Third Ave. Assoc. v. United States*, 48 F.3d 1575, 1580 (Fed. Cir. 1995) (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)). When regulation "denies an owner economically viable use of his land," the regulation has gone too far. *Lucas*, 505 U.S. at 1016. In addition, there are two categories of per se taking. "The first encompasses regulations that compel the property owner to suffer a physical invasion of his property." *Lucas*, 505 U.S. at 1015. The second situation is when the regulation "denies all economically beneficial or productive use of the land." *Id.*

**C. PLAINTIFFS CROSS MOTION FOR SUMMARY JUDGMENT**

The remaining issues in this case are not about denying access to forage in areas near vested water sources as asserted by the United States; they are about denying use of the water itself, and denying the transfer of water to other parts of the allotments.[4] These are water rights vested under New Mexico law, a factual issue not in dispute (see discusion above). Here, the fencing off and denial of access to these vested water rights is a physical taking. The denial of the USFS of the numerous requests to move water also deprives SGA of all economic use of this water. Further, the Defendant has appropriated the water within the exclosures and in Alamo pasture

---

4 In *Walker v. United States*, 142 N.M. 45, 162 P.3d 882 (2007), the New Mexico Supreme Court determined that there is no forage right implicit in any vested water right or in any right-of-way for the maintenance and enjoyment of vested water rights. The parties in this case stipulated to this legal issue on July 26, 2007. (see Joint Status Report, Doc No. 27)

for its own use, ousting SGA and takings its water rights. SGA should not bear the sole burden of this deprivation of property in light of the significant public benefit the USFWS and USFA are attempting to achieve . *See Estate of Hage*, 82 Fed. Cl. at 208 ("The Fifth Amendment protects citizens by providing that if private property is taken for public use, those citizens should be justly compensated."). Summary judgment on this issue should be granted in favor of SGA.

### 1. The Use of Exclosures and Denial of Access to Vested Water Sources is A Physical Taking and Summary Judgment Should Be Awarded In Favor of SGA

On May 5, 1998 the Forest Service "officially" excluded the fenced water sources from the Sacramento Allotment and thereafter prevented access or transfer of this water. The extent of that physical occupation or whether SGA failed to inquire into moving the water is not an issue in determining the government's liability for physically taking the water right in the first instance (see discussion below).

> Once the fact of occupation is shown, of course, a court should consider the extent of the occupation as one relevant factor in determining the compensation due. For that reason, moreover, there is less need to consider the extent of the occupation in determining whether there is a taking in the first instance.

*Loretto,* 458 U.S. at 437-438. Here, there is sufficient evidence in the record that the government's actions have, as a matter of fact and law, occupied and physically prevented access to vested water rights. There is no genuine issue as to any material fact that a physical taking has occurred and the issue should be determined in a summary judgment proceeding. The issues of the taking of the ranch and just compensation can then more easily be addressed in a separate proceeding before this Court.

A physical taking occurs when the government's action amounts to a physical occupation or invasion of the property, including the functional equivalent of a "practical ouster of [the owner's] possession." *Transportation Co.,* 99 U.S. at 642. When an

owner has suffered a physical invasion of his property, courts have noted that "no matter how minute the intrusion, and no matter how weighty the public purpose behind it, we have required compensation." *Lucas* 505 U.S. at 1016; *See also Tulare Lake,* 49 Fed. Cl. at 318. "In short, when the character of the governmental action is a permanent physical occupation of property, cases have uniformly found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." *Loretto,* 458 U.S. at 434-435.

In New Mexico a water right is treated as real property. *Posey v. Dove*, 57 N.M. 200, 210, 257 P.2s 541, 547(N.M. 1953). A property right includes the right "to possess, use and dispose of it." *United States v. General Motors Corp.*, 323 U.S. 373, 378 (1945). "To the extent that the government permanently occupies physical property, it effectively destroys each of these rights." *Loretto*, 458 U.S. at 435. "In the context of water rights, a mere restriction on use -- the hallmark of a regulatory action -- completely eviscerates the right itself since plaintiffs' sole entitlement is to the use of the water." *Tulare Lake Basin*, 49 Fed. Cl. at 319. A physical taking is found where the government "physically appropriated or denied meaningful access" to SGA's water rights. *Washoe County v. United States*, 319 F.3d 1320, 1326 (Fed. Cir. 2003).

