**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| SACRAMENTO GRAZING ASSOCIATION, INC., et al., | ) | |
| Plaintiffs, | ) | No. 04-786 L |
| v. | ) | |
| | ) | Judge Susan G. Braden |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to RCFC 56(h)(2), Defendant files the following Response to Plaintiffs' Proposed Findings Of Uncontroverted Fact in Support of Plaintiffs' Cross Motion For Summary Judgment.

1. The predecessors-in-interest of the Goss Family entered upon and were in possession of the area now known as the Sacramento Grazing Allotment in the 1880s, before the Lincoln National Forest was reserved. **See Goss Declaration in Support of Plaintiffs' Partial Cross Motion for Summary Judgment and Opposition to Defendant's Motion for Summary Judgment. ¶ 4 (hereafter "Goss Decl.").**

**Response:** Defendant does not have sufficient information with which to formulate a response. However, Defendant denies that any predecessor-in-interest was in "possession" of federal land.

2. In 1989 SGA began purchasing property known as the Goss Ranch, and on November 27, 1989, the United States Forest Service ("USFS") issued SGA a 10-year term Grazing Permit No. 08-1105 authorizing 553 head of cattle to graze on the Sacramento Allotment. Grazing Permit No. 08-1105 contained no mention of exclosures designed to exclude cattle from riparian or sensitive habitat where SGA's water rights are situated. **See Goss Decl. ¶ 3; Defendant's Exhibits.**

**Response:** Admitted in part. Defendant does not have enough information to confirm or deny when SGA began purchasing the Goss Ranch. Defendant admits that the term grazing permit issued to SGA in 1989 does not specifically mention the exclosures. However, the exclosures were already in place for the protection of the Sacramento Thistle and environmentally-sensitive areas at the time SGA was issued a grazing permit. Livestock use in the exclosures was not permitted (with the exception of the Upper Penasco Exclosure in 1989 and 1990 for gathering purposes only).

3. At the time the Plaintiffs acquired the Goss Ranch, SGA also acquired vested water rights originating in or around the Sacramento Grazing Allotment. **See Goss Decl. ¶ 5; Ex. 25 (Declarations of Ownership of Water Rights Perfected Prior to March 19,1907 (also attached in Appendix of Exhibits to Plaintiffs Memorandum in Opposition to Defendant's Motion To Dismiss, Doc No. 12) setting out a chain of title in this case that includes range rights and water rights now associated with the Sacramento Grazing Allotment).**

**Response:** Denied. There has been no state adjudication of Plaintiffs' purported water rights on the Sacramento Allotment, and the "declarations" attached as Exhibit 25 to the Goss Declaration clearly state: "The acceptance for filing of this declaration by this office does not indicate affirmation or rejection of the statements contained herein." In addition, SGA does not have any "range" (grazing) rights associated with the Sacramento Grazing Allotment.

4. The Goss Ranch, located in Otero County, New Mexico, consists of approximately 80 deeded acres owned by Plaintiffs in fee simple. It is the base property for a grazing allotment on lands administered by the USFS. **See Goss Decl. ¶ 6.**

**Response:** Admit.

5. From the original permitted amount of 553 cattle allowed on the allotment, USFS has never allowed more then 370 head since 2000, and the number has been as low as

230 in 2003 and 2004-2005. These determinations were made primarily by District Ranger Frank Martinez. **See Goss Decl. ¶ 9.**

**Response:** Admit, except to state that the reduction in livestock numbers was due to non-compliance with the terms and conditions of the grazing permit as well as reduced forage production due to drought conditions.

6. SGA at all times since 1989 until the present has had a valid grazing permit on the Sacramento Allotment. **See Goss Decl. ¶ 12.**

**Response:** Admit.

7. The United States Forest Service ("USFS") has constructed, reconstructed and modified fenced areas or exclosures designed to exclude cattle at the following water sources that are owned by SGA: Penasco Head Waters, Bluff Springs, 3 Hubble Springs, Mauldin Springs (Wills Canyon), Bluff North Springs, Kingsbury Springs, and Sacramento Lake. SGA is the owner of vested water rights within each of these exclosures. **See Goss Decl. ¶ 10; see also Declaration, of Frank Martinez |14, Exhibit B to Defendant's Motion for Summary Judgment.**

**Response:** Admit that exclosures were constructed by the USFS, and were designed to exclude livestock, but deny that the “water sources” are “owned by SGA.” See Def. Resp. # 3.