There are two important factors the Court must consider in this case. The first is that SGA at all times had a valid grazing permit on the Sacramento Allotment. Not only is the permit issued predicated on SGA having access to water, but the beneficial use of the water rights is for watering livestock only. Goss Decl. ¶ 57, Exhibit 25. Declarations of Ownership of Water Rights Perfected Prior to March 19, 1907) Second, after the May 5, 1998 amendment to the Allotment AOI, SGA repeatedly requested access to the water in the fenced exclosures, each was denied by the USFS. Goss Decl. ¶ 14, 17, 19, 20, 21, 25, 27, 29, Exhibit 19, 50, Exhibit 18, 47, Exhibit 15, 48, Exhibit 16, 53, Exhibit 21, 41, Exhibit 9. The requests were based on the need for SGA to provide

water to cattle from these fenced sources in order to effectively operate their ranching operation. SGA made clear there was no intent to allow the cattle to graze the exclosures but USFS still denied every request. Goss Decl. ¶ 47, Exhibit 15 (emphasis added). As explained by SGA, their operation is impacted by drought and having:

> water fenced off from the cattle that are passing through our south summer pasture has forced us to open the gate on the river as we are daily keeping track of the cattle as they move to mountain pastures. *We are not trying to graze cattle exclosures* you have exclosed on our allotment, and we have taken cattle off as soon as they came up as the weather warmed up and they began to drift.

May 29, 2002 letter from SGA to Frank Martinez. Exhibit Goss Decl. Exhibit 15. (emphasis added). By denying SGA's repeated requests for access, the USFS has compelled a property owner to suffer a physical invasion of property resulting in a per se taking. *Lucas*, 505 U.S. at 1015; *see also Foster v. United States*, 221 Ct. Cl. 412, 425 (1979) (Government's actions in denying repeated requests for access to public land and thereby denying plaintiffs use of their mineral rights, yet not condemning those property interests, constituted a permanent taking.)

This case is factually similar to a recent opinion in the case *Estate of Hage v. United States*, 82 Fed. Cl. 202 (Fed. Cl. 2008) ("*Hage V*"). In *Hage V*, a Nevada Rancher brought similar claims against the United States alleging that the Forest Service actively prevented them from accessing and maintaining their water rights; these actions amounted to a taking of their property and required just compensation. Among other issues, Hage argued that the government constructed fences around water sources and streams in which he had established a vested water right. These fences prevented Hage's cattle from accessing water *during the time in which cattle were still permitted to graze* on the allotments. The court determined that the government activity prevented access through the construction of the fences, "amounting to a 'physical ouster' which deprived Plaintiffs of the use of their property." *Hage V*, 82 Fed. Cl. at 211. The *Hage V* Court found:



1583639.1

that the Government's construction of fences around the water and streams amounts to a physical taking during the time period in which Plaintiffs' still had a grazing permit and their cattle had the right to water at these streams. *Id.*

Here, SGA has always maintained their grazing permit and at all times had a right to graze the Sacramento Allotment. And like *Hage* the government constructed fences which amounted to "physical ouster" depriving SGA of the use of its water right. This is a taking regardless of "whether the action achieves an important public benefit or has only minimal economic impact on the owner." *Loretto*, 458 U.S. at 435. The fact that the exclosures have prevented access to vested water rights is not in dispute, and the construction of fences along with the systematic denial of access to vested water rights is a physical taking. Therefore, SGA's Cross Motion for Summary Judgment on the issue of whether there was a taking in this case should be granted.

**2. The Government Has Taken The Water in the Exclosures for Its Own Purposes Effectuating a Physical Taking**

The primary reason the exclosures were built and SGA was prohibited access is for the protection of *Cirsium vinaceum* (Sacramento Mountains Thistle) ("cirsium"), which is dependent on the water and riparian habitat located within the exclosures.5 Transferring the water out of the exclosures will not be permitted because of the USFWS requirements for the protection of cirsium and its riparian habitat. All of the water in the exclosures is needed for the protection of cirsium. "This plant is dependent on springs or streams. Reduction or removal of this water supply would reduce or eliminate the populations." Final Rule Listing Cirsium, 52 FR 22935, June 16, 1987, Goss Decl. ¶ 35.

[M]onitoring of thistle has shown a simple and direct relationship between water availability in suitable habitat and numbers and extent of plaints in occurrences (Forest Service 2003a). As water flow has been observed to decline at springs, decreases in

5 The Secretary of the Interior under the Endangered Species Act could have purchased the water rights within the exclosuers for the protection of cirsium after it was listed in 1987. 16 U.S.C. 1534(a)(2)

plant numbers and the size of site have occurred.

February 4, 2004 Biological Opinion at p. 63, Van Zandt Decl. ¶ 5. Even before cirsium was listed, there was a concern by the USFS in 1983 that development of spring sources would be detrimental to the plant. Goss Decl. ¶ 58. The USFS recognized that "[w]ater rights problems present a continuing threat to the cirsium," and believed they "have sufficient control over water development to require [ ] restriction." Goss Decl. ¶ 59, September 26-27 Lincoln National Forest Trip Report at p. 3.

The major threat to the Sacramento Mountains thistle is the potential appropriation and development of water rights directly from spring habitat . . . The Forest Service has some control through special use permits on how springs will be developed on the Lincoln national Forest. Water rights can be acquired without threat to Sacramento Mountains thistle springs habitats if the point of diversion is immediately below the spring.