8. The *Cirsium vinaceum* (Sacramento Mountain Thistle) ("cirsium" of "thistle") was proposed for listing as a Federally Endangered Species in 1984 and was listed on June 16, 1987. **Declaration of Michael J. Van Zandt in Support of Plaintiffs' Cross Motion for Partial Summary Judgment and Opposition to Defendant's Motion for Summary (hereafter "Van Zandt Decl.") ¶ 4, Exhibit B, p. 1.**

**Response:** Admit.

9. In 1989 and 1990 SGA was given permission by the USFS to access the exclosure on the upper Penasco. **See Goss Decl, ¶ 15.**

**Response:** Admit, except to state that the permission to access the exclosure was for gathering purposes only.

10. In 1993 the United States Fish and Wildlife Service ("USFWS") issued the Sacramento Mountain Thistle Recovery Plan. **Van Zandt Decl ¶ 4, Exhibit B.**

**Response:** Admit.

11. The Sacramento Mountain Thistle Recovery Plan stated as a Recovery Priority the acquisition of water rights from springs in areas with suitable habitat for the thistle. **Van Zandt Decl ¶ 4, Exhibit B, p. 9.**

**Response:** The United States admits only that the Recovery Plan states, in part: "Develop and implement a policy for spring development on Lincoln National Forest and acquire water rights to springs if instream-flow legislation is ever passed in New Mexico." To date, instream-flow legislation has not been passed in New Mexico.

12. The Sacramento Mountain Thistle Recovery Plan states the following: "Another land use that has been identified as a threat to this thistle is grazing. The Sacramento Mountians thistle occurs on four grazing allotments in the Lincoln National Forest." **Van Zandt Decl ¶ 4, ExhibitB, p. 5.**

**Response:** The United States admits that Plaintiffs have accurately quoted from the Recovery Plan, in part.

13. The Sacramento Mountain Thistle Recovery Plan also states the following under Recovery Objective and Criteria: "1. Acquire water rights specifically for the maintenance of travertine spring habitats at a minimum of 30 percent of the occupied spring localities, including at least 1 occupied spring locality in each of the known canyons of occurrence. ... There are 20 main canyon systems that have suitable habitat occupied by the Sacramento Mountain thistle. The largest and best representative spring habitat in each canyon system should have the water rights acquired for habitat maintenance by the management agency. At present, there is no mechanism to acquire

these rights without a developed point of diversion and stated beneficial use. Therefore, until the State of New Mexico adopts instream-flow or similar legislation, the Sacramento Mountains thistle must remain listed as threatened under the Act." **Van Zandt Decl ¶ 4, Exhibit B, p. 9.**

**Response:** The United States admits that Plaintiffs have accurately quoted from the Recovery Plan, in part.

14. Under Recovery Tasks, the Sacramento Mountains Thistle Recovery Plan states: "12. Monitor and encourage legislation for a state instream-flow statute and acquire water rights. **Van Zandt Decl ¶ 4, Exhibit B, p. 10.**

**Response:** The United States admits that Plaintiffs have accurately quoted from the Recovery Plan, in part.

15. Under Narrative Outline of Recovery Actions in the Sacramento Mountains Thistle Recovery Plan the following is stated: "12. **Monitor and encourage legislation for a state instream-flow statute and acquire water rights.. . .** The water right should encompass the total flow from the spring source to the point where the water leaves the travertine deposit." **Van Zandt Decl ¶ 4, Exhibit B, p. 11.**

**Response:** The United States denies that Plaintiffs have accurately quoted from the Recovery Plan since part of the paragraph is missing. In addition, the Recovery Plan also states that water rights can be acquired without threat to the Sacramento Mountain thistle "if the point of diversion is immediately below the spring."

16. Under Narrative Outline of Recovery Actions in the Sacramento Mountains Thistle Recovery Plan the following is also stated: **Livestock Grazing Management.** . . .Plants along streams should be afforded greater protection from the impact of frequent livestock grazing and trampling during the grazing years or seasons. This will require dispersing livestock from riparian areas or creating small pastures to divert cattle from

these areas when necessary. No livestock facilities or holding traps should be constructed on or near occupied habitat. **Van Zandt Decl ¶ 4, Exhibit B, p. 12.**

**Response:** The United States denies that Plaintiffs have accurately quoted from the Recovery Plan since part of the paragraph is missing.