Sacramento Mountains Thistle Recovery Plan, U.S. Fish and Wildlife Service, 1993 ("Recovery Plan") at p. 4., Van Zandt Decl. ¶ 4Exhibit B. Thus, SGA will never be granted permission to access or transfer water out of the exclosures because it would have an adverse effect on recovery of cirsium and would be an unlawful take of an endangered species under the ESA. 16 USC § 1538(a); *See* October 20, 1991 letter to Hollis Munson, President SGA from Samuel J Tobias, Acting District Ranger (Goss Decl. ¶ 60Exhibit 28) (indicating that "[t]he presence of Sacramento Thistle in Water Canyon and within the exclosure make it very difficult to use without complications.")

The concern related to impacts from cattle on *cirsium* is not limited to foraging, there is also a concern about livestock using the *cirsium* habitat for watering.

> C. vinaceum is associated with water and riparian habitats. These habitats typically represent key areas which livestock select for use at rates that are higher than upland forage areas. It is therefore reasonable to assume that cattle will use sites with water and riparian habitat and come into contact with C. vinaceum at some level. The main waters and riparian habitat on Sacramento allotment are typically the same areas that C. vinaceum occupies.

May 8, 1992 Sacramento Allotment Interim Summer Grazing Plan, Section II.A, Van Zandt Decl. ¶ 7 Exhibit E. "Trampling is associated with livestock usage of riparian (thistle) habitat and may represent a greater threat to this species than grazing. Livestock tend to concentrate in riparian areas from May through July when these areas are the major source of water (USDA, 1992a)" January 6, 1995 USFWS Formal Consultation at p. 6., Goss Decl. ¶ 61 Exhibit 29; *see* also February 11, 1983 letter from James R. Abbott, Forest Supervisor to USFWS (Goss Decl. ¶ 62 Exhibit 30) (indicating the conflict with grazing is that "[l]ivestock and wildlife roam at will and utilize habitat for watering.").

The United States owns no water rights within the exclosures in Lincoln National Forest. *See United States v. New Mexico*, 438 U.S. 696, 707-708 (1978) (Congress did not intend national forests to be reserved for aesthetic, environmental, recreational, or wildlife-preservation purposes.); *see also United States v. Rio Grande Dam & Irrigation Co.*, 9 N.M. 292, 303 , 51 P. 674, 677-678 ((N.M. 1898); reversed on other grounds in *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690 (1899)) (The riparian rights of the United States were surrendered in 1866. R. S., sec. 2339.). The United states does not acquire any water rights on the public land through ownership, control, or management of grazing or other resources. *See Joyce Livestock Co. v. United States* (In re SRBA Case No. 39576), 144 Idaho 1, 18, 156 P.3d 502, 519 (Idaho 2007).

This left the Defendant with two options, either appropriate water under New Mexico law for the benefit of the plant, or control the use of water in the area of the cirsium habitat. These options were spelled out in the Recovery Plan which requires action to "[d]evelop and implement a policy for spring development on Lincoln National Forest and acquire water rights to springs if in-stream flow legislation is ever passed in New Mexico." Recovery Plan Executive Summary at p. iii., (Van Zandt Decl. ¶ 4 Exhibit B. However, the Recovery Plan recognized that New Mexico, unlike many western states, does not recognize beneficial use of water for in-stream flows. Because the

Forest Service could not implement its highest recovery priority of acquiring "water rights for the purpose of maintaining travertine habitat and protecting at least 30 percent of the spring localities, including at least one occupied spring in each of the 20 occupied main canyon systems", as planned, it was forced to control the water source physically in order to protect cirsium. Van Zandt Decl. ¶ 5 Exhibit C. It elected to "ensure permanent protection for the thistle in at least 75 percent of the known occupied habitat, both spring and riparian sites, under established management plans." *Id.* Thus, to control the water source, Defendant constructed exclosures and denied all access to the water, appropriating the water for its own purposes. This is a physical taking of SGA's vested water rights.

The Defendant argues, citing to *Colvin Cattle Co. v. United States*, 468 F.3d 803 (2006), ("Colvin"), that the United States is not liable for the use of water by endangered species and/or elk. *See* Summary Judgment Motion at p. 17. In *Colvin*, a Nevada rancher brought a claim of taking of vested water by the government allowing wild horses to infringe on his water rights. The court found that "because wild horses are *outside the government's control*, they cannot constitute an instrumentality of the government capable of giving rise to a taking." (emphasis added). *Colvin* did not involve the fencing off of water rights for the protection of endangered species.

Here the protection offered by the USFS for the cirsium plant is protection by way of control or ownership of the plant species by excluding access to its habitat, including SGA's vested water sources. The exclusion of SGA from its water source for use in protecting the Sacramento Mountains thistle is a taking.