17. Under the recovery actions addressing monitoring and study, the Sacramento Mountains Thistle Recovery Plan states: "23. **Begin experimental grazing treatments.....** Grazing intensity and duration should be controlled by either herding operations or constructing a fence around manageable units or pasture." **Van Zandt Decl ¶ 4, Exhibit B, p. 13.**

**Response:** The United States denies that Plaintiffs have accurately quoted from the Recovery Plan since part of the paragraph is missing. In addition, this paragraph only provides guidance for experimental grazing treatments in order to determine the effects of livestock grazing on the threatened Sacramento Mountain thistle and the potential for effective control of teasel, a competitive plant species in suitable thistle habitat.

18. On May 5, 1998 the Annual Operating Plan ("AOP") for the Sacramento Allotment was amended and the riparian exclosures on the Sacramento Allotment were officially excluded from livestock grazing activities, and SGA was denied use of water within the exclosures. **See Goss Decl. ¶ 13, 40 Exhibit 8.**

**Response:** The exclosures were present on the Sacramento Allotment at the time SGA was issued a term grazing permit in 1989, and SGA was not allowed to graze livestock within the exclosures, with the exception of the Upper Peñasco Exclosure in 1989 and 1990, however this was for gathering purposes only. See Def.'s Resp. # 9. The May 5, 1998 AOP incorporated the Forest Service's decision to exclude livestock from the exclosures. The United States denies that the SGA was "denied use of water within the exclosures," since, for example, SGA accessed water as it flowed from the exclosures.

19. SGA through Frances Goss, Jimmy Goss or Justin Goss, during annual meetings with USFS beginning in 1998, made annual requests to access the water or transfer the water at the Penasco head waters and were denied by USFS employees Max Goodwin, Rick Newman and Frank Martinez. **See Goss Decl. ¶ 14.**

**Response:** The United States admits only that SGA made informal requests to divert water from the Upper Peñasco Exclosure to outside the exclosure. More specifically, SGA proposed to pipe water out of the Peñasco Exclosure along a route that would cause cattle to congregate in a meadow bottom adjacent to a scenic byway. The Forest Service denied the request because the route advocated by SGA would not be consistent with best management practices. SGA was offered at least two alternatives to the route proposed by SGA, but SGA objected to a different watering point for their cattle.

20. On November 23, 1999, the USFS issued SGA Grazing Permit No. 08-1250 for an additional 10 years. This permit for the first time included the exclosures in the USFS management practices for the allotment, and states that "[enclosures designated on the attached Sacramento Allotment Range Improvement/Allotment Map are considered special emphasis areas and not part of the Sacramento Allotment. Livestock use is not permitted within the exclosures and will be removed in a timely manner." **See Goss Decl. ¶ 16; see also Exhibit C to Defendant's Motion for Summary Judgment.**

**Response:** Admit in part. The exclosures were present on the Sacramento Allotment at the time SGA was issued a term grazing permit in 1989, and SGA was not allowed to graze livestock within the exclosures, with the exception of the Upper Peñasco Exclosure in 1989 and 1990; however, this was for gathering purposes only. Because SGA refused to comply with the Forest Service's direction excluding grazing from the exclosures, and based on the January 6, 1995 Biological Opinion from the FWS, the Forest Service incorporated this grazing restriction into SGA's 1999 term grazing permit.

21. On October 12, 2000 Justin (Spike) Goss spoke with Rick Newman and requested permission to transfer water out of the Penasco exclosure. **See Goss Decl. ¶ 17.**

**Response:** The United States does not have enough information to confirm or deny this statement.

22. In the 2001 AOP, SGA was instructed by the USFS to move cattle into a pasture across the road approximately 400 feet from the Penasco headwaters. SGA requested permission from the USFS to pipe water at its own expense out of the Penasco exclosure across the allotment approximately 400 feet through a culvert beneath a road to the adjoining pasture that had no water. SGA's proposal was to pipe water into a trough with the overflow returning to the Penasco exclosure. On September 13, 2001 Frank Martinez denied Plaintiffs' request to transfer water from the Penasco headwaters. **See Goss Decl. ¶ 18; Exhibit 19.**

**Response:** See Def.'s Resp. # 19.

23. In 2002 SGA requested access to exclosures for the purpose of watering cattle, specifically notifying the USFS they did not intend to graze cattle in the exclosures. This request was denied. **See Goss Decl. U 19, Exhibits 15-18.**

**Response:** The United States admits only that livestock use within the exclosures is not authorized under SGA's term grazing permit. Although SGA claimed that they "did not intend to graze cattle in the exclosures," such a statement was meaningless since it is "impossible to keep a cow from eating while being herded to a water source." See Walker v. United States, 162 P.3d 882, 895 (N.M. 2007).