### 3. The Government Has Taken SGA's Water Rights in The Alamo Pasture

The Environmental Review for the Sacramento, Dry Canyon and Davis grazing allotments included potential impacts to the Sacramento Mountains prickly poppy (*Argemone pleiacantha* ssp. *pinnatissecta*) ("prickly poppy"), which was listed as an

endangered species on August 24, 1989 (54 FR 35302). *See* Biological Opinion at p. 21, Van Zandt Decl. ¶ 5 Exhibit C. The Alamo and Cabellero Canyons in SGA's Sacramento Allotment contain the vast majority of the prickly poppy. *Id.* at 24. Threats to the prickly poppy include livestock use, "which reduces the moisture holding capacity of the soils" and water extraction. *Id.* at 33. The ROD requires the removal of "livestock from the Alamo Pasture by February 1 for two years to protect Sacramento Mountains prickly poppy." ROD at p. 7, Van Zandt Decl ¶ 6 Exhibit D.

Starting in 2004 SGA was unable to access its water rights on the Alamo Pasture after February 1. Goss Decl ¶ 11. This includes, but is not limited to, the following water sources: Upper Alamo #1, Mud Springs, Caballero #1, Caballero #2, Caballero #3, Wood Spring #1, and Wood Spring #2. *Id.* SGA can only access these water right from November 1 to January 31, thus preventing access when the water is most abundant during the spring runoff from snow melt. ROD at p. 7, Exhibit 11; see also Van Zandt Decl. ¶ 6 Exhibit D. Although the prohibition was only to last for two years, it still remains in effect. *Id.*

As discussed above, when the government takes water for its own purposes and deprives the use of the rightful owner, there has been a physical taking. *See Washoe County* 319 F.3d at 1325-1326. Here, as with the Sacramento Mountains thistle there is a conflict between the riparian areas that are the habitat for the endangered species and also the source of water for the cattle. *See* Biological Opinion at p. 33, Van Zandt Decl. ¶ 5 Exhibit C. ("Canyon-bottom riparian areas provide increased levels of livestock forage and represent the majority of the suitable acres within the Alamo pasture . . . These sites are believed to be the enhanced-moisture habitat that are most favorable to seedling establishment of the poppy."). Not only has the Defendant taken the water for its own use, is has prevented SGA from accessing its water, which is the "functional equivalent of a practical ouster of [the owner's] possession.'" *Transp. Co. v. Chicago*, 99 U.S. 635, 642, (1878); *See also Loretto v. Teleprompter Manhattan CATV Corp.*, 458

U.S. 419, 430 (1982). In order to protect the endangered species, the Defendant has prevented SGA's access to its water rights, and thus taken its water rights. *See Tulare Lake Basin v. United States*, 49 Fed. Cl. 313 (Fed. Cl. 2001) (California water users right to the use of water was taken from them when defendant United States imposed water use restrictions under the Endangered Species Act.)

### D. OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

As discussed above, the Defendant precluding and denying access to vested water rights for the protection of an endangered species is a taking, which alone is sufficient to show there are genuine disputes as to material facts asserted by the Defendant in this case, and that Defendant's Motion for Summary Judgment should be denied. These actions by the Defendant go far beyond restrictions on grazing and impact water rights directly. SGA realizes that "[i]n order for Plaintiffs' claim to succeed, they must establish a taking of their property that is not related to the cancellation of grazing permits." *Estate of Hage* 82 Fed. Cl. at 210. But since there has been no cancellation of grazing permits, this concept does not apply. This however does not mean that the government can prevent access to the water separate and distinct from grazing, or prevent the water right owner from transferring the water to a location outside the exclusure where it can be beneficially used. Here, SGA has always had a valid permit to graze the allotment, and its ability to beneficially use the water is not in question. The Defendant's actions raise undisputed material facts as to whether the government regulation has effectuated a taking. Therefore, the Defendant's Motion for Summery Judgment should be denied.

#### 1. The Government Has Restricted Not Just Grazing, But Also Access to Water in The Enclosures Where SGA Owns A Vested Water Right

The First Amended Complaint Filed on September 6, 2005 directly alleges the Defendant has physically taken SGA's water rights. *See* Amend. Compl. ¶ 27. A; see

also ¶ 25 Q. ("Defendant has prevented plaintiffs from using certain water sources, as listed in Exhibit "A" to this First Amended Complaint, and from making lawful improvements necessary to transport water from lawful point of diversion to a lawful point of use.")**6** Defendant argues that "because Plaintiffs do not possess a compensable property right to graze cattle on the allotment, and grazing restrictions that allegedly impact Plaintiffs ability to bring cattle directly to the water source located on the allotment cannot form the basis of plaintiffs' claim that their water rights have been taken." *See* Defendant's Motion for Summary Judgment at p. 12. Included in the Defendant's definition of restrictions on grazing is "fencing off particular areas from grazing in order to protect endangered species." *Id.* at 11. However, what the Defendant fails to realize, as discussed above, the restrictions on the exclosures were more than grazing restrictions, they were restrictions to use the water right itself in any manner or in any place.