24. On June 20, 2002 in a telephone conversation with Frank Martinez, SGA explained they owned the water in the Rio Penasco enclosure and the USFS needed to make provisions to transfer the water to an accessible area. **See Goss Decl. ¶ 20.**

**Response:** The United States cannot confirm or deny the date or content of the alleged conversation. The United States has found no documentation supporting such a telephone conversation.

25. On June 21, 2002 Justin (Spike) Goss participated in an inspection of the allotment with Mark Cadwallader and Cedric Selby, employees of USFS. He explained the presence of cattle in an exclosure was because "it was the only water available" for the cows. Further, the possible option of providing water outside the exclosure was again discussed. **See Goss Decl. ¶ 20, Exhibit 17.**

**Response:** Admit.

26. In the summer of 2002 Otero County Deputy John Braziel witnessed Bobby Gomez, USFS Law Enforcement Officer, closing the gate to the Pensaco exclosure. He informed the Mr. Gomez that closing the gate and preventing the cattle access to water is cruelty to animals. The gate was left open; however, the USFS continued to threaten non-compliance if cattle were found within the exclosure. **See Goss Decl. ¶ 22.**

**Response:** The United States cannot confirm or deny any conversation between Deputy Braziel and LEO Gomez in the summer of 2002. However, since livestock use is prohibited within the exclosures according to the terms and conditions of SGA's grazing permit, it is correct that SGA would not be in compliance of its grazing permit if cattle were placed in the exclosures.

27. In February 2004, the USFWS issued a Biological Opinion for the Sacramento Allotment related to endangered species, including the Sacramento Mountain Thistle. **Van Zandt Decl ¶5, Exhibit C.**

**Response:** Admitted in part. A Biological Opinion was issued on February 4, 2004 which evaluated the effects of a proposed action on the Mexican spotted owl, the Sacramento Mountains thistle, and the Sacramento Mountains prickly poppy.

28. The Biological Opinion recognizes the existence of the current exclosures within the SGA's grazing allotments, including Sacramento Lake, Hubbell, Upper Mauldin, Lower Mauldin, Western Riparian, Upper Penasco, and Bluff Springs, as part of the proposed action that must be continued to allow a no jeopardy opinion from the USFWS. **Van Zandt Decl ¶ 5, Exhibit C, p. 11.**

**Response:** Denied. The Biological Opinion evaluated a proposed action which did not include the exclosures as part of the Sacramento Grazing Allotment. (BO, pg. 10). The no jeopardy opinion is based on an evaluation of the entire proposed action, including conservation measures incorporated in the project design. (BO, pg. 65)

29. The Biological Opinion also states that the thistle has a recovery priority of 2 out of 18, with 1 being the highest priority and restates the Recovery Criteria in the Recovery plan as follows "1) acquire water rights for the purpose of maintaining travertine habitats and protecting at least 30 percent of the occupied spring localities, including a least one occupied spring in each of the 20 occupied main canyon systems, 2) ensure permanent protection for the thistle in at least 75 percent of the known occupied habitat, both spring and riparian sites, under established management plans, and 3) establish a 10-year monitoring and research program to demonstrate effectiveness of management plans." **Van Zandt Decl ¶ 5, Exhibit C, p. 27.**

**Response:** The United States admits that SGA has accurately quoted from the Biological Opinion, in part. However, SGA failed to quote from the remainder of the paragraph, which states, in part: “The Recovery Plan acknowledges that New Mexico does not have an instream-flow statute . . .”