Under New Mexico law, except in the context of irrigation, a water right is separate and distinct from a right to the surface estate. *Walker 142 N.M at 53-54,* 162 P.3d 890-91; *Hydro Res. Corp.*, 173 P.3d at 755; see also *Walker v. United States*, 69 Fed. Cl. 222, 229 (2005) ("under New Mexico law, the water rights alleged in the Complaint are separate and independent property interests, the ownership of which is not dependent on possessing an interest in an associated surface estate."). Thus, the Defendant's argument that restrictions on grazing cannot constitute a taking of SGA's water right does not adequately address the claim for taking of the water rights which exist independently of any permit to graze provided by the federal government.

For the same reasons, the Defendant's citation to this Court's determination in

6 Defendant's statement that Plaintiffs admit that they have never tried to access their alleged water rights absent their demand to graze cattle on the Allotment . . ." is false. Defendant's Motion for Summary Judgment at p. 14, FN 9. SGA denied this very position because "Defendant has caused exclosures to be constructed around water sources where plaintiffs own water rights under New Mexico law, thus preventing access by plaintiffs and their cattle to make beneficial use of the water." Pls.' Response to Request for Admission 1.

*Walker v. United States*, 79 Fed. Cl. 685 (2008) is unavailing. The fact that this Court in *Walker* ultimately found that cancellation of the term grazing permit did not place any limitation on the Walker's alleged water rights, does not aid the court in this matter. *Id.* at 705. Here, SGA has a valid permit to graze and did not take "the risk of either forfeiting their water right through non-use or being forced to transfer, lease, or sell that right." *Id.* at 706; see also *Walker*, 142 N.M at 55, 162 P.3d at 892. In fact, SGA has always had the right to graze and currently grazes the allotment. Counter to claims by the Defendant, this fact does not make SGA's argument more tenuous. Given New Mexico's split estate approach to water rights, and SGA's continuing ability to graze the allotments, the only thing preventing beneficial use of the vested water rights within the exclosures are the fences and the Defendant's refusal to either allow entry to access the water or to transfer the water outside the exclosures to a place of beneficial use.

The facts here are more in line with the facts in *Hage V* where the court distinguished between the cancellation of a grazing permit where "the Government did not prevent the Plaintiff from accessing their water," and the active prevention of allowing access to water rights. *See Hage V*, 82 Fed. Cl. at 211. The *Hage V* court cites to *Colvin*, 468 F.3d at 807, a case where the grazing permit was cancelled, and distinguishes the Hage's facts because

> the Government . . . actively prevented them from accessing the water through threat of prosecution for trespassing and through the construction of the fences. Clearly, these actions prevented Plaintiffs' access to the water and there was plainly a 'physical ouster' which deprived Plaintiffs of the use of their property.

*Id.* The same distinction is made in *Colvin*, where the court finds that "[a]lthough Colvin may no longer access the allotment for grazing purposes, *the government has not impeded its access to water.*" *Colvin,* 468 F.3d at 806 (emphasis added). In fact, this Court in *Walker* notes the same distinction and finds that "[c]ancellation of Plaintiffs' grazing permit also did not place any limit on Plaintiffs' alleged right to certain water sources." *Walker*, 79 Fed. Cl. at 706. Here, the Defendant has impeded, actively

prevented, and limited SGA from accessing the water rights both through physically fencing the water as well as systematic denials of access to the water, including denying requests to move the water out of the exclosure. Moreover, given the USFS obligations under the Endangered Species Act with regard to the protection of the thistle and poppy, requests for movement of the water would be futile.

**2. The Defendant Has Unreasonably Limited Access to SGA's Water Rights**

Defendant misunderstands the split estate concept and SGA's right to access it's vested water rights. According to Defendant the "[p]laintiffs could not have a reasonable expectation that they would have unlimited access to their alleged water rights." Motion for Summary Judgment at p. 15. To support this proposition, Defendant cites to the Property Clause, which gives Congress the power "to dispose of and make all needful Rules and Regulations respecting the territory or other Property belonging to the United States." U.S. Const. art. IV, §3, cl.2. What the Defendant fails to understand is that the Congress confirmed to SGA and its predecessors a right to access and use its vested water right. 43 U.S.C. § 661 In the Mining Act of 1866 Congress confirmed that water rights established pursuant to state law are rights the government is bound to protect for the benefit of the settlers who appropriated such water. *Broder v. Natomas Water Co.*, 101 U.S. 274, 276 (1879); *Jennison v. Kirk*, 98 U.S. 453, 456-457 (1878); *see also* Federal Land Policy Management Act (FLPMA), 43 U.S.C. §§ 1769(a) ("Nothing in this subchapter shall have the effect of terminating any right-of-way or right-of-use heretofore issued, granted, or permitted"). Stock watering is a beneficial use of water in New Mexico, and SGA has a reasonable expectation to continue this use, separate and distinct from a right to graze. The Fifth Amendment does not prohibit the government from interfering with this property right; "it merely prohibits the government from taking property without paying just compensation." *Miller,* 945 F.2d at 352.