30. The Biological Opinion also states that as to the Sacramento Mountains prickly poppy: "Livestock grazing is currently authorized on the winter unit of the Sacramento Allotment from November 1 to May 14. However, the lack of consistent application of previous forage/range guidelines has likely historically, and currently continues, to

adversely affected the poppy....The Forest Service acknowledged that damage could occur to poppies after February 1 in Alamo pasture from grazing activity and associated trampling. (Forest Service 2002, 2003, 2003g). Subsequently, the AOI for the current winter grazing season (i.e. November 2003 through May 14, 2004) included a provision that livestock would be removed from the Alamo pasture prior to February 1, 2004 **. . ."** **Van Zandt Decl ¶ 5, Exhibit C, p. 35.**

**Response:** Admitted in part. SGA selectively quoted from page 35 of the Biological Opinion and failed to include the documented effects within the winter unit of the Sacramento Allotment caused by livestock.

31. The Biological Opinion addresses the need for water by the Sacramento Mountains thistle by stating: "The thistle is an obligate riparian species that requires surface or immediately sub-surface water flows. Spring dessication at thistle sites has contracted occurrence boundaries, reduced the number of individuals, and in some cases, caused a loss of all plants at previously occupied sites (Forest Service 2003a)… Trampling by livestock, wildlife, or humans can cause damage to travertine formations or out-flow creek beds in ways that may alter water flow to sites." **Van Zandt Decl ¶ 5, Exhibit C, p. 35.**

**Response:** Admitted in part. SGA selectively quoted from parts of page 35 of the Biological Opinion and fails to include the three other causes of loss of water delineated on pg 35 of the Biological Opinion.

32. Concerning the Sacramento Mountains thistle, the Biological Opinion states: "Monitoring of the thistle has shown a simple and direct relationship between water availability in the suitable habitat and numbers and extent of plants in occurrences (Forest Service 2003a). As water flow has been observed to decline at springs, decreases in plant numbers and the size of the sites have occurred. The situation reverses when increased water is available. **Van Zandt Decl ¶ 5, Exhibit C, p. 63.**

**Response:** Admitted in part. SGA selectively quoted from page 63 of the Biological Opinion and failed to include the related discussion of livestock impact during drought conditions. For example: "During drought conditions when streams dry up, livestock are forced to seek water which puts them more frequently in occupied thistle habitat."

33. For the three species of concern, the Mexican Spotted Owl, Sacramento Mountains thistle and Sacramento Mountains prickly poppy, the Biological Opinion determined that the proposed action to graze by SGA "is not likely to jeopardize the continued existence of the [species]," based on full implementation of the project as described in the Description of Proposed Action. **Van Zandt Decl ¶ 5, Exhibit C, pp. 65-67.**

**Response:** Admitted.

34. The no jeopardy opinion in the Biological Opinion for the three species is based on a finding that there will be reduced stocking levels for livestock; for the poppy, the Alamo Pasture will be closed to livestock by February 1 of each year; and for the thistle: "[t]he continued construction of exclosures will protect isolated occurrences of the thistle. Continued maintenance of existing exclosures will continue to protect some thistle occurrences from livestock impacts." **Van Zandt Decl ¶ 5, Exhibit C, pp. 66-67.**

**Response:** Denied. The no jeopardy opinion is not based solely on reduced stocking levels. It is based on an evaluation of the proposed action including any conservation measures incorporated in the project design. (Pg. 65, B.O.)

35. The Biological Opinion then imposes Reasonable and Prudent Measures and Terms and Conditions that include limitations on activities by the livestock permittee near Mexican Spotted Owl protected activity centers. **Van Zandt Decl ¶ 5, Exhibit C, pp. 69.**

**Response:** Admitted, except to state the Biological Opinion speaks for itself.

36. The Final Environmental Impact Statement for Sacramento, Dry Canyon and Davis Grazing Allotments ("FEIS") was issued in July 2004 and adopted the determinations of the USFWS in the Biological Opinion. **Van Zandt Decl ¶ 5, Exhibit A.**

**Response:** Admit.

37. The Record of Decision ("ROD") for the FEIS for the allotment was issued by the USFS **on July 28, 2004. Van Zandt Decl ¶ 6, Exhibit D.**

**Response:** Admit.

38. The Record of Decision for the FEIS determined that reduced stocking levels on the allotments was necessary in order to protect endangered species, determined that livestock must be removed from Alamo Pasture before February 1 of each year, continued exclusion of livestock from the exclosure areas, and added several new exclosure areas: **Van Zandt Decl. ¶ 6, Exhibit D, pp. 5-7.**

**Response:** Denied. The Record of Decision explicitly states that the selected alternative was chosen as it "best balances the five issues identified in the proposed action (FEIS Chapter 1) by balancing the needs of the livestock operation with the needs of listed and rare plant and animal species, elk populations, conflicts with recreation, and riparian conditions (FEIS Chapter 3).