SGA realizes that its water rights residing in National Forest lands are subject to reasonable regulation. *See Hage*, 51 Fed. Cl. at 584-585. A "reasonable regulation is defined as regulation which neither prohibits the ranchers from exercising their vested rights nor limits their exercises of those rights so severely as to amount to a prohibition." *Id.* (citing *Elko County Bd. of Supervisors v. Glickman*, 909 F. Supp. 759, 764 (D. Nev. 1995)). The construction of exclosures and repeated denial of access to SGA's vested water rights "limits their exercises of those rights so severely as to amount to a prohibition." Further, there are limits on the federal governments regulations, and it may not destroy private property interests located on public lands. *See Curtin v. Benson*, 222 U.S. 78, 86 (1911) ("the United States may exercise over the Park not only rights of a proprietor but the powers of a sovereign. There are limitations, however, upon both. Neither can be exercised to destroy essential uses of private property.")

The issue of whether SGA needs to request access to its water right is not an issue suited for summary judgment.

> Defendant argues that until plaintiffs apply for and are denied the right to change the place of diversion, defendant has not taken plaintiffs' water by denying access. The court finds implausible the concept that plaintiffs should be required to apply for a change of place of diversion before bringing their claim.

*Hage* 35 Fed. Cl. at 173 (rescinded in part, affirmed in part by *Hage v. United States*, 51 Fed. Cl. 570 (2002)) *See also Loretto*, 458 U.S. at 437-438 (Once the fact of occupation is shown . . . there is less need to consider the extent of the occupation in determining whether there is a taking in the first instance.). Moreover, as discussed above SGA has requested several times to access or transfer its water and each has been denied by the USFS. Moreover, given the USFS obligations under the Endangered Species Act with regard to the protection of the thistle and poppy, requests for movement of the water would be futile.

This same issue arose before this Court in *Walker*, 79 Fed. Cl. at 706, where the government argued that "to the extent that Plaintiffs are alleging a taking of their water

rights and access rights . . . independent of a grazing or forage right, that claim also fails, because Plaintiffs have not attempted to access or utilize their water." This Court found that the Walkers "have not alleged nor submitted any evidence that their ability to transfer, lease, or sell any water rights has been impaired." *Id.* The situation here is different for three reasons. First, there is evidence that the SGA has the ability and specifically asked to transfer water, and every discussion with the USFS regarding potentially moving water out of the exclosures or otherwise accessing the water has been meet with denial. The fact is, as discussed above, USFS needs all the water for the protection of cirsium and it is unlikely a transfer by SGA will ever be allowed because it would result in an unlawful take of an endangered species. 16 U.S. C. § 1538(a); *see also* Final Rule Listing Cirsium, 52 FR 22935, June 16, 1987, Goss Decl. ¶ 35, Exhibit 3. ("This plant is dependent on springs or streams. Reduction or removal of this water supply would reduce or eliminate the populations.") Transferring the water out of the exclosures would violate the USFWS requirements for protection of the riparian areas, habitat and endangered species within the exclosures. Van Zandt Decl. ¶ 4, Exhibit B ("The major threat to the Sacramento Mountains thistle is the potential appropriation and development of water rights directly from spring habitat . . . "). Second, in the *Walker* situation, the USFS did not construct fences or exclosures to physically prevent access to water. This leads directly to the third distinction, the grazing permit in *Walker* was cancelled. Thus in *Walker*, "because Plaintiffs chose not to comply with the government's permitting process, they took the risk of either forfeiting their water rights through non-use or being forced to transfer, lease, or sell that right." *Id.*; citing to *Walker IV*, 142 N.M. at 55, 162 P.3d at 892. The Gosses still have permission to graze the allotment, they have repeatedly requested to water their cattle within the exclosures without consuming forage, and they have had discussions with the USFS and specifically requested permission to move water out of exclosures. All of these are material facts this Court should consider, and the Defendant's Motion for

Summary Judgment should be denied.

Counter to Defendant's suggestion, SGA requested more then once to transfer water. SGA has had many discussion with Defendant about transferring water out of the Penasco exclosure ( Goss Decl ¶¶ 14, 20, 21), and specifically requested such a transfer on or about October 12, 2000 ( Goss Decl ¶ 17 ), September 13, 2001 ( Goss Decl ¶ 18 ; see also Goss Decl. ¶ 51 Exhibit 25**)**, June 16, 2006 (Goss Decl ¶ 19; see also (Goss Decl. ¶ 52 Exhibit 20, July 25, 2006 letter to SGA from Frank Martinez), and on February 19, 2007 (*See* Goss Decl ¶ 243; see also February 19, 2007 letter, Goss Decl. ¶ 53 Exhibit 21).