39. The 2004 AOI for the Sacramento Allotment states that the "Forest service does not recognize any 'easement' associated with water rights upon which you have recently filed declarations. As a result, no clearing of trees or excavation associated with said easements are authorized without approval by the District Ranger." **See Goss Decl. ¶ 17, Exhibit 23.**

**Response:** Admitted, except to state that the AOI speaks for itself.

40. On June 10, 2005 SGA was instructed to sign a new term grazing permit or modify the existing permit, which limit the allowed head of cattle from 553 year long to 412 maximum in the summer and 335 in the winter. **See Goss Decl. ¶ 23.**

**Response:** Admitted in part. Following the July 2004 ROD, SGA was offered the opportunity to sign a new ten year grazing permit that would implement the ROD. After almost 18 months of communications back and forth, including a June 10, 2005 letter from the Regional Forester explaining the options the Forest Service had to implement the ROD, SGA refused to sign a new grazing permit. Upon the determination that SGA would not sign a new term grazing permit, District Ranger Martinez modified the still current 1999 permit consistent with the 2004 ROD, and notified SGA of this modification by letter dated January 17, 2006.

41. In 2005 or 2006 in the spring when cattle were being moved into the summer pasture the east end gates on the Sacramento Lake exclosure were locked. Otero County Commissioner Doug Moore was notified. He removed the locks and informed USFS not to close the gates. The gates remained open until May of 2008 when a lane was put in the Sacramento Lake exclosure on the west end to allow cattle to access the water (see below). The USFS then closed both gates on the Sacramento exclosure. This forces the cattle to move approximately 1 1/2 miles along a highway up the Sacramento Lake to access the lane on west end of the lake. This causes undue stress on the cattle. Once there, the cattle tend to graze that area making it difficult for SGA to manage grazing impacts on the Allotment. Even when the east end gate is open, SGA faces the threat of non-compliance if cattle are found inside the exclosure. **Goss Decl. ¶ 24.**

**Response:** Denied. The Forest Service has no knowledge of any employee being authorized to lock gates at the Sacramento Lake exclosure. However, the Forest Service does keep the gates closed and SGA is not permitted to open them. It is a violation of the terms and conditions of SGA's grazing permit to open the gates and move cattle

within the exclosures. In addition, it is only approximately 3/4 mile from the top of the Sacramento Lake exclosure to the bottom. In a June 6, 2006 letter from the District Ranger, SGA was offered for the second time, the option of placing a water trough on an existing tap on the pipeline just below the lake exclosure that would negate the need for access to the lake at the bottom end of the exclosure. As of this date, SGA has failed to take action to install the trough.

42. On June 16, 2006, SGA met at the Sacramento Enclosure with Frank Martinez, Lou Weltering, Forest Supervisor, Mr. Doug Moore and Mr. Mike Nivison, Otero County Commissioners, and Dr. Redd Baker and Dr. John Fowler of the Range Improvement Task Force ("RITF"), as well as neighboring allotment owners. SGA again discussed with the USFS the opportunity to pipe water out of the Penasco exclosure, again requested permission from the USFS to pipe water at its own expense out of the exclosure across the allotment approximately 400 feet through a culvert beneath a road to the adjoining pasture that had no water. This request was denied by the USFS on July 25, 2006. **See Goss Decl. ¶ 25.**

**Response:** Admitted in part. District Ranger Martinez denied the request to place a water trough within sight of Forest Road 6563 (Cloudcroft to Sunspot Highway), but proposed two additional alternatives, including piping water from within the exclosure to a point further up the canyon.

43. On June 16, 2006, SGA met at the Sacramento Enclosure with Frank Martinez, Lou Weltering, Forest Supervisor, Mr. Doug Moore and Mr. Mike Nivison, County Commissioners, and Dr. Redd Baker and Dr. John Fowler of the Range Improvement Task Force ("RITF"), as well as neighboring allotment owners. There was agreement among all parties, including Frank Martinez, to move the west fence of the Sacramento exclosure back a few hundred feet to allow access for cattle. The fence was to be constructed the following week. However, Mr. Martinez contacted the Forest Guardian

and changed his mind, not allowing the movement of the fence and thus continued to deny access to the water. **See Goss Decl. ¶ 27.**

**Response:** Admitted in part. After the meeting, District Ranger Martinez reviewed the 2004 ROD and determined that the fence adjustment would be not consistent with the ROD, and therefore, denied the request to move the fence. The United States denies that the Forest Service "continued to deny access to the water."