In 2001, SGA was instructed by the USFS to move cattle into a pasture across the road approximately 400 feet from the Penasco headwaters. SGA requested permission from the USFS to pipe water at its expense out of the Penasco exclosure across the allotment 400 feet through a culvert beneath a road to the adjoining pasture that had no water. SGA's proposal was to pipe water into a trough with the overflow returning to the Penasco exclosure. On September 13, 2001 Frank Martinez denied Plaintiffs' request to pipe water at the Penasco headwaters. Goss Decl. ¶ 18. On June 20, 2002 in a telephone conversation with Frank Martinez, SGA explained they owned the water in the Penasco enclosure and there needed to be provisions made to get the water out. Goss Decl. ¶ 20. On June 16, 2006, SGA met with USFS, Otero County Commissioners, and members of the Range Task Force. Goss Decl. ¶ 25. SGA again requested permission to pipe water out of the Penasco exclosure to the adjoining pasture that had no water. This request was denied by the USFS on July 25, 2006, and the reason given was due to supposed interference with a scenic byway. Goss Decl. ¶ 52, Exhibit 20, (July 25, 2006 letter to Jimmy Goss from Frank Martinez).7 However,

7 Under the National Scenic Byways Program (23 U.S.C. § 162) roads are designated that have outstanding scenic, historic, cultural, natural, recreational, and archaeological qualities. Cattle ranching has been part of the history and culture of the Sacramento Mountains since the 1880's, long before the establishment of the Lincoln National Forest or the introduction of non-native elk. It not clear how the appearance of cattle

this reasoning is disingenuous in the face of the USFWS determination that the waters are necessary for the recovery of the Sacramento Mountains thistle.

It is disingenuous for the Defendant to claim that they have not denied SGA all meaningful access to water within the Penasco exclosure. The Defendant admits it denied SGA request to move water out of the Penasco, but claims it provided SGA with "options" which were not pursued by SGA. *See* Defendant's Motion for Summary Judgment at p. 15. These "options" were not even offered or discussed until 2006, and are unreasonable and would negatively impact SGA's operation. Goss Decl ¶ 26. Plaintiffs assert that these after the fact "offer" of options that were unreasonable on their face was merely a ruse by the USFS to avoid a finding of a physical taking by this Court. The first option was to extend the pipeline away from the scenic byway. This so-called option would require the use of a pump to get the water uphill, whereas SGA's request would allow water to flow by gravity. There is no electricity on Forest Service land. The use of a pump would require an electrical generator, a constant supply of fuel, maintenance, and continual observation to ensure continued operation and to ensure that it does not cause a fire hazard. Further, the maintenance and operation of the generator and pump would be a considerable expense to SGA's operation. *Id.* The second option, to pipe water from adjacent private land is unreasonable because SGA does not own the water right on the adjacent privately owned land. The third option was to install a trick tank in Atkinson pasture. *Id.* This option does not provide a reliable source of water. A trick tank depends on rainfall as a water source and would not be a reliable or permanent source of water. *Id.* Further, the Defendant's argument that SGA can graze up to the exclosure where water flows underneath is pointless. The water that flows out of the exclosures is not consistent, and is dependent on the weather. Goss Decl. ¶ 31. SGA needs access to a reliable source of water at all times, and access is meaningless without water available for the cattle to drink. *See* January 6,

---

would conflict with a scenic byway designation.

1995 USFWS Formal Consultation at p. 6., Goss Decl. ¶ 61, Exhibit 29. ("Livestock tend to concentrate in riparian areas from May through July when these areas are the major source of water (USDA, 1992a)" The so-called offer of these options in light of the USFWS Recovery Plan and Biological O-pinion was nothing more then a ruse by the USFS in an attempt to avoid a taking.

SGA has requested accommodations on more than the Penasco Exclosure. On June 16, 2006, SGA met at the Sacramento Enclosure with Frank Martinez, Lou Woltering, Forest Supervisor, Mr. Doug Moore and Mr. Mike Nivison, County Commissioners , and Dr. Redd Baker and Dr. John Fowler of the Range Improvement Task Force ("RITF"), as well as neighboring allotment owners. Goss Decl. ¶ 27. There was agreement among all parties, including Frank Martinez, to move the west fence of the Sacramento exclosure back a few hundred feet to allow access for cattle. *Id.*; *See also* Goss Decl. ¶ 52, Exhibit 20. (letter of July 25, 2006 to SGA from Frank Martinez.). The fence was to be constructed the following week. However, Mr. Martinez inexplicably contacted the Forest Guardian, an environmental group that filed a Notice of Intent to Sue against the USFS for violations of the ESA. Goss Decl. Exhibit 32. Mr. Martinez changed his mind, not allowing the movement of the fence and thus continued to deny access to the water. See 7/26/2006 Letter from Otero County Commissioner Doug Moore to Frank Martinez, Goss Decl. ¶ 54 Exhibit 22. What becomes clear is that at the time SGA could not under any reasonable circumstance gain access to the water within the exclosures or could not move the water to other accessible areas. **8**

Defendant's reliance on *Washoe County v. United States*, 319 F.3d 1320 (Fed.