44. At the June 16, 2006 meeting, Forest Supervisor Lou Weltering stated that the Forest service owns the water within the Sacramento Exclosure. **See Goss Decl. ¶ 28.**

**Response:** The United States cannot confirm or deny this statement. However, impoundment rights at Sacramento Lake are recognized by the Office of the State Engineer, and are held by several downstream users.

45. On February 19, 2007, SGA again requested permission to pipe water from the Penasco exclosure, this time requesting the ability to move the water into a drinker in Atkinson Canyon. **See Goss Decl. ¶ 29.**

**Response:** Admitted. But see Def's Response to # 19, 22.

46. On May 13, 15, and 19 of 2008 there were a series of meeting held between SGA, USFS, Otero County Commissioners, and the RITF regarding cattle access to water on Sacramento Lake. SGA wanted the gates to remain open so cattle may have access to the water. At the May 13, 2008 meeting Gary Zieh agreed to leave the gate open. However, at the May 15, 2008 meeting Mr. Zieh stated that New Mexico Game and Fish would not allow the gates to remain open. Initially USFS closed the gate and decided to haul water from Sunspot Observatory to a trough near the Sacramento exclosure. This only lasted 2-3 weeks. Then, USFS decided to implement a suggestion by Forest Supervisor Jackie Buchannan and construct a lane to allow cattle to access water at Sacramento Lake. The lane was constructed on the west end of the Lake and

provides an approximate 40 foot access to the water without the cattle grazing within the exclosure. **See Goss Decl. ¶ 30.**

**Response:** Admitted in part. At the May 13, 2008 meeting, Natural Resources Staff Officer Ziehe stated several times that he did not have authority to leave the gate open, but did agree to make that recommendation to Acting District Ranger, Terry DeLay.

47. The United States owns no water rights within the exclosures in Lincoln National Forest. See *United States v. New Mexico*, 438 U.S. 696, 718 (1978)

**Response:** Denied.

48. SGA has requested that the USFS ensure adequate water flow out of all exclosures. This spring feed water flow however is not consistent, and is dependent on the weather. **See Goss Decl. ¶ 31.**

**Response:** Admitted, except to state that the original design of each of the exclosures was to avoid trampling of environmentally sensitive areas by livestock and to protect resource values around spring sources. Water flowed out of each of the exclosures at the time of their construction, allowing water use by livestock outside the exclosures. The periodic drought that we have experienced in the last few years has resulted in reduced spring flows across the entire allotment. During drought periods water has receded within the confines of the exclosures in certain areas. During periods of normal or above normal precipitation water is likely to flow outside each of the exclosures.

49. SGA periodically uses the tap on the pipeline at Sacramento Lake to fill a water trough about a mile below Sacramento exclosure. However, that trough is on private property and fills from the pipeline in the exclosure. Further, there are six other users on the pipeline. The water that flows out of the Sacramento Lake exclosure is not reliable because there is frequently inadequate water pressure for SGA to utilize its water trough for watering cattle due to use at this source by other water users. The USFS was refused to allow SGA to move water from Sacramento Lake. **See Goss Decl. ¶ 32.**

**Response:** Denied. SGA uses water from the pipeline flowing down from Sacramento Lake, both from the tap on the pipeline and further downstream in the Grapevine Pasture.

DATED: September 12, 2008

Respectfully submitted,
RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

s/ Kathleen Doster

KATHLEEN DOSTER
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, DC 20044-0663
Telephone No.: (202) 305-0481
Facsimile No.: (202) 305-0506
E-mail: kathleen.doster@usdoj.gov

KRISTINE S. TARDIFF
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
53 Pleasant Street, 4th Floor
Concord, NH 03301
Telephone No.: (603) 230-2583
Facsimile No.: (603) 225-1577

OF COUNSEL:

MARY ANN JOCA
Assistant Regional Attorney
Office of the General Counsel
United States Dept. of Agriculture
P.O. Box 586
Albuquerque, N.M. 87103-0586