8 Recently, a lane was constructed on the west end of the Lake that provides an approximate 40 foot access to the water without the cattle grazing within the exclosure. Goss Decl. ¶ 30. This happened at the suggestion of a new Forest Supervisor, Jackie Buchannman, and was never before available to SGA. However, there remains an issue on the east end of the Sacramento exclosure where the USFS has closed the gate. This forces the cattle to move along a highway approximately 1 1/2 miles up the Sacramento Lake to access the lane on west end of the lake. This causes undue stress on the cattle. Once there, the cattle tend to graze that area making it difficult for SGA to manage grazing impacts on the Allotment. Goss Decl. ¶ 30.

Cir. 2003) is misplaced, and actually supports SGA's claim a taking has occurred. In *Washoe County*, the plaintiff requested permission for a right-of-way to pipe ground water appurtenant to private property across federal land to other private property. The court found that the "government did not effect a physical taking here because it neither physically appropriated nor denied meaningful access to Appellants' water rights." *Id.* at 1326. Here, SGA's vested water rights are located on federally administered land. Further, SGA is not requesting a right-of-way across federal land, because they already possess such a right-of-way by virtue of its Mining Act of 1866 water rights. Finally, and most importantly, the government both physically appropriated the water at issue here for the protection and preservation of cirsium, denied all meaningful access to SGA's vested water rights, and denied moving the water to another place of use in the allotment. Likewise, the issue of whether SGA could have attempted to sell or lease its water right has no bearing here. It is disingenuous for the United States to suggest that moving the water is even an option given the need for the waters by endangered species. SGA is in the cattle business, it has valid grazing permit and vested water rights with a beneficial use for livestock watering. It needs a consistent and reliable water to supply for the health of its cattle and to operate an economically viable ranching operation.**9**

SGA is still operating a ranching operation on the Sacramento Allotment. It has vested water rights, which have a beneficial use of watering livestock. These rights are separate and distinct from the Defendant's ownership of the land. The facts in this case clearly show repeated requests and unreasonable denials to both access the water and to transfer it to a place of beneficial use within the allotment. SGA should not have to

---

9 Denying cattle water raises a serious issue of animal welfare. In the summer of 2002 Otero County Deputy John Braziel witnessed Bobby Gomez, USFS Law Enforcement Officer, closing the gate to the Pensaco exclosure. He informed the Mr. Gomez that closing the gate and preventing the cattle access to water is cruelty to animals. The gate was left open, however the USFS continued to threaten non-compliance if cattle were found within the exclosure. Goss Decl. ¶ 22.

continue to make requests that are consistently denied by USFS. Such requests would be futile. *See Estate of Hage v. United States*, 82 Fed. Cl. at 212-213 (where the court determined that based on the history between the Forest Service and Plaintiffs, application for a special use permit would clearly have been futile.) This is clearly a taking of these vested water rights and the Defendant's Motion for Summary Judgment must be denied.

## V. CONCLUSION

This actions of the Defendant represent a clear case of physical taking. Defendant has physically exclude SGA from its water rights. Defendant has denied access to the water exclusive of any right to forage in the exclosure. Defendant has denied requests to transfer the water out of the exclosure to another place of beneficial use in the Allotment. And, Defendant has appropriated the water for its own use. These actions clearly indicate a physical taking of the SGA's vested water rights and summary judgment on the issue of a taking should be granted in favor of SGA. For the same reasons, the Defendant's motion For Summary Judgment should be denied.

DATED: August 15, 2008

By: ______________________

Michael J. Van Zandt
HANSON BRIDGETT LLP
425 Market Street, 26th Floor
San Francisco, CA 94105
Telephone: (415) 777-3200
Facsimile: (415) 995-3566

Attorneys for Plaintiff
Sacramento Grazing Association

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of August, 2008, a true and accurate copy of the PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT, OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND MEMORANDUM IN SUPPORT THEREOF was served upon counsel by first-class mail, by placing the same in the United States mail, postage prepaid, addressed to:

Kathleen Lennon Doster
U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 663
Washington, DC 20044-663
Tel: (202) 305-0481
Fax: (202) 305-0506
Kathleen.doster@usdoj.gov

Keith Kiley