# In the United States Court of Federal Claims

No. 04-786 L

Filed: November 3, 2017

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

SACRAMENTO GRAZING ASS'N, INC., *et al.*,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Declaration of Water Right Ownership, N.M. STAT. ANN. § 72-1-3 (West 2015); Endangered Species Act of 1973, 7 U.S.C. § 163, 16 U.S.C. §§ 1531–1544 (2012); Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1752 (2012); National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4375 (2012); Forest and Rangeland Renewable Resources Planning Act of 1974, 16 U.S.C. § 1604 (2012); Statute of Limitations, 28 U.S.C. § 2501 (2012); U.S. CONST. amend. V, Takings Clause; 36 C.F.R. § 222.3(c)(1)(ii) (Forest Service Livestock Grazing Permits).

**Michael Joseph Van Zandt**, Hanson Bridgett, LLP, San Francisco, California, Counsel for Plaintiffs.

**Kristine Sears Tardiff**, United States Department of Justice, Environment & Natural Resources Division, Concord, New Hampshire, Counsel for the Government.

### MEMORANDUM OPINION AND ORDER DETERMINING THAT THE FEDERAL GOVERNMENT VIOLATED PLAINTIFFS' RIGHTS UNDER NEW MEXICO LAW TO BENEFICIAL USE OF STOCK WATER IN THE LINCOLN NATIONAL FOREST

**BRADEN**, *Chief Judge*.

On January 2, 2016, several dozen ranchers, who unsuccessfully attempted to find common ground with environmental groups and officials from Oregon's Malheur National Wildlife Refuge for over a decade, decided to take up arms to protest federal policy and regulations to prioritize migrating bird water habitat, by limiting the number of cattle that historically grazed and used water in that area—decades before it was subject to federal control.[1]  In contrast, the Sacramento Grazing Association, Inc. ("SGA") filed a complaint in the United States Court of Federal Claims

---

[1] *See Cranes, Curlews, And Cows—The Delicate Debate Over Oregon's Federal Lands* PBS NEWS (May 24, 2016), http://www.pbs.org/newshour/bb/cranes-curlews-and-cows-the-delicate-debate-over-oregons-federal-lands/.

for an adjudication of its right to beneficial use of stock water sources within the Sacramento Allotment of the Lincoln National Forest, New Mexico, that pre-date federal control.

Today, the court reaffirms a prior ruling that SGA's Fifth Amendment Takings Clause claims are not barred by the statute of limitations. In addition, the court has determined that SGA established, at trial, a property interest, recognized by New Mexico law, to make beneficial use of stock water sources in the Sacramento Allotment of the Lincoln National Forest. The court also has determined that SGA established the right to make beneficial use of stock water sources in the Sacramento Allotment that was abrogated by actions undertaken by the United States Forest Service ("USFS"), in violation of the Takings Clause of the Fifth Amendment to the United States Constitution.[2]

As Justice Holmes observed ninety-five years ago, "We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 416 (1922); *see also Murr v. Wisconsin*, 137 S. Ct. 1933, 1950 (2017) (Roberts, C.J., dissenting, joined by Thomas & Alito, JJ.). ("Our decisions have, time and time again, declared that the Takings Clause protects private property rights as state law creates and defines them. By securing such established property rights, the Takings Clause protects individuals from being forced to bear the full weight of actions that should be borne by the public at large.") (emphasis omitted); *see also Tahoe-Sierra Preservation Council v. Tahoe Regional Planning Agency*, 535 U.S. 302, 354 (2002) (Rehnquist, C.J., dissenting, joined by Thomas & Scalia, JJ.). ("[A]s is the case with most governmental action that furthers the public interest, the Constitution requires that the costs and burdens be borne by the public at large, not a few targeted citizens.").

The United States Forest Service ("USFS") has responsibility to manage national forests including the habitat of endangered species. But a small, family-owned cattle ranch should not be forced to "bear" the entire financial burden of the USFS's management choices, where they interfere with property rights, recognized by state law.

To facilitate review of this Memorandum Opinion And Order, the court has provided the following outline:

---

[2] After the trial concluded in this case in 2012, the court stayed this case so that both parties could ascertain whether alternative water sources could be made available for SGA's cattle. That process, described herein, began on May 5, 2012 and ended in April 2016, when SGA asked the court to resume post-trial briefing. At SGA's request, this case again was stayed from May 23, 2016 through November 1, 2016, to allow SGA to obtain permission from the New Mexico Office of State Engineers ("OSE") to re-direct a water source from the Peñasco Headwaters located on other private property to the Atkinson Canyon for use by SGA. ECF No. 182. SGA's efforts were only partially successful, so post-trial briefing resumed. ECF Nos. 186, 188.

I.   FACTUAL BACKGROUND.

    A.  The History Of The Lincoln National Forest.

    B.  The History Of The Sacramento Grazing Association.

    C.  In 1985, The United States Forest Service Erected "Exclosures" Around Water Sources To Protect Endangered Species: The Sacramento Mountains Thistle And The Southwestern Prickly Poppy.

    D.  Post-Trial Efforts Made By The Parties To Ascertain Alternative Water Sources From 2012 To 2016.

II.   RELEVANT PROCEDURAL HISTORY.

III.   JURISDICTION.

    A.  The Second Amended Complaint Properly Invoked The Jurisdiction Of The United States Court Of Federal Claims.

    B.  The Statute Of Limitations Does Not Bar The Court From Adjudicating The Takings Clause Claims Alleged In The Second Amended Complaint.

        1.  The Court's Pre-Trial November 1, 2010 Memorandum Opinion And Order.

        2.  The Effect Of Subsequent Precedent.

            a.  The Government's Argument.

            b.  The Plaintiffs' Response.

            c.  The Government's Reply.

            d.  The Court's Resolution.

    C.  Standing.

IV.   PLAINTIFFS ESTABLISHED THE RIGHT, UNDER NEW MEXICO LAW, TO BENEFICIAL USE OF STOCK WATER SOURCES WITHIN THE SACRAMENTO ALLOTMENT OF THE LINCOLN NATIONAL FOREST.

    A.  Prior To Trial, Plaintiffs Satisfied The Requirements Of New Mexico Law To Establish A *Prima Facie* Right To Beneficial Use Of Stock Water Sources Within The Sacramento Allotment.

    B.  At Trial, Plaintiffs Also Established That SGA Made Beneficial Use Of Water Sources Within The Sacramento Allotment.

        1.  The Plaintiffs' Argument.

        2.  The Government's Response.

        3.  The Plaintiffs' Reply.

        4.  The Government's Sur-Reply.

        5.  The Court's Resolution.

C. New Mexico Law Does Not Require Diversion To Establish The Right To Beneficial Use Of Stock Water.

    1. The Government's Argument.

    2. The Plaintiffs' Response.

    3. The Court's Resolution.

V.  AT TRIAL, PLAINTIFFS ESTABLISHED UNDER THE TAKINGS CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION THAT THE GOVERNMENT EFFECTED A TAKING OF THEIR RIGHT TO BENEFICIAL USE OF STOCK WATER SOURCES WITHIN THE SACRAMENTO ALLOTMENT OF THE LINCOLN NATIONAL FOREST.

A. The Plaintiffs' Argument.

B. The Government's Response.

C. The Plaintiffs' Reply.

D. The Government's Sur-Reply.

E. The Court's Resolution.

VI.  CONCLUSION.

I.    **FACTUAL BACKGROUND.**[3]

    A.    **The History Of The Lincoln National Forest.**

Between 1902 and 1910, Congress set aside certain tracts of land within the New Mexico Territory to protect the region's timber and water supply, control overstocking the range, and

---

[3] The facts herein were discussed in or derived from: *Sacramento Grazing Ass'n v .United States*, 66 Fed. Cl. 211 (Fed. Cl. 2005) ("*Sacramento Grazing I*") (dismissing, without prejudice, SGA's unripe claim for compensation); *Sacramento Grazing Ass'n v. United States*, 96 Fed. Cl. 175 (Fed. Cl. 2010) ("*Sacramento Grazing II*") (holding that SGA's Takings Clause Claim was not barred by the statute of limitations and that SGA established the right to beneficial use of stock water in the Sacramento Allotment, but denying summary judgment, in part, because issues of material fact remained as to whether the USFS effected a taking of SGA's right to beneficial use of those waters); the April 29, 2008 Government Motion For Summary Judgment Exhibits A–G ("Gov't S.J. Mot. Exs. A–G"); an August 15, 2008 Declaration of Michael Van Zandt ("8/15/08 Van Zandt Decl.") and attached Exhibits A–E ("8/15/08 Van Zandt Decl. Exs. A–E"); an August 15, 2008 Declaration of Frances Goss ("8/15/08 Goss Decl."), and attached Exhibits 1–33 ("8/15/08 Goss Decl. Exs. 1–33"); the September 12, 2008 Government Exhibits H–J ("Gov't Exs. H–J"); the October 10, 2008 Declaration of Michael Van Zandt ("10/10/08 Van Zandt Decl."); the October 10, 2008 Declaration of Frances Goss ("10/10/08 Goss Decl."); the August 12, 2011 Second Amended Complaint ("Sec. Am. Compl."); the October 2011 Expert Report of David Gallacher (DX 504); testimony adduced at the February 6–8, 2012 trial (TR 1–1021"); the June

provide a recreational area for the public.  DX 504 at 10–11.  In 1917, these tracts of land were combined to form the Lincoln National Forest.  DX 504 at 11.

Since 1905, the USFS has administered federally-owned land within the Lincoln National Forest.  Sec. Am. Compl. ¶ 3.[4]  Every year, the USFS determines the number of cattle that may graze on the Sacramento Allotment.  DX 504 at 15 (describing the origin of the "permitting system").  This information is published in Annual Operating Instructions ("AOI"), known as Annual Operating Plans ("AOP").  JX 17–20 (AOI For The Sacramento Allotment from 1997-1998).  Prior to the issuance of an AOP, the USFS District Ranger ("District Ranger") must consult with permittees to determine "the number of cattle, length of [the] grazing season, and [the] allowable utilization levels on forage species," before reaching a final decision issued in a Bill for Collection.  *See Sacramento Grazing I*, 66 Fed. Cl. at 212.

Since 1910, the USFS also has issued multi-year grazing cards (or permits) to ranchers that list "the number of cattle, which pastures were used for grazing[,] and how the ranchers came to obtain the allotment."  TR 202–20, 306 (Frances Goss) ("The grazing cards are to show cattle grazing on allotted pieces of land, and when cattle graze, they drink water, and water was transferred to us when we purchased the allotment.");  PX 17 (grazing cards, issued from 1910-1989, reflecting both cattle grazing and use of water within the Sacramento Allotment).  Historically, grazing permits were issued, based on priority of earliest and continuous use, with priority for smaller, local ranchers, after payment of a fee.  DX 504 at 16, 18.

## B.   The History Of The Sacramento Grazing Association.

In 1885, Ananias Green moved his family from Texas to the Sacramento Mountains of New Mexico to raise cattle.  TR 189–90 (Frances Goss) (Ananias Green "came into the Sacramento Mountains in 1885 from Texas.").  His great-great grandson, Justin ("Spike") Goss, is the Vice-President of SGA,[5] a New Mexico non-profit corporation, formed in 1989, to obtain and hold

---

20, 2017 Declaration of Michael Van Zandt ("2017 Van Zandt Decl.");  Plaintiffs' June 20, 2017 Motion To Supplement The Trial Evidentiary Record ("Pls. 6/20/17 Mot.");  the Government's July 7, 2017 Response to Plaintiffs' 6/20/17 Motion ("Gov't 7/7/17 Resp.");  Plaintiffs' July 17, 2017 Reply ("Pls. 7/17/17 Reply");  and documents admitted into evidence.

[4] *See Our History*, U.S. FOREST SERV., http://www.fs.fed.us/learn/our-history (last visited October 26, 2017).

[5] Initially, the Goss family held forty-six percent of SGA, with Hollis Munson and Melvin Z. Bonnell owning thirty-six percent and eighteen percent, respectively.  DX 504 at 57.  In 1997, the Goss family acquired sole ownership of SGA.  DX 504 at 57.  In 2004, when the initial Complaint in this case was filed, SGA's principal shareholders included: Spike Goss's parents, Frances Goss, Ananias Green's great-granddaughter, and her husband, James ("Jimmy") Goss, who served as SGA's founding President.  Sec. Am. Compl. ¶ 2.  Jimmy Goss passed away on July 6, 2015.  ECF No. 166.  Frances Goss passed away on June 10, 2017.  ECF No. 202.

USFS permits to graze cattle on the Sacramento Allotment of the Lincoln National Forest, New Mexico. TR 183 (Frances Goss) ("[SGA] is an association that was formed to run cattle on an allotment in the Sacramento Mountains."). SGA's base property consists of approximately eighty acres and is held in fee simple. Sec. Am. Compl. ¶¶ 6–7; TR 223 (Frances Goss).[6]

It has been the custom of ranchers in this area of New Mexico to convey water rights at the same time as the sale or transfer of land on the Sacramento Allotment. PX 26; TR 227–32 (Frances Goss) ("You buy [the deed] from predecessors, and all the waters that Oliver Lee had bought, when he sold his allotment, he sold cattle, water rights, access rights, range rights."); TR 321 (Frances Goss) ("it was the custom of the Sacramento Mountain ranchers when they passed their allotment to someone else, that was one of the things they passed, was their water rights."). For example, on December 12, 1896, Eli Reynolds conveyed a deed to Oliver Lee that described "all rights, to title, and interests of [Eli Reynolds] and then to all and every spring or springs in the mouth of said Alamo Canyon, and the Waters of the said springs . . . and to all of the said waters, springs, ditches, and so forth used by appropriation and otherwise." PX 26 (12/12/1896 Deed from Eli Reynolds to Oliver Lee); TR 226–27 (Frances Goss) (reading from PX 26). Such deeds, bills of sale, and other documents trace the appropriation and use of stock water sources within the Sacramento Allotment from 1885 to the present. PX 28; TR 228–29 (Frances Goss) (testifying that the earliest deed in evidence is an 1885 deed from "John James to D.D. Wills."). Federally-issued grazing cards and other documents evidence the continuous grazing of livestock on the Sacramento Allotment from 1885 to the present. PX 18–26; TR 211–32 (Frances Goss).

On April 17, 1989, SGA acquired the Sacramento Cattle Company, including its "cattle, water rights, range rights, access rights, and range improvements on the base property, as well as the appurtenant federally-administered grazing allotment, known as the Sacramento Allotment[.]" Sec. Am. Compl. ¶ 6; *see also* PX 28; DX 504 at 55; TR 229–32 (Frances Goss) (testifying that she traced ownership from the Sacramento Cattle Company to SGA). On November 27, 1989, the District Ranger issued SGA Grazing Permit No. 08–1250 (the "1989 Grazing Permit"), that allowed up to 553 cattle to graze on the Sacramento Allotment for a period of ten years, "unless modified by the [USFS] in the Bill for Collection." JX 10.

**C.    In 1985, The United States Forest Service Erected "Exclosures" Around Water Sources To Protect Endangered Species: The Sacramento Mountains Thistle And The Southwestern Prickly Poppy.**

In 1983, the United States Fish & Wildlife Service ("USFWS") proposed designating the Sacramento Mountains Thistle (*Cirsium vinaceum*) as a threatened species under the Endangered Species Act of 1973, 7 U.S.C. § 163, 16 U.S.C. §§ 1531–1544 (2012) ("ESA"). DX 504 at 51; *see also* DX 20 at SG08526–27; 45 FED. REG. 82,480 (1980). Within the USFS, there was significant disagreement at that time about whether human recreational use was the cause of harm to the thistle or if timber production or livestock grazing was the cause. DX 504 at 51. By 1984,

---

[6] The USFS requires that ranchers who graze cattle on the Sacramento Allotment must maintain a separate base property. TR 323–24 (Frances Goss).

the USFS agreed that "limiting or excluding livestock and humans from the critical habitat areas would help the Sacramento Mountains Thistle to recover." DX 504 at 52 (citing 1/18/84 Letter from the District Ranger to the USFS Supervisor); *see also* DX 44 at SG02112; DX 45–46; DX 50; DX 59; DX 63. To mitigate potential threats to the thistle, the USFS planned to construct fenced exclosures around twenty-nine water bodies, designated as "critical habitats." DX 504 at 52.

By September 1985, the USFS completed exclosures "around 10 acres at the Silver Springs Cienega, 225 acres at Bluff Springs, nineteen acres in Water and Peñasco canyons, and 163 acres in the upper Peñasco for a total of 417 acres within nine exclosures." DX 504 at 53; *see also* DX 37 at SG02075; DX 40 at SG02080. During the 1989 grazing season, additional exclosures were constructed around the Mauldin Springs Habitat Exclosure, the Hubbell Canyon Exclosure, and the Masterson Springs Habitat Exclosure. DX 504 at 53.

SGA was aware of the exclosures at the Sacramento Lake area, when it purchased all rights to the Sacramento Cattle Company in April 1989. TR 454–55 (Jimmy Goss). Nevertheless, from 1989 to 1992, the USFS did not prohibit SGA from leading their cattle to graze and drink water for weeks at a time inside certain exclosures, including the Peñasco Exclosure. DX 504 at 59–60. In fact, unlocked gates or gaps in the exclosures allowed SGA to lead their cattle inside to use the stock water sources therein. TR 482 (Jimmy Goss). The USFS took no enforcement action against SGA for this practice.[7]

In 1992, the USFS constructed the Western Riparian Exclosure, pursuant to the State of New Mexico Habitat Stamp Program ("NMHS Program"),[8] to prevent livestock from entering into

---

[7] As Jimmy Goss testified:

Q. [D]uring this time period that you took over as a member of the [SGA] in [1989] and going forward until 1999, were you able to put your cattle inside of the exclosures to drink water?

A. Yes, sir.

Q. Every year?

A. We owned the water right.

TR 486 (Jimmy Goss).

[8] The NMHS Program works with "sportspersons and the agencies that manage wildlife and their habitats[,]" to fund and engage in habitat improvement projects. *See Habitat Stamp Program*, N.M. Dep't of Game & Fish, http://www.wildlife.state.nm.us/conservation/habitat-information/habitat-stamp/ (last visited November 2, 2017). The NMHS Program requires "licensed hunters, anglers, and trappers" operating on state land to purchase a stamp. *Id.* The

marsh areas.  DX 5 at SG01426 (12/13/91 Western Riparian Exclosure Project Decision Memo); DX 123 (9/18/92 Letter from SGA stating that the Sacramento Mountains Thistle was not threatened by improper livestock management); DX 165 at PL02703 (listing the "Western Riparian Enhancement" as a 1992 "Wildlife Project").  At the time these exclosures were erected, however, stock water was piped by the USFS from a catchment at the end of a marsh in the exclosure to a trough outside the exclosure, so SGA's cattle could use that water.  DX 5 at SG01428, SG01454–72; TR 463–64 (Jimmy Goss); TR 842–43 (Cadwallader).  During drought conditions, an alternative water source at Wright Spring, about a mile away, was available to SGA cattle.  DX 467 at SG06708; TR 504 (Spike Goss); TR 841–44 (Cadwallader).

On January 10, 1994, the District Ranger sent a letter to Jimmy Goss with the 1994 AOP attached.  DX 138 at SG00197.  The 1994 AOP granted SGA permission to graze 553 cattle on the Sacramento Allotment from "03/01 – 2/28."  DX 138 at SG00198.

In May 1994 and again in April 1995, the District Ranger wrote letters to Jimmy Goss to inform him that SGA's cattle were grazing in summer pastures, earlier than the date specified in SGA's 1994 AOP.  DX 504 at 60–61.  In both instances, the District Ranger warned that future violations of the 1994 AOP would not be tolerated, because "the terms and conditions of your grazing permit must be strictly adhered to."  DX 504 at 61 (quoting 4/5/95 Letter from the District Ranger to Jimmy Goss).  Frances Goss responded with two letters to the District Ranger.  DX 504 at 61.  One expressed SGA's gratitude for the District Ranger's fairness and willingness to listen; the other recited SGA's disagreements with the USFS's Manager of the Sacramento Allotment.  DX 504 at 61–62.  In the second letter, Frances Goss took issue with the USFS's concern about overgrazing.  DX 504 at 62 ("There is no way the area we graze in the summer can be overgrazed by 553 head of cattle that only graze it 3 months of the year!") (4/25/95 Letter from Frances Goss to the District Ranger).

On March 1, 1995, the USFS issued an Environmental Assessment, pursuant to the National Environmental Policy Act of 1969, § 102, 42 U.S.C. § 4332 (2012), stating that the Sacramento Lake Exclosure was constructed and being maintained to protect endangered plant species, including the Southwestern Prickly Poppy, as well as the Sacramento Mountains Thistle.  DX 165 at PL02658 (listing species requiring analysis); PL02704 (identifying the Sacramento Lake Exclosure as a past project to be analyzed in conjunction with new alternatives); DX 504 at 60, 63 (grazing on a deferred rotation schedule would have no significant impact).

In November 1995, several letters between William Zimsky, an attorney representing SGA, and the District Ranger were exchanged, discussing management of cattle movement between winter and summer pastures.  DX 504 at 62–63.  After some of SGA's cattle were seen on the summer range, the District Ranger warned SGA that its cattle needed to be removed as soon as possible to avoid USFS administrative action.  DX 504 at 63.

---

revenues received from the purchase of these stamps were to be used by New Mexico to improve wildlife habitat.  *Id.*

On June 12, 1996, the USFS sent a letter to SGA, emphasizing that the "Lincoln National Forest Plan does not permit grazing in wetlands along the Sacramento River," to the extent that SGA's 1989 Grazing Permit was ambiguous.  DX 176.  Recognizing the drought conditions at that time, however, the District Ranger allowed SGA to enter the exclosures, so long as SGA monitored forage levels within the exclosure and promptly moved cattle to the south pasture.  DX 504 at 64.

Nearly a year passed before the USFS sent a letter to SGA on April 11, 1997, stating that "[l]ivestock grazing inside the [Sacramento] wetland exclosure and other excluded riparian areas is not authorized."  DX 184.  But, SGA's 1989 Grazing Permit did not prohibit use of water sources within any of the exclosures constructed before 1989[9] and the USFS continued to allow SGA's cattle the use of water sources therein.  TR 284–86, 298 (Frances Goss).

On August 31, 1997, Frances Goss complained to the USFS about fencing "off our water in various areas."  DX 504 at 64 (quoting 8/31/97 Frances Goss Letter "Decisions Made by the Forest Service, That We Feel Were Detrimental to Our Forage and Natural Resources").  Nevertheless, SGA had sufficient access to stock water sources.  TR at 284–85 (Frances Goss testifying that, even in 1997, SGA's cattle could access water, despite the fencing); TR at 293 (Frances Goss testifying that the USFS did not prohibit access to water in the grazing permit in 1997); TR at 486–87 (Jimmy Goss testifying that SGA was able to take their cattle within the exclosures to drink water every year from 1990 through 1999).

Sometime in 1998, the USFS issued an undated and unsigned AOP that granted SGA permission to graze 553 cattle on the Sacramento Allotment from "03/01 - 2/28."  JX 18 at PL03887.

On May 5, 1998, the District Ranger issued the May 5, 1998 AOP Amendment ("May 5, 1998 AOP Amendment") that specifically listed six riparian exclosures within the Sacramento Allotment where livestock were not permitted to graze.  JX 19 at SG00297.  Those riparian exclosures were: Mauldin Exclosure, Hubbell Springs Exclosure, Western Riparian Exclosure, Bluff Springs Exclosure, Upper Peñasco Exclosure, and Sacramento Lake Exclosure.  8/15/08 Goss Decl. Ex. 8 at SG01695–99.

---

[9] By September 1985, the USFS completed exclosures at Silver Springs Cienega, Bluff Springs, Water Canyon, Peñasco Canyon, and the Upper Peñasco.  DX 504 at 53; *see also* DX 37 at SG02075; DX 40 at SG02080.



DX 408 at SG03621 ("Figure 2. Lower End of the Hubble Exclosure.").



DX 408 at SG03630 ("Figure 14. Water Flowing Below the Bluff Springs Exclosure.").

10



DX 408 at SG03631 ("Figure 16. Exclosure Just Below Top End of the Sacramento Lake Exclosure.").

The May 5, 1998 AOP Amendment required that SGA remove any livestock that might get into the exclosures.  JX 19 at SG00297.  Failure to do so could result in a suspension or cancellation of SGA's 1989 Grazing Permit.  JX 19 at SG00297.

On November 23, 1999, the District Ranger issued Grazing Permit No. 08–1250 (the "1999 Grazing Permit"), that like the prior 1989 Grazing Permit, allowed SGA to graze 553 head of cattle for a ten-year term, but specified that the USFS could cancel or modify the permit to conform to "changes brought about by law, regulation, Executive Order, allotment management plans, land management planning, numbers permitted or seasons of use necessary because of resource conditions, or the lands described otherwise being unavailable for grazing."  JX 70 at SG04304. The 1999 Grazing Permit, however, contained a new clause:

> 5.   Wetland and Threatened and Endangered Plant Exclosures.  Exclosures designated on the attached Sacramento Allotment Range Improvement Allotment Map are considered special emphasis areas . . . [where l]ivestock *use* is not permitted[.]

JX 70 at SG04309 (emphasis added); *see also* DX 504 at 68.

The following map was attached to the 1999 Grazing Permit:



4/29/08 Gov't S.J. Mot. Ex C. at SG04315.

On May 8, 2000, the District Ranger issued the May 5, 1998 AOP Amendment that reduced the number of SGA cattle allowed to graze on the Sacramento Allotment from 553 to 428.  DX 236; TR 324–25 (Frances Goss) (testifying that SGA leased land in 2000, because SGA was "required to move cattle off the [Sacramento A]llotment.").  According to the District Ranger, this amendment was necessary "to provide the required residual plant residue for Mexican Spotted Owl prey species."  DX 504 at 70 (quoting 5/8/00 Letter from the District Ranger to Jimmy Goss).

On August 2, 2000, the USFS again reduced the number of SGA cattle allowed to graze on the Sacramento Allotment from 428 to 330.  DX 242 at SG00497.  On September 8, 2000, in response to SGA's initial refusal to comply, the USFS partially suspended SGA's 1999 Grazing Permit and reduced the number of authorized SGA cattle that could graze on the Sacramento Allotment by 40% for the next two years.  DX 504 at 70.

In 2001, the USFS denied SGA's request to pipe water from the Upper Peñasco Exclosure to a nearby pasture.  DX 504 at 71.  Thereafter, Frances Goss wrote to the Otero County Commission stating that, "we feel [the USFS's denial] violates our right to water cattle."  DX 504 at 71 (quoting 9/15/01 Letter from Frances Goss to Otero County Commission).

In early 2002, the District Ranger informed Jimmy Goss that SGA's cattle were seen in the Upper Rio Peñasco and Sacramento Lake Exclosures, in violation of the 1999 Grazing Permit, and SGA was responsible for removing them.  DX 504 at 72.  In response, Frances Goss wrote that,

> [h]aving our water fenced off from cattle that are passing through our south summer pasture has forced us to open the gate on the river as we are daily keeping track of the cattle as they move to mountain pastures.  We are not trying to graze cattle in exclosures you have exclosed on our allotment, and we have taken cattle off as soon as they came up as the weather warmed up and they began to drift.

JX 25 at SG00640 (5/29/02 Letter from Frances Goss to the District Ranger).

On June 14, 2002, after issuing a Notice of Non-Compliance, the District Ranger delivered an ultimatum: either SGA must remove its cattle from the exclosures or face disciplinary action.  DX 288 at SG0642; DX 504 at 72.  Frances Goss responded that, SGA opened the gate to exclosure areas, only "to access our water right for cattle," and those cattle were only able to access the exclosures, because elk had damaged areas of the exclosure.  DX 504 at 72; JX 26 at PL00814.[10]

---

[10] In 1967, elk were introduced on the Mescalero Apache Reservation, in New Mexico.  TR 880 (Cadwallader).  In the absence of natural predators, the elk population "increased dramatically," to the point where, at the time of the February 2012 trial, the USFS was concerned about "widespread elk use" in the area of, and around, the Sacramento Allotment.  TR 819, 880 (Cadwallader).  In fact, more than one thousand, and possibly even "[t]housands," of elk now roam the Sacramento Allotment.  TR 496 (Spike Goss); TR 956 (Hein).

As the elk population increased, so has their need for plant life and water.  TR 496 (Spike Goss); TR 818 (Cadwallader); TR 956 (Hein).  In addition, elk are "hard on [the exclosure] fences," and much of the damage to "range improvements" has been attributed to elk.  TR 818

A subsequent USFS inspection of the exclosures corroborated Frances Goss's letter.  DX 504 at 73.

On August 30, 2002, at SGA's Annual Meeting, the expenses incurred because of "adverse decisions made for [SGA] by the [USFS]," were discussed and SGA considered "the possibility of a [lawsuit, based on a] taking for riparian areas that are fenced from [SGA's] cattle."  DX 504 at 73 (quoting 8/30/02 Minutes of SGA's Annual Meeting).  When SGA submitted a grazing application for the 2003-2004 season, the District Ranger authorized only 330 cattle and warned SGA that, "we could possibly be looking at total removal of cattle around the end of August[,] if we find ourselves unable to meet the 35% use level or close to it.  We will be reviewing key areas this spring."  DX 504 at 73 (quoting 1/28/03 Letter from the District Ranger to Jimmy Goss).

From February 2003 until August 2003, SGA filed Declarations of Water Rights within the Sacramento Allotment of the Lincoln National Forest with the OSE.  DX 504 at 74.

On August 15, 2003, the USFS ordered that all of SGA's cattle must be removed from the Sacramento Allotment.  DX 504 at 74.  In response, Michael J. Van Zandt, counsel for SGA, requested that the USFS reconsider or delay the deadline for livestock removal, because SGA held "vested and perfected water rights within the federally administered lands [the denial of which would] result in a temporary taking of those property rights."  DX 504 at 74 (citing 8/29/03 Letter from Michael J. Van Zandt, Esq., Counsel to SGA, to the District Ranger).

On December 19, 2003, in response to SGA's failure to remove cattle from the Sacramento Allotment by October 31, 2003, the USFS imposed a second partial suspension on SGA's 1999 Grazing Permit, that subsequently was withdrawn.  DX 504 at 75.  But, the 2004-2005 AOI authorized SGA to graze only 230 cattle on the Sacramento Allotment from March 1, 2004 to May 15, 2004, and 275 cattle from May 16, 2004 to February 28, 2005.  DX 504 at 75.

On February 4, 2004, the USFWS issued a BIOLOGICAL OPINION ON THE EFFECTS TO THE MEXICAN SPOTTED OWL, SACRAMENTO MOUNTAINS THISTLE, AND SACRAMENTO MOUNTAINS

---

(Cadwallader); TR 496 (Spike Goss).  The USFS, however, has "no control over where [elk] go, and how many congregate."  TR 881 (Cadwallader).  As a result, elk freely roam and forage within the exclosures, use water sources therein, and damage endangered species therein.  TR 881 (Cadwallader).

Elk, however, are considered "a huge public resource."  TR 880 (Cadwallader).  Elk is "a high dollar species that brings in hunters, sportsmen, and people who just like to see elk."  TR 880 (Cadwallader).  Therefore, the USFS must "ensure that [it has] adequate elk populations."  TR 880 (Cadwallader).  To control the elk population, the USFS has recommended that the number of elk hunting permits be increased.  TR 818 (Cadwallader).  The USFS can only speculate, about the effectiveness of this effort, because it "[doesn't] really have a good feel for exactly how many elk are out there."  TR 881 (Cadwallader).

PRICKLY POPPY FROM THE PROPOSALS TO ISSUE A PERMIT FOR THE SACRAMENTO GRAZING ALLOTMENT C ("2/4/04 BIOLOGICAL OPINION").   JX 39.   The 2/4/04 BIOLOGICAL OPINION identified the Sacramento Mountains Thistle, the Southwestern Prickly Poppy, and the Mexican Spotted Owl, as species on the Sacramento Allotment that were subject to the ESA.   JX 39 at PL002274.   The 2/4/04 BIOLOGICAL OPINION recommended the permanent exclusion of all livestock from exclosures on the Sacramento Allotment.   JX 39 at PL002286 ("Exclosures will have no livestock use at any time").

On May 4, 2004, SGA filed a Complaint in this case.   ECF No. 1.

On July 28, 2004, the USFS issued a Record of Decision, entitled "Final Environmental Impact Statement, Sacramento, Dry Canyon and Davis Grazing Allotments" ("7/28/04 Record of Decision"), to implement most of the recommendations made by the USFWS in the 2/4/04 BIOLOGICAL OPINION, including the removal of SGA's livestock from the Alamo Pasture from July 1, 2005 through July 1, 2006, but allowing between 200 and 412 of SGA's cattle to graze on the Sacramento Allotment on the summer range and between 200 and 335 on the winter range.   JX 41; DX 504 at 76.

On September 6, 2005, SGA filed the First Amended Complaint in this case.   ECF No. 15.

In late 2005, the District Ranger prepared a draft of a new ten-year grazing permit, but SGA refused to sign it, so the USFS modified the 1999 Grazing Permit to conform to the 7/28/04 Record of Decision.   DX 504 at 77 (citing 11/17/05 Letter from the District Ranger to Jimmy Goss).   After SGA refused to sign a new ten-year grazing permit, on January 17, 2006, the USFS unilaterally modified SGA's 1999 Grazing Permit to specify that grazing was prohibited within the Sacramento Lake Exclosure, Hubbell Exclosure, Upper Mauldin Exclosure, Lower Mauldin Exclosure, Upper Peñasco Exclosure, Bluff Springs Exclosure, and Western Riparian Exclosure. DX 504 at 77; DX 413 at PL3317 (12/16/05 Letter from the District Ranger to Jimmy Goss with the new ten-year grazing permit attached that modified Part 3 of SGA's Grazing Permit so that "livestock grazing is not authorized within [the following exclosures:] Sacramento Lake, Hubbell, Upper Mauldin, Lower Mauldin, Upper Peñasco, Bluff Springs, and Western Riparian."); JX 45 at PL3353 (1/17/06 Letter from the District Ranger to Jimmy Goss stating, because "[SGA] did not comment on the draft or request a meeting with [the District Ranger] to discuss [the new ten-year grazing permit] . . . [or] sign the new term grazing permit, [SGA's 1999 Grazing Permit] is modified.").   In addition, pursuant to the 7/28/04 Record of Decision, an updated allotment management plan was provided to SGA announcing the construction of new exclosures around Wills Canyon, Water Canyon, McAfee Canyon Wetland, Sacramento Lake Wetland Expansion, and Upper Peñasco Fence.   DX 504 at 77; DX 413 at PL3318.

Later in 2006, SGA requested permission to: (1) move a fence at the north end of the Sacramento Lake Exclosure, so that livestock could access water from outside the exclosure; and (2) install a temporary pipeline from the Rio Peñasco to the Atkinson Pasture.   DX 504 at 78.   The District Ranger rejected both requests, stating that both plans could potentially impact the Sacramento Mountains Thistle population and would be incompatible with the 7/28/04 Record of Decision.   DX 504 at 78.   Although disputing SGA's claims of water rights, the District Ranger

suggested alternative sources of water below the Sacramento Lake Exclosure that SGA might be able to use.  DX 504 at 78–79.

In 2007, SGA continued to assert that the USFS continued to deny SGA use of stock water sources in the Sacramento Allotment to which SGA had a property right under New Mexico law. DX 504 at 80.  In a letter to the District Ranger, Jimmy Goss wrote that "[w]e have asked many times that you would allow our cattle to access our right to water on the Sacramento River and Pe[ñ]asco Headwaters.  These rights have been denied. . . . We don't want any more fences . . . that exclude cattle."  DX 504 at 79 (5/28/07 Letter from Jimmy Goss to the District Ranger). Jimmy Goss also informed the USFS that it was SGA's practice to allow cattle to access water inside the exclosures, because "the county said the [USFS] had no right to keep [the exclosure] gates closed."  DX 504 at 80 (quoting 6/11/07 Letter from a Rangeland Management Specialist to the District Ranger and his staff).

Since 2008, the number of SGA's cattle permitted on the Sacramento Allotment has fluctuated between 335 and 412.  DX 504 at 81.  Although the USFS suspended SGA's permit several times, to date, SGA's permit was never cancelled.  DX 504 at 70.  SGA's current permit expires on December 31, 2018.  ECF No. 150 at 1.

### D.    Post-Trial Efforts Made By The Parties To Ascertain Alternative Water Sources From 2012 To 2016.

At the court's request, after the trial in this case was concluded in 2012, the USFS and SGA worked together until 2016 to locate alternative water sources within the Sacramento Allotment that could be made available to SGA's cattle.

On March 5, 2012, the USFS "filed an Application for a Permit to appropriate surface water from the Rio Peñasco [H]eadwaters" with the OSE (the "March 5, 2012 Application").  ECF No. 119 at 1.  This Application "requested a permit authorizing the [USFS] to divert up to 0.78 acre-feet [per annum] from the Rio Peñasco [H]eadwaters to the Lincoln National Forest."  ECF No. 119 at 1.  The water was to be re-directed "into a trough in Atkinson Canyon . . . where the water would be used for livestock and wildlife watering."  ECF No. 119 at 1–2.  On March 21, 2012, the OSE notified the USFS that the March 5, 2012 Application was rejected, because "the Rio Peñasco . . . [was] fully appropriated."  ECF No. 119 at 2.  Thereafter, proceedings before the OSE were stayed "until approximately January 3, 2014 . . . to allow time for SGA to file a separate application for processing by the OSE, that, if approved, would obviate the need to go forward with . . . protests against the [USFS's March 5, 2012 A]pplication."  EFC No. 145 at 2.

On April 30, 2012, the USFS also met with SGA to "review a proposed permit modification for the cooperative development" of a trick tank in the Atkinson Pasture.  ECF No. 121 at 2–4. Initially, the USFS proposed "cost sharing," under which "the [USFS] estimated that its share of the project costs (materials and labor) was 75% and SGA's was 25% (all labor)."  ECF No. 121 at 2.

On May 11, 2012, SGA sent a letter to the USFS "raising concerns about the trick tank" and stating that SGA "[did] not believe that the trick tank should be included as part of its range improvements." ECF No. 121 at 2. In response, on June 1, 2012, the USFS "notified SGA . . . that it was prepared to move forward with the construction of the Atkinson [P]asture trick tank and that 'the [USFS would] provide all materials and labor for the project.'" ECF No. 121 at 3. On June 13, 2012, the USFS installed the Atkinson Pasture trick tank. ECF No. 121 at 3; ECF No. 183. A photograph of the trick tank follows:



JX 126 at 1 ("Atkinson Trick Tank Photograph – October 18, 2012").

In addition, on June 14, 2012, the USFS met with SGA to discuss "options for improving access to water in the area of the Sacramento Lake, including options for rebuilding or relocating portions of the exclosure fence at this location." ECF No. 121 at 4.

On September 11, 2012, the USFS submitted a letter and Application For Permit To Change An Existing Water Right to the OSE (the "September 11, 2012 Application For Permit To Change"). JX 120 at 1; JX 121 Ex. 1 at 1. The September 11, 2012 Application For Permit To Change requested permission from the OSE to

divert[] water from Willie White Canyon Spring, . . . for livestock and wildlife watering purposes. Water is conveyed in a closed conduit to place of use in an area near the spring and released into a watering trough. Excess water is returned to the water course in which the spring naturally discharges.

JX 121 Ex. 1 at 2.



DX 576 at 65 ("Sacramento Lake Range Improvements").

On June 13, 2013, the District Ranger "signed a Decision Notice and Finding of No Significant Impact," on the water development projects proposed as a result of April 30, 2012 and June 14, 2012 meetings between the USFS and SGA.  ECF No. 142 at 1.

18



JX 124 at 19 ("Sacramento Lake fence, pipeline, and drinker proposed location").

The June 13, 2013 Decision summarized the three proposed developments as follows: (1) "construction of a diversion to collect and divert water from a free flowing spring source at [the] headwaters of the Rio Peñasco;" (2) "construction of a new water development just below the dam at Sacramento Lake;" and (3) "removal of existing barbed wire fence around [the] Sacramento Lake wetland and replacement with a three rail pipe fence design." ECF No. 142 Ex. 1 at 2–3.

On November 25, 2013, SGA filed an "Application for Permit to Change part of the Peñasco water right to [the] Atkinson [P]asture" with the OSE (the "November 25, 2013 Application") (ECF No. 147), to re-direct 0.185 acre-feet per annum of water located on private property owned by Arthur and Mary Jenke to the Lincoln Nation Forest from the "headwaters of the Rio Peñasco" (PX 96).

On February 10, 2014, the OSE approved SGA's November 25, 2013 Application, but "found that the extent of the water right is 2.875 acre-feet per annum, which is less than the 12.6 acre-feet per annum amount claimed." ECF No. 147 at 2.

On February 12, 2014, SGA requested a clarification of the OSE's decision.  ECF No. 148 at 2.  On February 14, 2014, the USFS withdrew the March 5, 2012 Application in light of the OSE's approval of SGA's prior November 25, 2013 Application.  ECF No. 149 at 3.  On February 18, 2014, "Otero County gave permission to place a 1 1/4 inch poly pipeline . . . to supply water from the headwaters of the Rio Peñasco to [the] Atkinson Pasture."  ECF No. 149 at 4.  On that same day, the OSE provided SGA with an explanation for its finding regarding the "extent of [SGA's] water right" that SGA believed was "in error."  ECF No. 148 at 2.

On February 24, 2014, a pipeline was installed by the USFS and SGA to re-direct water from the Rio Peñasco to a water trough installed in the Atkinson Pasture, with the USFS providing the pipeline and trough.  ECF No. 149 at 4; ECF No. 183.

On February 26, 2014, "members of SGA and [the USFS] returned . . . to complete the over flow-line, set the float valve on the trough, and test the trough."  ECF No. 149 at 4.



ECF No. 149 Ex. 3 at 9 (USFS and SGA members working on the pipeline).

On March 10, 2014, SGA filed a request for partial reconsideration of the OSE's finding.  ECF No. 149 at 1–3.  Despite the fact that the administrative appeal was pending, it was "SGA's understanding that the project [could] go forward."  ECF No. 148 at 3.

On March 13, 2014, SGA and the USFS placed a tap on a pipeline below the Sacramento Lake area, installed a water meter, and plumbed a trough that was filled with water from the Sacramento River Pipeline.  ECF No. 149 at 4; ECF No. 183.



ECF No. 149 Ex. 3 at 9 ("Water meter installed to measure water usage").



ECF No. 149 Ex. 3 at 10 ("Trough with escape ramp and float valve cover").

In early 2016, SGA filed a new "Application to Change Place of Use and Point of Diversion," (the "2016 Application") with the OSE, "identifying an adjudicated water right owned by the Gosses . . . for a partial change in point of diversion for the 0.185 acre-feet per annum of water originally applied for in SGA's November 25, 2013 Application." ECF No. 184 at 1–2. The 2016 Application "propose[d] to change the point of diversion and place of use of a portion of [the] water right . . . to the location of the Peñasco/Atkinson project for consumption by livestock and wildlife." ECF No. 187 at 2.

On August 24, 2016, the OSE issued an "emergency authorization . . . while [SGA's 2016] Application proceed[ed] through the publication and permitting process." ECF No. 186 at 2, 10.

On October 12, 2016, the OSE resolved SGA's March 10, 2014 administrative appeal by approving SGA's 2016 Application, to allow SGA to change the point of diversion for 0.185 acre-feet per annum of water. ECF No. 188.

## II.    RELEVANT PROCEDURAL HISTORY.

On May 4, 2004, SGA filed a Complaint in the United States Court of Federal Claims (the "Complaint"), alleging a taking by the USFS of SGA's water rights, preference grazing rights, and the Goss Ranch, under the Takings Clause of the Fifth Amendment to the United States Constitution and for compensation, pursuant to 43 U.S.C. § 1752(g).[11]  ECF No. 1.

On November 1, 2010, the court issued a Memorandum Opinion And Order granting-in-part and denying-in-part the Government's April 29, 2008 Motion For Summary Judgment regarding the alleged taking of SGA's right to forage, SGA's 1999 Grazing Permit and/or preference grazing rights, and taking of SGA's right-of-way over federal lands.  ECF No. 74 (*Sacramento Grazing II*, 96 Fed. Cl. at 189–90).  Therein, the court also granted-in-part and denied-in-part the Government's Motion For Summary Judgment regarding SGA's claim that the USFS engaged in an alleged taking of the Goss Ranch, "[t]o the extent [SGA's claim was] premised on [an] alleged right to forage and/or taking of [SGA's 1989] Grazing Permit . . . and/or

---

[11] Section 402(g) of the Federal Land Policy And Management Act of 1976 provides:

Whenever a permit or lease for grazing domestic livestock is cancelled in whole or in part, in order to devote the lands covered by the permit or lease to another public purpose, including disposal, the permittee or lessee shall receive from the United States a reasonable compensation for the adjusted value, to be determined by the Secretary, concerned, of his interest in authorized permanent improvements placed or constructed by the permittee or lessee on lands covered by such permit or lease, but not to exceed the fair market value of the terminated portion of the permittee's or lessee's interest therein.  Except in cases of emergency, no permit or lease shall be cancelled under this subsection without two years' prior notification.

43 U.S.C. § 1752(g) (2012).

preference grazing rights." *Id*. at 190.  The court, however, denied the Government's Motion For Summary Judgment as to SGA's claims that the USFS engaged in a taking of the Goss Ranch "[t]o the extent that . . . claim [arose] from [the] USFS's[s] . . . denying [SGA's] use of their vested range stock water rights, within the riparian exclosures of the Sacramento Allotment and the Alamo Pasture[.]" *Id*.  The court also denied the Government's Motion For Summary Judgment as to an alleged taking of SGA's stock water rights in the Peñasco Exclosure and other riparian exclosures. *Id*. at 190–91.  The court also granted-in-part SGA's Cross-Motion for Summary Judgment, ruling that SGA established *prima facie* ownership of range stock water rights within the Sacramento Allotment under New Mexico law.  *Id*. at 191–93.  The court, however, denied-in-part SGA's Cross-Motion For Summary Judgment, with respect to the alleged physical taking of SGA's stock water rights, because genuine issues of material fact existed "with respect to water sources within the exclosure to the Sacramento Allotment and other water sources in the Alamo Pasture" and "neither party has proffered any evidence [about] the economic impact" of the regulatory taking claim alleged in the May 4, 2004 Complaint.  *Id*. at 193–95.  In addition, the court ruled that genuine issues of fact existed as to whether the USFS "reduced the amount of water accessible by [SGA or] denied all meaningful access to their water rights."  *Id*. at 195 (internal citation omitted).

On August 12, 2011, SGA filed a Second Amended Complaint, alleging a Fifth Amendment taking of SGA's "rights to water found on or originating on the [Sacramento Allotment.]"  ECF No. 85; Sec. Am. Compl. at 7.  On August 29, 2011, the Government filed an Answer.  ECF No. 87.

From February 6, 2012 through February 8, 2012, the court presided over a liability trial in Albuquerque, New Mexico.  TR 1–1021.

On February 23, 2012 SGA filed an Amended Declaration with the OSE to re-direct water from the Rio Peñasco Headwaters that the OSE rejected, because it was not specific as to the point of diversion, quantity of water claimed by SGA, or that the water had been put to beneficial use. Gov't 9/17/15 Br. at 67 (citing JX 91, 94).

On March 2, 2012, the parties filed a Joint Status Report, informing the court that the parties were engaged in settlement negotiations.  ECF No. 110.  On April 16, 2012, the parties filed a Joint Status Report, informing the court of proceedings held before the OSE.  ECF No. 119. On June 18, 2012, the Government filed a Status Report regarding the parties' settlement negotiations.  ECF No. 121.  On June 19, 2012, SGA filed a Status Report, informing the court of SGA's settlement efforts.  ECF No. 122.

On July 13, 2012, the court issued an Order requesting the parties to convene a settlement conference with the District Ranger and the OSE on July 27, 2012.  ECF No. 125.  Thereafter, the parties worked together to identify alternative water sources that could be made available to SGA at the Atkinson Pasture and the Sacramento Lake.  ECF Nos. 126, 128, 131–32, 135, 137–38, 140–50, 183–84, 186–88 (Status Reports filed by parties, either separately or jointly).

On April 16, 2014, SGA filed a Status Report, to inform the court that after SGA's term grazing permit expires on December 31, 2018, SGA has "priority for a new permit" on that date.

ECF No. 150 at 1 (citing 43 U.S.C. § 1752(c) (2012)[12]); *see also* 36 C.F.R. § 222.3(c)(1)(ii).[13] According to SGA, grazing permits are automatically renewed, unless the permittee is in violation

---

[12] 43 U.S.C. § 1752(c) provides, in relevant part:

(c)      First priority for renewal of expiring permit or lease

     (1)      Renewal of expiring or transferred permit or lease

         During any period in which (A) the lands for which the permit or lease is issued remain available for domestic livestock grazing in accordance with land use plans prepared pursuant to section 1712 of this title or section 1604 of Title 16, (B) the permittee or lessee is in compliance with the rules and regulations issued and the terms and conditions in the permit or lease specified by the Secretary concerned, and (C) the permittee or lessee accepts the terms and conditions to be included by the Secretary concerned in the new permit or lease, the holder of the expiring permit or lease shall be given first priority for receipt of the new permit or lease.

     (2)      Continuation of terms under new permit or lease

         The terms and conditions in a grazing permit or lease that has expired, or was terminated due to a grazing preference transfer, shall be continued under a new permit or lease until the date on which the Secretary concerned completes any environmental analysis and documentation for the permit or lease required under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) and other applicable laws.

[13] 36 C.F.R. § 222.3(c)(1)(ii) provides:

(c)      The Chief, Forest Service, is authorized to issue permits for livestock grazing and other use by livestock of the National Forest System and on other lands under Forest Service control as follows:

     (1)      Grazing permits with priority for renewal may be issued as follows: On National Forests in the 16 contiguous western States 10–year term permits will be issued unless the land is pending disposal, or will be devoted to other uses prior to the end of ten years, or it will be in the best interest of sound land management to specify a shorter term. On National Forest System lands other than National Forests in the 16 contiguous western States, the permit term shall be for periods of 10 years or less. Term grazing permits for periods of 10 years or less in the form of grazing agreements may be issued to cooperative grazing associations or similar organizations incorporated or otherwise established pursuant to State law. Such an agreement will make National Forest System lands and improvements available to the association for grazing in accordance with provisions of the grazing agreement and Forest Service policies. Term permits authorized in

24

of the grazing permit or the land is devoted to another public purpose. ECF No. 150 at 1 (citing *Pub. Lands Council v. Bobbitt*, 529 U.S. 728, 743 (2000)). Although SGA appeared to be satisfied with the mitigation efforts at the Atkinson Pasture and the Sacramento Lake, SGA nevertheless concluded it is entitled to "compensation . . . due for the taking of its water rights and resulting impacts to its ranching operations" from 1998 to the present. ECF No. 150 at 2. On June 16, 2014, the parties filed a Joint Status Report, to inform the court of the status of the settlement negotiations. ECF No. 152.

On September 4, 2014, the parties filed a Joint Status Report, informing the court that settlement negotiations did not resolve all issues between the parties and proposing further proceedings. ECF No. 153. On September 30, 2014, the parties filed a Joint Proposed Liability Post-Trial Briefing Schedule. ECF No. 154. On October 1, 2014, the court issued a Scheduling Order scheduling post-trial brief filings. ECF No. 155. On December 19, 2014, the parties filed a Joint Status Report, submitting to the court Joint Proposed Supplements To The Trial Record. ECF No. 158.

On January 9, 2015, the Government filed Objections To Supplement Exhibits, arguing that four documents related to proceedings before the OSE should be "admitted only for the purpose of showing what was filed by SGA with [the] OSE." ECF No. 159 at 1. On March 11, 2015, the court stayed its ruling on the Government's January 9, 2015 Objections To Supplement Exhibits "until conclusion of post-trial briefing," and ordered the parties to "file a Joint Motion To Close The Record on or before April 13, 2015." ECF No. 160. On April 13, 2015, the parties filed a Joint Motion To Close Trial Record. ECF No. 161. On April 14, 2015, the court granted the parties' April 13, 2015 Joint Motion To Close Trial Record.

On June 30, 2015, SGA filed a Post-Trial Brief. ECF No. 164 ("Pls. 6/30/15 Br."). On September 17, 2015, the Government filed a Post-Trial Brief. ECF No. 167 ("Gov't 9/17/15 Br."). On November 2, 2015, SGA filed a Reply. ECF No. 170 ("Pls. 11/2/15 Reply"). On November 17, 2015, the Government filed a Post-Trial Reply Brief. ECF No. 178 ("Gov't 11/17/15 Reply").

On May 23, 2016, the court issued a stay, pending resolution of SGA's 2016 Application pending before the OSE. ECF No. 182.

---

this paragraph may be in the form of private land or on-and-off grazing permits where the person is qualified to hold such permits under provisions the Chief may require. Permits issued under this paragraph are subject to the following:

* * *

(ii)     A term permit holder has first priority for receipt of a new permit at the end of the term period provided he has fully complied with the terms and conditions of the expiring permit.

On June 8, 2016, the Government filed a Status Report informing the court of the status of improvements on the Sacramento Allotment. ECF No. 183. On September 1, 2016, SGA filed a Status Report, informing the court of the resolution of proceedings before the OSE. ECF No. 184.

On September 28, 2016, SGA filed a Status Report advising the court that the OSE resolved SGA's 2016 Application. ECF No. 186. On October 17, 2016, SGA filed a Status Report including documentation of the OSE's October 12, 2016 resolution. ECF No. 188. On November 1, 2016, the court issued an Order lifting the May 23, 2016 stay and inviting the parties to file supplemental briefs. ECF No. 189.

On December 30, 2016, SGA filed a Post-Trial Supplemental Brief ("Pls. 12/30/16 Br. Supp.). ECF No. 192. On January 2, 2017, the Government filed a Post-Trial Supplemental Brief. ECF No. 193 ("Gov't 1/2/17 Br. Supp.").

On March 17, 2017, the Government filed a Notice of Supplemental Authority, advising the United States Court of Federal Claims that the United States District Court for the District of Nevada had issued a final decision in a related case, *United States v. Estate of Hage*, No. 2:07-cv-1154-GMN-VCF, 2017 WL 752832 (D. Nev. Feb. 27, 2017). ECF No. 194. On April 4, 2017, SGA filed an Objection To Defendant's Notice Of Supplemental Authority, arguing that the court should strike the Government's March 17, 2017 Notice, because it was an attempt to file a supplemental brief, without the court's leave. ECF No. 195. In the alternative, SGA requested the court's leave to file a Response. ECF No. 196. On April 6, 2017, the court granted the parties leave to file supplemental briefs regarding the Government's March 17, 2017 Notice. ECF 197.

On June 20, 2017, SGA filed a Motion To Supplement Trial Evidentiary Record. ECF No. 198 ("Pls. 6/20/17 Mot."). Accompanying the June 20, 2017 Motion was the Declaration of SGA's Counsel, Michael Van Zandt and two exhibits issued by the OSE. ECF No. 199 ("6/20/17 Van Zandt Decl., Ex. 1 and 2"). On July 7, 2017, the Government filed a Response, requesting leave to file briefing contesting the relevance of these documents. ECF No. 200 ("Gov't 7/7/17 Resp."). On July 17, 2017, SGA filed a Reply to the Government's Response. ECF No. 201 ("Pls. 7/17/17 Reply").

## III.   JURISDICTION.

### A.   The Second Amended Complaint Properly Invoked The Jurisdiction Of The United States Court Of Federal Claims.

The United States Court of Appeals for the Federal Circuit has held that the Takings Clause of the Fifth Amendment is "money-mandating." *See Schooner Harbor Ventures, Inc. v. United States*, 569 F.3d 1359, 1362 (Fed. Cir. 2009) ("The Tucker Act waives sovereign immunity and provides jurisdiction for certain types of claims, including . . . where there is a money-mandating provision on which the plaintiff may base its recovery. . . . In this case, that provision is the Fifth Amendment.") (citing *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005)); *see also Moden v. United States*, 404 F.3d 1335, 1341 (Fed. Cir. 2005). Therefore, "to the extent [Plaintiffs]

26

have a nonfrivolous takings claim founded upon the Fifth Amendment, jurisdiction under the Tucker Act is proper." *Moden*, 404 F.3d at 1341.

The court previously determined that it has jurisdiction to adjudicate the Fifth Amendment Takings Clause claim alleged in SGA's September 6, 2005 First Amended Complaint. *See Sacramento Grazing II*, 96 Fed. Cl. 175 at 186. SGA's August 12, 2011 Second Amended Complaint also alleges "a taking of property within the meaning of the Fifth Amendment to the Constitution of the United States for which compensation is due and owing" and properly invokes the jurisdiction of the United States Court of Federal Claims under 28 U.S.C. § 1491(a)(1). *See* Sec. Am. Compl. ¶ 16.

For these reasons, the court has jurisdiction to adjudicate the Takings Clause claims alleged in SGA's August 12, 2011 Second Amended Complaint.

**B.      The Statute Of Limitations Does Not Bar The Court From Adjudicating The Takings Clause Claims Alleged In The Second Amended Complaint.**

**1.      The Court's Pre-Trial November 1, 2010 Memorandum Opinion And Order.**

As a matter of law, the Tucker Act requires that a plaintiff must file a complaint in the United States Court of Federal Claims within six years after a claim "first accrues." *See* 28 U.S.C. § 2501 ("Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.").

On May 5, 1998, the USFS amended the 1998 AOP for the Sacramento Allotment, the result of which was to prohibit SGA's cattle from grazing on six riparian exclosures and access to stock water therein. JX 19 at 1 (5/5/98 AOP Amendment). Thereafter, the court determined that the Fifth Amendment Takings Clause claims alleged in SGA's May 4, 2004 Complaint did not accrue until May 5, 1998. *See Sacramento Grazing II*, 96 Fed. Cl. at 187; *see also John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1355 (Fed. Cir. 2006) ("A takings claim accrues when *all* the events have occurred which fix the liability of the Government and entitle the claimant to institute an action.") (internal quotation marks omitted) (emphasis added); *Walker v. United States*, 69 Fed. Cl. 222, 233 (Fed. Cl. 2005) (holding that plaintiff's constitutional taking claim did not accrue, until they were denied access to use their rightful water). Although some of the riparian exclosures at issue, including the Peñasco Exclosure, existed within the Sacramento Allotment, prior to May 5, 1998, the USFS took no action until September 8, 2000 to require SGA to remove its cattle from those six exclosures within the Sacramento Allotment on penalty of suspension or cancellation of SGA's 1999 Grazing Permit. JX 18; JX 19; JX 21, JX 70; DX 504 at 70; 10/10/08 Goss Decl. ¶ 7 ("In the time between when SGA first obtained [a] grazing permit in 1989 and when the exclosures became a barrier to the use of water in 1998, if the cattle needed water, SGA was allowed free access so the cattle could use the water.").

In 2009, in *Ingrum v. United States,* 560 F.3d 1311 (Fed. Cir. 2009), the United States Court of Appeals for the Federal Circuit held that a "claim first accrues *when all the events have*

*occurred that fix the alleged liability* of the [G]overnment and entitle the claimant to institute an action. Therefore, a claim alleging a Fifth Amendment taking accrues *when the act that constitutes the taking occurs.*" *Id.* at 1314 (emphasis added); *see also Nw. La. Fish & Game Preserve Comm'n v. United States*, 446 F.3d 1285, 1289 (Fed. Cir. 2006) ("A taking occurs when governmental action deprives the owner of all or most of its property interest.") (internal citations omitted).

For these reasons, on November 1, 2010, the court determined that SGA's Takings Clause claims, as set forth in SGA's May 4, 2004 Complaint,  first accrued on May 5, 1998 and therefore were not barred by 28 U.S.C. § 2501.

### 2.    The Effect Of Subsequent Precedent.

In 2012, the United States Court of Appeals for the Federal Circuit held that a physical taking, based on the construction of fences in a grazing allotment to prohibit cattle from access to and use of water sources, accrued for statute of limitations purposes when the fences were completed.  *See Estate of Hage v. United States*, 687 F.3d 1281, 1289–90 (Fed. Cir. 2012), *cert. denied*, 133 S. Ct. 2824 (2013).

### a.    The Government's Argument.

During post-trial briefing, the Government argued that SGA knew or should have been aware, as early as the issuance of the 1983 "Sacramento River Wildlife Habitat Management Plan Environmental Analysis," that the construction of exclosures was likely to occur in the near future.

> The recommendations proposed in the . . . [Sacramento River Wildlife Habitat Management] Plan are to fence, plant, and seed portions of the Sacramento River basin. . . . The objective is to restore and protect important wildlife habitat.

> At present, wildlife habitat in the Sacramento River basin is deteriorating for a number of reasons.  Long term cattle grazing, heavy recreational use, and the location of Forest Road 537 in the river basin all contribute to the declining quality of wildlife habitat.

DX 194 at SG01806; *see also* DX 65 at SG00966–67, SG01092 (1986 Lincoln Forest Plan designating areas from which livestock use was to be excluded); DX 177 at PL00499 (6/20/96 Letter from the District Ranger to SGA stating: "Livestock use inside the Sacramento Lake Exclosure has been a problem since the beginning of the summer grazing season. Th[is] area [is] effectively closed to grazing. . . . I cannot legally justify allowing continual livestock use within the exclosures.").

In the alternative, the Government argues that SGA's claims, alleging the taking of water rights within the exclosures in the Sacramento Allotment,[14] accrued between 1983 and 1992, when the USFS erected eight exclosure fences and warned SGA not to allow cattle to graze within those exclosures. Gov't 9/17/15 Br. at 47–48 (citing DX 106 at PL00446 (8/16/91 Letter from the USFS Forest Supervisor to the District Ranger stating, "[i]f cattle are observed at any time during the grazing season in any of these exclosures by either the [USFS] or the permittees, they will be immediately removed and the fences repaired."); DX 109 (10/20/91 USFS letter acknowledging SGA's request for permission to use Upper Peñasco Exclosure and recommendation by USFS staff that no grazing be permitted within the exclosure); DX 123 at SG02433 (9/18/92 Letter from SGA to the USFS Forest Supervisor reporting that the August 28, 1992 Recovery Plan for Sacramento Mountains Thistle ("8/28/92 Recovery Plan") resulted in a situation where, "[t]he species in almost every area where it grows is fenced away from livestock"); DX 189 (8/31/97 Letter from SGA complaining that the USFS "fenced off our water in various areas . . . and forced the cows to use other water areas and graze around those waters excessively")). "The fact that SGA was allowed limited use of the Upper Peñasco Exclosure in 1989 and 1990 does not change the [statute of limitations] analysis." Gov't 9/17/15 Br. at 57. Instead, it reaffirms SGA's prior "understanding that the livestock use of the exclosure was not authorized under its term grazing permit." Gov't 9/17/15 Br. at 57. In addition, SGA's requests to allow cattle within the exclosures in 1991 was denied on October 16, 1992, because of the USFS's decision that the Peñasco Exclosure "was constructed in 1985 from Threatened and Endangered Species funds to protect the upper Rio Peñasco watershed, as well as to protect [the] Sacramento Mountain[s] Thistle from livestock grazing." DX 109 at PL00450; *see also* DX 124 at PL00452 (10/16/92 Letter from the District Ranger, denying SGA's request to graze up to 50 cattle in the Upper Peñasco from October 15, 1992 to November 1, 1992, because of the need to "protect critical [*Cirsium*] vinaceum habitat on the headwaters of the Rio Peñasco.").

In any event, by 1991, when SGA's request to place livestock in the exclosures was denied, SGA knew that livestock were not permitted within the exclosures. Gov't 9/17/15 Br. at 60. The letters from the USFS denying those requests confirmed that SGA livestock use of the exclosures was not permitted, to the extent that issue was not previously understood by SGA. Gov't 9/17/15 Br. at 60.

Therefore, prior to the May 5, 1998 AOP Amendment, "SGA was aware of the exclosures on the Sacramento Allotment, was informed about the purposes of the exclosures, and knew that livestock use of those exclosures was not authorized." Gov't 9/17/15 Br. at 60. The 1998 AOP Amendment did not reflect any "new decision or policy . . . , nor did [it] modify the location or size of exclosure fences that had been constructed years earlier." Gov't 9/17/15 Br. at 59. Instead, it was issued "to [e]nsure that [the USFS] policy regarding grazing use in riparian exclosures [was]

---

[14] The eight exclosures identified by the Government are: Sacramento Lake Exclosure, Western Riparian Exclosure, Bluff Springs Exclosure, Upper Peñasco Exclosure, Upper and Lower Mauldin Exclosures, Hubbell Springs Exclosure, and Water Canyon Exclosure. Gov't 9/17/15 Br. at 13–14.

clearly understood." JX 19 at SG00297. The Government concludes that SGA's May 4, 2004 Complaint is barred by 28 U.S.C. § 2501. Gov't 9/17/15 Br. at 47–48.

### b.      The Plaintiffs' Response.

SGA's Fifth Amendment Takings Clause claims accrued no earlier than the May 5, 1998 AOP Amendment. Pls. 6/30/15 Br. at 12 (citing JX 19). Prior to that time, SGA was permitted to run cattle on the Sacramento Allotment "in accordance with the [applicable AOP] at all times" and neither SGA's 1989 Grazing Permit nor the 1998 AOP prohibited SGA from exercising the right to beneficial use of water on the Sacramento Allotment within the exclosures. Pls. 11/2/15 Reply Br. at 2–3; JX 10 (SGA's 1989 Grazing Permit); TR at 502 (Spike Goss) (testifying that SGA was able to open the gates of the exclosures and enter with their cattle). As a former District Ranger testified:

> A. What I recall is that the Gosses used to bring cattle from one pasture to another one, through that area, and we would allow them to open the gate and move the cattle through there without letting them stop and graze.
>
> Q. Would the cattle use the water source there?
>
> A. They could, for maybe a day or two.

JX 84 at 79.

The 1998 AOP only stated that "salt [would be placed] at least one half mile [away] from" occupied Sacramento Mountains Thistle habitat, to attract livestock away from these exclosures. JX 18 at PL03888; *see also* 16 U.S.C. § 1536(a)(2) (2012) (requiring that an AOI must comply with the ESA). Subsequently, a restraint was placed at the Peñasco Exclosure "to prevent the [USFS]'s practice of allowing SGA to open up the fence gates and bring cattle through the Peñasco [E]xclosure to use the water source for a day or two, but that restraint only was for one year." Pls. 11/2/15 Reply Br. at 3.

Moreover, the communications between the USFS and SGA prior to May 5, 1998, concerning the exclosures focused on "the prohibition against grazing therein—not denial of access to water." Pls. 11/2/15 Reply Br. at 5 (citing DX 109; DX 124; DX 176; DX 177; DX 184 (4/11/97 Letter from USFS to SGA, requesting removal of cattle from the Sacramento Lake Exclosure); DX 185 (6/6/97 Letter from USFS to SGA, warning that grazing within the Peñasco Exclosure was not authorized); DX 194.

The May 5, 1998 AOP Amendment became effective on November 23, 1999. Pls. 11/2/15 Reply Br. at 3–5. On July 10, 1998, the USFS observed that a "pattern of non-compliance with the Conditions of the Term Grazing Permit is developing." DX 206 at SG00331. It was not until September 8, 2000, however, that the USFS "officially excluded" SGA's cattle from using water inside the exclosures and SGA was instructed to remove cattle within the exclosures and warned

that failure to do so could result in the suspension or cancellation of SGA's grazing permit.  Pls. 11/2/15 Reply Br. at 2–3 (citing JX 19).

Therefore, *Estate of Hage* supports SGA's argument, because the United States Court of Appeals for the Federal Circuit held that "plaintiff could not base its takings claim on the construction of fences that occurred less than six years before the lawsuit, because those fences *did not actually deny* plaintiff[s] access to [their] water."  Pls. 11/2/15 Reply Br. at 6 (emphasis added).  The record, in this case, evidences that "the fenced exclosures . . . did not prevent SGA from accessing its water rights until they were officially excluded[.]"  Pls. 11/2/15 Reply Br. at 6. In addition, in *Casitas Municipal Water District v. United States*, 708 F.3d 1340 (Fed. Cir. 2013) ("*Casitas V*"), the United States Court of Appeals for the Federal Circuit cited *Estate of Hage* for the proposition that a Fifth Amendment Takings Clause claim accrues *when the physical act* that constitutes the taking is completed.  *Id.* at 1359–60 (emphasis added).

### c.    The Government's Reply.

The Government replies that *Estate of Hage* compels the conclusion that SGA's physical taking claims involving the exclosures accrued for purposes of the statute of limitations, when the fences were constructed between 1983 and 1992.  Gov't 11/17/15 Reply Br. at 1.  In addition, SGA's contention that "it had no idea what the [exclosures] were for . . . until the [USFS] provided the 1998 AOP that allegedly instructed [SGA] for the first time ever that these fences were meant to exclude livestock from the riparian areas" is not supported.  Gov't 11/17/15 Reply Br. at 2 (citing Pls. 11/2/15 Reply Br. at 3).  The record shows that the exclosures were erected for the "specific purpose" of keeping livestock out of the riparian areas.  Gov't 11/17/15 Reply Br. at 2. The 1986 Forest Plan also required the USFS to manage the Sacramento Allotment wetlands in a manner that excluded livestock grazing to protect riparian habitats.  Gov't 11/17/15 Reply Br. at 2 (citing 16 U.S.C. § 1604(i) (2012)[15]).  Therefore, because SGA's 1989 Grazing Permit, incorporated the 1986 Forest Plan, by law "the permit legally reflected that the previously erected exclosures were built for the purpose of excluding livestock to protect the [Sacramento Mountains

---

[15] The Forest And Rangeland Renewable Resources Planning Act of 1974, in relevant part, provides:

> Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans.  Those resource plans and permits, contracts, and other such instruments currently in existence shall be revised as soon as practicable to be made consistent with such plans.  When land management plans are revised, resource plans and permits, contracts, and other instruments, when necessary, shall be revised as soon as practicable.  Any revision in present or future permits, contracts, and other instruments made pursuant to this section shall be subject to valid existing rights.

16 U.S.C. § 1604(i) (2012).

T]histle."  Gov't 11/17/15 Reply Br. at 2 (citing *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1512 (9th Cir. 1992) ("The Forest Supervisor must ensure that all projects are consistent with the plan.")).

In addition, SGA's attempt to characterize the USFS's communications[16] only as prohibiting "grazing," implicitly acknowledges that SGA was prohibited from grazing livestock within the exclosures prior to May 5, 1998.  Gov't 11/17/15 Br. at 3.  Moreover, "SGA's effort to minimize the significance of this prohibition rests on the false premise that SGA's livestock are not 'grazing' in an exclosure if they are placed there to drink water[.]"  Gov't 11/17/15 Br. at 3; *see also* TR 159–60 (Martinez) (former District Ranger, stating that it is not possible to place cattle in an exclosure to drink water, without also having these cattle graze in the exclosure).

Finally, SGA's explanation that it was allowed to place livestock in the exclosures to water and provide forage for a few days or a week cannot be reconciled with the inherent purpose of the exclosures, *i.e.*, to protect endangered plant species, as well as the springs and riparian areas.  Gov't 11/17/15 Reply. Br. at 4–5.  Therefore, the court should "reject SGA's contention that it was allowed to put its livestock in the exclosures to water and feed them," prior to the May 5, 1998 AOP Amendment.  Gov't 11/17/15 Reply Br. at 5.

### d.    The Court's Resolution.

The Government insists that *Estate of Hage* requires the court to bar SGA's Takings Clause claims.  In that case, plaintiffs filed suit against the Government alleging a Fifth Amendment Takings Clause claim, based on the construction of fences surrounding water sources on federal lands, where plaintiffs also held grazing permits.  *See Estate of Hage*, 687 F.3d 1281 at 1288.  Therein, the United States Court of Appeals for the Federal Circuit held that the plaintiffs' 1991 Fifth Amendment Takings Clause claim, based on fences erected in 1981 and 1982, was barred by the six-year statute of limitations.  *Id.* at 1289, 1292 ("To the extent the Hages' claim for a physical taking relies on fences constructed in 1981–1982, this claim is untimely.").

In this case, the record shows that prior to May 5, 1998, SGA received warnings about cattle use of stock water within the exclosures.  JX 18 (1998 AOP); DX 504 at 59–64 ("If cattle are observed at any time during the grazing season in any of these exclosures . . . they will be immediately removed;" "livestock [are] not permitted in the Upper Peñasco exclosure;" "this amount of unauthorized use will not be tolerated in the future;" "the terms and conditions of your grazing permit must be strictly adhered to.");  DX 138 (USFS letter to SGA with 1994 AOP); TR 284–86, 293 (Frances Goss); TR 482–87 (Jimmy Goss); TR 502 (Spike Goss).  But, it was USFS's May 5, 1998 AOP Amendment that was the official action that ordered SGA to remove cattle from the exclosures and interfered with SGA's right to beneficial use of water sources within the Sacramento Allotment.  Even after the May 5, 1998 AOP Amendment became effective on November 23, 1999, USFS took no enforcement action against SGA until September 8, 2000.  DX

---

[16] The Government argues that the USFS communications to SGA refer to "livestock use" and "grazing use" interchangeably.  11/17/15 Gov't Reply Br. at 4 (citing DX 124, 184–85, 206).

504 at 70 ("On September 8, 2000, Acting District Ranger Ray Kingston informed the Gosses that, left no other choice, the [USFS] imposed a penalty of a 40-percent reduction of livestock for two years.  Kingston warned that further non-compliance would result 'in the form of permit cancellation.'  The Goss family [therefore] apparently complied with the orders to remove cattle from the [Sacramento A]llotment.").

For these reasons, the court has determined that the statute of limitations, under 28 U.S.C. § 2501, does not bar the court from adjudicating SGA's Fifth Amendment Takings Clause claims. *See Holmes v. United States*, 657 F.3d 1303, 1317 (Fed. Cir. 2011) (holding that a claim "accrues" for purposes of 28 U.S.C. § 2501 when "*all* the events have occurred that fix the alleged liability of the [G]overnment and entitle the claimant to institute an action") (emphasis added).

### C.     Standing.

The court previously determined that SGA's September 6, 2005 First Amended Complaint "allege[d] an injury in fact, that is traceable to [SGA] being denied use of their vested range stock water rights and has resulted in economic injury that can be determined in a specific amount sufficient to establish standing." *Sacramento Grazing II*, 96 Fed. Cl. at 188.  SGA's August 12, 2011 Second Amended Complaint alleges the same injury in fact, *i.e.*, a taking of SGA's right to beneficial use of water sources "found on or originating on the [Sacramento] [A]llotment."  Sec. Am. Compl. at 7.  Therefore, SGA did not have standing, at the earliest until May 5, 1998, to sue USFS or on September 8, 2000, when the USFS took action to enforce the May 5, 1998 AOP Amendment.  JX 20, 21; DX 504 at 70; *see also Boling v. United States*, 220 F.3d 1365, 1370 (Fed. Cir. 2000) ("[T]he key date for accrual purposes is the date on which plaintiff's land 'has been clearly and permanently taken.'"); *Catawba Indian Tribe of S.C. v. United States*, 982 F.2d 1564, 1570 (Fed. Cir. 1993) (holding that the accrual period does not begin until "the plaintiff has a legal right to maintain his or her action") (internal citation omitted).

For these reasons, the court has determined that SGA's August 12, 2011 Second Amended Complaint alleges sufficient facts to establish SGA's standing.[17]

---

[17] The Government also relies on a non-precedential case, *Mitchell v. United States*, 41 Fed. Cl. 617 (Fed. Cl. 1998), to support an argument that SGA's ability to access the exclosures should be treated as a trespass, not as a failure by the USFS to prevent SGA from grazing within the exclosure.  Gov't 9/17/15 Br. at 50–51.  In *Mitchell*, the Bureau of Land Management ("BLM") granted plaintiffs permits to graze livestock on an allotment partially reserved by the United States Department of the Navy (the "Navy") on a year-to-year basis.  *See Mitchell*, 41 Fed. Cl. at 619.  A 1980 Memorandum of Understanding with the BLM, however, allowed the Navy to terminate grazing privileges after 30 days' notice to the BLM.  *Id*. at 621.  In 1983, after receiving plaintiffs grazing application, the BLM and the Navy informed plaintiffs that they would no longer be permitted to graze livestock on a portion of the allotment.  *Id*. at 619–20.  On March 30, 1990, after sending multiple letters to plaintiffs beginning in 1988, the Navy informed plaintiffs that their cattle's "trespass" could not continue.  *Id*. at 623.  On March 6, 1991, the BLM informed plaintiffs that the Navy had the legal authority to exclude their cattle from the Navy's land.  *Id*. at 621.  Since

33

IV.    **PLAINTIFFS ESTABLISHED THE RIGHT, UNDER NEW MEXICO LAW, TO BENEFICIAL USE OF STOCK WATER SOURCES WITHIN THE SACRAMENTO ALLOTMENT OF THE LINCOLN NATIONAL FOREST.**

A.    **Prior To Trial, Plaintiffs Satisfied The Requirements Of New Mexico Law To Establish A *Prima Facie* Right To Beneficial Use Of Stock Water Sources Within The Sacramento Allotment.**

The New Mexico Constitution recognizes water rights vested prior to March 19, 1907, as acquired through common law prior-appropriation. *See* N.M. CONST. art. XVI, § 1 ("All existing rights to the use of any waters in this state for any useful or beneficial purpose are hereby recognized and confirmed."). The priority of a water "right relates back from the date of first beneficial use to the date work commenced to bring about the beneficial use." *State ex rel. Martinez v. Parker Townsend Ranch Co.*, 118 N.M. 787, 790 (N.M. Ct. App. 1992), *aff'd on other grounds*, 118 N.M. 780 (1994); *see also* N.M. STAT. ANN. § 72-1-2 (2016).[18]

---

the Navy previously terminated plaintiffs' grazing privileges on the allotment in 1983, the trial court found that Plaintiffs were not *legally* permitted to graze on Navy lands, knew they were not permitted, and were physically excluded when the Navy's fence was completed in 1991. *Id.* at 624. Therefore, plaintiffs were on notice to file any lawsuit within six years after the fence was completed in spring 1991, *i.e.*, "when the Government denied plaintiff access." *Id.* at 624–25.

In this case, however, the USFS has not terminated any of SGA's grazing permits and took no action to preclude SGA from access to and use of its stock range water rights until September 8, 2000, well *after* the May 5, 1998 AOP Amendment was effective on November 23, 1999. JX 19; JX 21.

[18] N.M. STAT. ANN. § 72-1-2 (2016) provides:

Beneficial use shall be the basis, the measure and the limit of the right to the use of water, and all waters appropriated for irrigation purposes, except as otherwise provided by written contract between the owner of the land and the owner of any ditch, reservoir or other works for the storage or conveyance of water, shall be appurtenant to specified lands owned by the person, firm or corporation having the right to use the water, so long as the water can be beneficially used thereon, or until the severance of such right from the land in the manner hereinafter provided in this article. Priority in time shall give the better right. In all cases of claims to the use of water initiated prior to March 19, 1907, the right shall relate back to the initiation of the claim, upon the diligent prosecution to completion of the necessary surveys and construction for the application of the water to a beneficial use. All claims to the use of water initiated thereafter shall relate back to the date of the receipt of an application therefor in the office of the territorial or state engineer, subject to

Although not required, any person claiming ownership of a pre-1907 water right may file a Declaration of Ownership with the OSE, "setting forth the beneficial use to which said water has been applied, the date of first application to beneficial use, the continuity thereof, [and] the location of the source of said water[.]" N.M. STAT. ANN. § 72-1-3. A Declaration of Ownership "may be accompanied by deeds, survey plats, affidavits and other evidence tending to substantiate the claim, . . . [or it] may be filed by the declarant on his personal information and belief." N.M. CODE R. § 19.26.2.8 (West 2005). Once certified and recorded by the OSE, a Declaration of Ownership becomes, as a matter of New Mexico state law, "*prima facie* evidence of the truth of [its] contents." N.M. STAT. ANN. § 72-1-3 (emphasis added). These pre-1907 vested water rights, however, are "in no way dependent on the existence of an application to or a permit from the [OSE]." *May v. Torres*, 519 P.2d 298, 300 (N.M. 1974).

Between 1999 and 2003, SGA filed Declarations of Ownership of Water Rights Perfected Prior to March 19, 1907, for each stock water source at issue in this case. PX 58–68; JX 32–36, 56–57, 61. These Declarations of Ownership are "sufficient in law to raise a presumption of fact or establish the fact in question[,] unless rebutted." *Goodman v. Brock*, 498 P.2d 676, 679–680 (N.M. 1972) (internal citations omitted). Prior to trial, the Government argued that SGA's Declarations of Ownership were inadequate, because "there has been no state adjudication of [SGA's] purported water rights." 4/29/08 Gov't S.J. Mot. at 8. The Government, however, proffered no evidence prior to trial that contradicted SGA's *prima facie* evidence to use the water sources at issue. Moreover, neither the USFS nor the State of New Mexico, at any point, initiated any proceedings in any federal court or New Mexico state court challenging SGA's Declarations of Ownership.

For these reasons, the court determined, prior to trial, that SGA satisfied the requirement of New Mexico law to establish a *prima facie* right to beneficial use of stock water within the Sacramento Allotment of the Lincoln National Forest. *See Sacramento Grazing II*, 96 Fed. Cl. at 193 (citing N.M. STAT. ANN. § 72-1-3); *see also State ex rel. Martinez v. Lewis,* 118 N.M. 446, 882 P.2d 37, 40 (N.M. Ct. App. 1994) ("Section 72-1-3 merely provides that the declarations shall be *prima facie* evidence of the truth of their contents. . . . At most, admission of such declarations would satisfy Appellant's burden of going forward; it would satisfy Appellant's burden of proof only if not rebutted by the state.") (internal quotations omitted).

**B.    At Trial, Plaintiffs Also Established That SGA Made Beneficial Use Of Water Sources Within The Sacramento Allotment.**

**1.    The Plaintiffs' Argument.**

At trial, Frances Goss testified that, prior to 1907, SGA's predecessors grazed cattle on the Sacramento Allotment and made beneficial use of stock water sources at issue in this case. TR 212–23 (Frances Goss). Frances Goss also testified that it was, and has been, the custom of

---

compliance with the provisions of this article, and the rules and regulations established thereunder.

cattlemen to identify stock water rights and access to those sources when property is sold or willed. TR 225–28 (Frances Goss). In addition, she testified that SGA's predecessors' and SGA made continuous beneficial use of stock water in the Sacramento Allotment from 1885 to the filing of Declarations of Ownership in 1999, 2003, 2008, and 2010. TR 228–29 (Frances Goss); *see also* JX 32–36, 56, 57, 61. Therefore, the relevant Declarations of Ownership, together with Frances Goss's testimony, establish that SGA made beneficial use of stock water rights within the Sacramento Allotment under New Mexico law. Pls. 6/30/15 Br. at 12–15; *see also* JX 32–36, 56, 57, 61; TR 212–23, 228–29 (Frances Goss).

### 2.      The Government's Response.

The Government responds that the OSE's decision not to challenge SGA's Declarations of Ownership, particularly at the Peñasco Headwaters does not establish a property right under New Mexico law and is premised on "the erroneous assumption or contention that the filing of a Declaration [of Ownership] automatically triggers such review." Gov't 9/17/15 Br. at 64.

Likewise, SGA's reliance on other Declarations of Ownership does not establish SGA's rights to use stock water sources, because SGA: (1) did not identify specific constructed works; (2) used properties authorized only for seasonal grazing year-round; and (3) otherwise did not have sufficient documentation. Gov't 9/17/15 Br. at 69 (citing PX 65; DX 504 at 136–43; TR 370–73, 375–76 (Carrie Goss)).

### 3.      The Plaintiffs' Reply.

SGA replies that the Government's post-trial argument cannot overcome the fact that the Government failed at trial to rebut the presumption attached to SGA's Declarations of Ownership and collaborating testimony that SGA established claims to beneficial use of stock water rights at the Peñasco Headwaters and other water sources at issue in this case. Pls. 11/2/15 Reply at 10–11. In addition, the state administrative proceeding initiated by SGA's February 23, 2012 Amended Declaration regarding the Peñasco Headwaters was stayed "to allow for settlement discussions between SGA and the United States . . . and . . . allow SGA to move part of its declared right at the Peñasco [H]eadwaters to [the] Atkinson Pasture." Pls. 11/2/15 Reply at 10–11. Although SGA's November 25, 2013 Application is a separate document from SGA's February 23, 2012 Amended Declaration, both relate to the same right to beneficial use of stock water sources in the Sacramento Allotment. Pls. 11/2/15 Reply at 11.[19] In addition, the USFS withdrew its own Application For Permit to Change from the OSE on February 14, 2014, once SGA's separate November 25, 2013 Application was granted. Pls. 11/2/15 Reply at 11. Therefore, the fact that the Atkinson Pasture project was completed using a portion of SGA's declared stock water

---

[19] SGA's representation that the two documents relate to the same right to beneficial use of stock water resources is supported by the identical declaration number SD-04945 on both documents. PX 58; JX 146–47.

right at the Peñasco Headwaters evidences that OSE recognized SGA's right to beneficial use of water at that location.  Pls. 11/2/15 Reply at 11 (citing JX 156).

In sum, the Government presented no evidence at trial to rebut the *prima facie* status of SGA's right to use stock water sources within the Sacramento Allotment, including the sources previously identified by the court.  Pls. 11/2/15 Reply at 12–13 (citing TR 334–35 (Francis Goss), 382–83 (Carrie Goss)).  In addition, the USFS at no time filed a protest or initiated any adjudication to challenge the validity of SGA's rights to beneficial use of stock water sources in the Sacramento Allotment under New Mexico law.  Pls. 11/2/15 Reply at 12.  Having failed to pursue, much less exhaust, available New Mexico state administrative remedies, the USFS cannot circumvent that process by simply arguing that SGA's Declarations of Ownership do not establish a property right under New Mexico law.  Consequently, the Government failed to rebut SGA's *prima facie* evidence of its right to beneficial use of stock water sources in the Sacramento Allotment.

## 4. The Government's Sur-Reply.

The Government contends that SGA's property rights are based on the submission of incomplete and deficient Declarations of Ownership and, while submitting a Declaration of Ownership is *prima facie* evidence of the truth of its contents, when a Declaration of Ownership omits required content, the *prima facie* validity of the Declaration of Ownership is rebutted, as a matter of law.  Gov't 11/17/15 Reply at 5–6.  SGA has not produced evidence in the record to establish a diversion, nor has it identified any other New Mexico statute, case law, or regulatory provision concluding that a diversion is not required to acquire stock water rights.  Gov't 11/17/15 Reply at 6.

In addition, the actions of the OSE demonstrate that a diversion is a requirement under New Mexico law to establish a pre-1907 water right, because the OSE found SGA's August 31, 1999 Declaration of Ownership deficient, because it did not include any information about a diversion or impoundment at the Peñasco Headwaters.  Gov't 11/17/15 Reply at 9.  In addition, the OSE did not accept SGA's February 23, 2012 Amended Declaration, because the supporting documentation did not cure the prior defects and the August 31, 1998 Declaration of Ownership was sufficient to verify OSE's version of the facts.  Gov't 11/17/15 Reply at 9.

## 5. The Court's Resolution.

The Fifth Amendment to the United States Constitution prohibits the taking of private property "for public use, without just compensation."  U.S. CONST. amend. V, cl. 14.  The Supreme Court consistently has recognized that "the plain language of the Takings Clause 'requires the payment of compensation whenever the [G]overnment acquires private property for a public purpose.'"  *Murr v. Wisconsin*, 137 S. Ct. 1933, 1942 (2017) (quoting *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 321 (2002)).

A physical taking involves "a direct government appropriation or [a] physical invasion of private property."  *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005).  The duration and severity of the taking is "immaterial to the analysis[.]"  *Casitas Mun. Water Dist. v. United States*,

543 F.3d 1276, 1288 (Fed. Cir. 2008) ("*Casitas III*").  In addition, "[w]hen the [G]overnment physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner." *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 233 (2003) (internal quotation marks and citation omitted).  As such, analysis of a physical taking claim requires a "straightforward application of *per se* rules." *Id.*  First, the claimant must satisfactorily identify "a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking." *Estate of Hage*, 687 F.3d at 1286 (internal quotation marks and citations omitted).  If, and only if, this first step is satisfied, the court then determines "whether that property interest was taken." *Id.* (internal citation omitted).

The scope of a legally protected property right is determined by "existing rules and understandings and background principles derived from an independent source, such as state, federal, or common law." *Schooner Harbor Ventures, Inc.*, 569 F.3d at 1362 (internal quotation marks omitted).  In *Andrus v. Charlestone Stone Products Co., Inc.*, 436 U.S. 604 (1978), the United States Supreme Court recognized that,

> [i]n 1866, [Congress] provided for the protection of the "vested rights" of "possessors and owners" "to the use of water for mining, agricultural, manufacturing or other purposes," to the extent that these rights derive from "priority of possession" and "are recognized and acknowledged by the local customs, laws, and the decisions of courts."  In 1870, Congress again emphasized its view that water rights derive from "local" law, not federal law, making "[a]ll patents granted . . . subject to any vested and accrued water rights . . . as may have been acquired under or recognized by [the 1866 provision]."

*Id.* at 611–12 (quoting 30 U.S.C. §§ 51, 52 (2012)).

Under New Mexico law, the right to beneficial use of water is a property interest distinct and severable from a right to use land.  *See Walker v. United States*, 162 P.3d 882, 888 (N.M. 2007) ("A water right is separate and distinct from a right to adjacent land because it is derived not from the rights in the land, but 'from appropriation for beneficial use.'") (citation omitted).  The establishment, maintenance, and extent of this right depends on beneficial use.  *See* N.M. Const. art. XVI, § 3 ("Beneficial use shall be the basis, the measure and the limit of the right to the use of water.").  Since March 19, 1907, under New Mexico law, a claim for beneficial use of water "requires [either] an existing water right or a permit from the State Engineer." *State Eng'r of N.M. v. Diamond K Bar Ranch*, 385 P.3d 626, 632 (N.M. 2016) (citing N.M. Stat. Ann. 1978 §§ 72-5-1, 72-5-39 (1907)).  But, beneficial use is "not considered ownership in any particular water source, but rather *a right to use a certain amount of water to which one has a claim via beneficial use*." *Diamond K Bar Ranch*, 385 P.3d at 631 (quoting *Walker*, 162 P.3d at 890) (emphasis added).  Therefore, a federal appropriation of a private water source does not, *per se*, constitute a taking.  *See Estate of Hage*, 687 F.3d at 1288–89.  Instead, in the context of a Takings Clause claim, a plaintiff must show that "any water taken could have been put to beneficial use." *Id.* at 1289.  This is so, because beneficial use is a "real property interest[] to which all the rules of real property apply." *Walker*, 162 P.3d at 890.  It is "a separate protected property right . . . [that] can be 'sold, leased, or transferred.'" *Id.* (internal citation omitted).

38

After trial, SGA filed three exhibits as attachments to a June 20, 2017 Declaration of Michael Van Zandt in support of SGA's Motion to Supplement Trial Evidentiary Record. ECF No. 199.  One document, dated June 9, 2017, is License No. SD-05076, specifying the conditions on SGA's rights to appropriate water from thirty-eight different sources within the Sacramento Allotment.  ECF No. 199 Ex. 1 at 6–22.  A second document, dated June 9, 2017, is an Order issued by the OSE, concerning the licensing of Pre-1907 Surface Water Rights For The Purpose Of Watering Livestock in the Lincoln National Forest.  ECF No. 199 Ex. 1 at 2–4.

The Government argued in a post-trial brief that, "[t]he legal basis for the issuance of this license is unclear" as "the State Engineer [does not] appear to have issued the License based on the predicate procedures for approval of a license under N.M. CODE R. § 19.26.2.11–12 (West 2005), *i.e.*, application for permit, notice, opportunity for protest and hearing."  Gov't 7/7/2017 Resp. at 2 (citing N.M. CODE R. § 19.26.2.11–12 (West 2005)).

The Government's response, however, continues to reflect a fundamental misunderstanding of the New Mexico regulatory framework.  The New Mexico Administrative Code specifies that publication of notice, opportunity for protest, and formal hearings are required only for an application filed under section 10 or 11 of Surface Water Administration, Office of the State Engineer.  *See* N.M. CODE R. § 19.26.2.12 (West 2005) ("This section describes the process in which applications filed pursuant to 19.26.2.10 or 19.26.2.11 NMAC will be processed."). Section 10 licenses apply only to water rights vested after 1907.  N.M. CODE R. § 19.26.2.10 (West 2005) ("Any appropriation of surface water initiated on or after March 19, 1907 requires a valid permit issued by the state engineer.")  Likewise, section 11 licenses only apply to those seeking key changes in a recorded water right.  *See* N.M. CODE R. § 19.26.2.11 (West 2005) ("Any change in point of diversion, place of use, or purpose of use of declared, permitted, licensed, or adjudicated surface water rights may be made only upon issuance of a permit by the state engineer.")  Neither of these sections applies to this case, because the claims at issue concern the right to beneficial use of range stock water rights that vested prior to 1907.

The enabling New Mexico statute also confirms that notice and opportunity for protest hearings are not a prerequisite for all applications for water rights, but only those "which require[] advertisement by virtue of the provisions of Chapter 72, Article 5 NMSA 1978."  N.M. STAT. ANN. § 72-5-5 (1978).  Therefore, these provisions apply only to those "intending to acquire the right to the beneficial use of any waters[.]"  N.M. STAT. ANN. § 72-5-1 (1978).  The stated purpose of a hearing is to determine "whether there is unappropriated water available for the benefit of the applicant [and, if so,] if the proposed appropriation is not contrary to the conservation of water within the state and is not detrimental to the public welfare of the state."  N.M. STAT. ANN. § 72-5-1 (1978).

The OSE June 9, 2017 Order neither grants nor modifies any water rights, but simply recognizes SGA's preexisting rights.  ECF No. 199 Ex. 1 at 2 ("[T]he State Engineer is issuing this order to provide certainty to the owners of Pre-1907 Stockwatering Water Rights within the Lincoln National Forest[.]"); *see also* ECF No. 199 Ex. 1 at 9 (OSE License No. SD-05076) ("The Sacramento Grazing Association or its predecessors in interest have since prior to 1907 continuously placed surface water to beneficial use for livestock purposes within the exterior

boundaries of the allotment."). Since beneficial use was made by SGA's predecessors prior to 1907, no license or permit was required. *See May v. Torres*, 519 P.2d 298, 300 (N.M. 1974) ("[I]f [water rights] were acquired pursuant to common law appropriations by the parties or their predecessors in interest prior to the enactment of our first Water Code (Ch. 49, Laws of 1907), these rights [are] in no way dependent on the existence of an application to or a permit from the State Engineer.") (internal citations omitted). Thus, as SGA correctly contends, the only procedural requirements relevant in this case are those outlined in N.M. CODE R. § 19.26.2.13 (West 2005). Pls. 7/17/17 Reply at 2.

In addition, the Government requested "an opportunity to address the relevance and effect of [the State Engineer's recognition of SGA's vested water rights] through supplemental post trial briefing prior to any ruling." Gov't 7/7/2017 Resp. at 5. It was the Government, however, that proffered the OSE's determinations as authoritative, until OSE's views did not support those of the Government. This post-trial evidence only further supports the *prima facie* status of SGA's Declarations of Ownership, that the Government failed to rebut at trial.

For these reasons, the court has determined that SGA's Declarations of Ownership (JX 32–36, 56, 57, 61) together with highly credible and unchallenged trial testimony (TR 212–23, 225–29, 284–86, 293) (Frances Goss); TR 482, 486–87 (Jimmy Goss)) together establish, under New Mexico law, that prior to 1907 until September 8, 2000 (JX 21 (9/8/00 Letter from USFS to SGA)), SGA made continuous beneficial use of stock water sources within the Sacramento Allotment, including: West Mauldin; Mauldin Springs; 3 Hubble Springs; Bluff Springs; Bluff North Springs; Bluff Springs West; Charles Spring; Sacramento Lake; Peñasco Headwaters; Water Canyon Spring; Upper Alamo # 1; Mud Springs; Caballero # 1, # 2, # 3; and Wood Spring # 1, # 2.

### C. New Mexico Law Does Not Require Diversion To Establish The Right To Beneficial Use Of Stock Water.

#### 1. The Government's Argument.

In post-trial briefing, the Government raised a new argument that the acquisition of a water right requires diversion under New Mexico law, emphasizing that the Government's expert, David Gallacher, did not find a diversion at the place of SGA's alleged stock water sources. The Government adds that New Mexico courts have held that diversion is a necessary prerequisite to establish a water right and the consumption of water by livestock is not a "diversion" under New Mexico state law. Gov't 9/17/15 Br. at 63 (citing *State ex rel. Reynolds v. Miranda*, 493 P.2d 409, 411 (N.M. 1972) (holding that "man-made diversion, together with intent to apply water to beneficial use and actual application of the water to beneficial use, is necessary to claim water rights by appropriation in New Mexico for agricultural purposes"). The Government also relies on pre-1907 New Mexico regulations governing the appropriation and use of surface waters to counter SGA's *prima facie* showing of beneficial use of the water sources at issue in this case. Gov't 9/17/15 Br. at 62 (citing N.M. CODE R. § 19.26.2.7(EE) (West 2005) (listing the "general" elements of a water right and "point of diversion," requiring that any declaration of water rights

must include "legal descriptions for the *point of diversion* and place of use"));[20] Gov't 9/17/15 Br. at 63 (quoting N.M. CODE R. § 19.26.2.8 (West 2005) (emphasis added).

Although SGA filed Declarations of Ownership on each of the stock water sources at issue, after trial SGA requested that the OSE "administer" one of the claimed rights by proposing to re-direct water from the Peñasco Headwaters to the Atkinson Canyon in 2011, requiring a review of SGA's Declaration of Ownership for that source. Gov't 9/17/15 Br. at 65 (citing PX 58). On June 28, 2011, a field investigation was conducted, but no evidence of diversion was found. Gov't 9/17/15 Br. at 65 (citing DX 497 at PL05900). Subsequently, the OSE met to discuss SGA's Declarations of Ownership, at which time SGA suggested that the culverts under the road were "constructed works" at the point of diversion. Gov't 9/17/15 Br. at 66 (citing TR 745 (Alaniz)). After the trial, on February 23, 2012, SGA filed an Amended Declaration with the OSE to re-direct water from the Peñasco Headwaters that the OSE rejected, because it was not specific as to the point of diversion, quantity of water claimed by SGA, or that the water had been put to beneficial use. Gov't 9/17/15 Br. at 67 (citing JX 91, 94). Instead of appealing the OSE's decision, SGA submitted a different application to the OSE to change the place where water would be re-directed to privately owned land in the same area, that was later accepted by the OSE. Gov't 9/17/15 Br. at 67–68. Therefore, SGA's assertion that a Declaration of Ownership is adequate proof of a recognized and protected water right under New Mexico law, "does not rise to the level of a protected property right under New Mexico law for purposes of the Fifth Amendment[.]" Gov't 9/17/15 Br. at 68.

### 2.     The Plaintiffs' Response.

SGA responds that the New Mexico Constitution states: "Beneficial use shall be the basis, the measure and the limit of the right to the use of water." N.M. CONST. art. XVI, § 3. The New Mexico Administrative Code section 19.26.2.8(A) expressly provides: "All water rights established by beneficial use in New Mexico prior to March 19, 1907, were recognized and confirmed by the state constitution at the time of adoption." N.M. CODE R. § 19.26.2.8 (West 2005); *see also* N.M. CONST. art. XVI, § 1 ("All existing rights to the use of waters in this state for any useful or beneficial purpose are hereby recognized and confirmed."). Therefore, the New Mexico Administrative Code recites only a "general" requirement to establish a water right. Pls. 11/2/15 Reply at 13–14. Finally, no New Mexico court has held that a diversion or constructed works is required to establish a stock watering right. Pls. 11/2/15 Reply at 14.

---

[20] N.M. CODE R. § 19.26.2.7(EE) (West 2005) provides:

Water right:  The legal right to appropriate water for a specific beneficial use.  The elements of a water right generally include owner, point of diversion, place of use, purpose of use, priority date, amount of water, periods of use, and any other element necessary to describe the right.  A permitted or declared right is considered to be a valid water right only to the extent water has been legally placed to beneficial use.

Nevertheless, assuming *arguendo* that a diversion is required to establish a stock water right in New Mexico, the Government has not established that there was no diversion of SGA's stock water rights at any time prior to trial. Pls. 11/2/15 Reply at 16. The lack of evidence of a diversion associated with SGA's water rights, however, is not dispositive, because at the time the water was first put to beneficial use, any constructed works would have been made from wood and deteriorated long ago. Pls. 11/2/15 Reply at 16.

### 3.     The Court's Resolution.

As previously discussed, New Mexico courts recognize two distinct appropriative water rights: those based on common law, prior to 1907; and, those based after enactment of New Mexico's 1907 Water Code. In *Harkey v. Smith*, 247 P. 550, 551 (N.M. 1926), the New Mexico Supreme Court, in discussing cases concerning pre-1907 water right disputes, stated that "the appropriation of water is accomplished by *taking or diversion* of it from a . . . water supply, with intent to apply it to some beneficial use . . . , and consummated . . . by the actual application of the water to . . . [a] useful purpose." *Id*. (emphasis added). The pre-1907 New Mexico cases, cited therein, did require "diversion," but to establish irrigation water rights. *Id*. (citing *Millheiser v. Long*, 61 P. 11 (N.M. 1900)); *see also Albuquerque Land & Irrigation Co. v. Gutierrez*, 61 P. 357 (N.M. 1900) ("There must be a rightful diversion"); Christine A. Klein, *The Constitutional Mythology of Western Water Law*, 14 VA. ENVTL. L.J. 343, 346 (1995) (discussing the pre-1907 appropriation doctrine adopting the nineteenth century custom in the case of miner water use, requiring diversion to satisfy beneficial use). But, irrigation use of water is considered an exception under New Mexico law, since "water rights are separate and distinct from the land." *See Walker*, 162 P.3d at 889 (citing *KRM, Inc. v. Caviness*, 925 P.2d 9, 11 (N.M. Ct. App. 1996) (holding that New Mexico statutory scheme "evince[s] an intent to create a limited statutory exception to the general rule that[, under New Mexico law,] water rights and land ownership are distinct property rights"). Since the use of water for irrigation is appurtenant to land, it is logical that the New Mexico courts required diversion, *i.e.*, a man-made construction to establish the right to beneficial use of water for those purposes.

In addition, the New Mexico Administrative Code defines "beneficial use" as encompassing direct use for livestock, in addition to—and as distinguished from—agricultural purposes. *See* N.M. CODE R. § 19.26.2.7 (West 2005) ("[Beneficial Use is t]he *direct use* or storage and use of water by man for a beneficial purpose including . . . agricultural [and] livestock . . . uses.") (emphasis added). Therefore, it is the "[b]eneficial use"—not a diversion—that is "the basis, the measure and the limit of the right to the use of water." N.M. CONST. art. XVI, § 3.

N.M. STAT. ANN. § 72-1-3[21] does mention "diversion," but it is in general instructions about the information to be included in a Declaration of Ownership, if it is recorded with the office

---

[21] N.M. STAT. ANN. § 72-1-3 (West 2015) (emphasis added) provides:

Declaration of water rights vested prior to 1907; form; contents; verification; filing; recording; presumption. Any person, firm or corporation claiming to be an owner of a water right which was vested prior to the passage of Chapter 49, Laws 1907,

of the county clerk, instead of the OSE.  *See* N.M. STAT. ANN. § 72-1-3 ("Such declarations . . . shall be recorded . . . in . . . the county wherein the *diversion* works . . . are located.") (emphasis added).  In addition, N.M. CODE R. § 19. 26.2.8(A) (West 2005) provides: "The declaration shall include . . . legal descriptions for the point of diversion[.]"  Neither of these statutes, however, govern whether beneficial use of stock water may be claimed as a property right under New Mexico law, because it does not require any state governmental approval or action to establish the right to use stock water.  For these reasons, the Supreme Court of New Mexico held in *May v. Torres*, 519 P.2d 298 (N.M. 1974) that pre-1907 water rights were not determined nor dependent on any administrative action.  *Id.* at 300 (citing N.M. CONST. art. XVI, § 1 ("All existing rights to beneficial use of any waters in this state for any useful beneficial purpose are hereby recognized and confirmed.")).

The Government also misreads *State Engineer of New Mexico v. Diamond K Bar Ranch*, 385 P.3d 626 (N.M. 2016), to require diversion; instead, that case states: "[d]iversion alone is not appropriation and does not create a water right."  *Id.* at 631.  Therefore, under New Mexico law, it is *beneficial use*—not diversion—that creates a water right.  *Id.* ("It is the application to beneficial use that gives an appropriator the perfected right to use the water.") (internal citation omitted); *see also id.* at 629 ("Under the doctrine of prior appropriation, *water rights are both established and exercised by beneficial use* [that establishes the parameters of] the measure and the limit of the right to use of the water.") (emphasis added) (internal quotation marks and citation omitted); *Carangelo v. Albuquerque-Bernalillo Cty. Water Util. Auth.*, 320 P.3d 492, 504 (N.M. Ct. App. 2013) ("A non-consumptive use is no more than 'a type of water use where either there is *no diversion from a source body*, or where there is no diminishment of the source.'") (emphasis added) (internal citation omitted).

The Government also cites *State ex. rel. Reynolds v. Miranda*, 493 P.2d 409 (N.M. 1972), for the proposition that "man-made diversion, together with intent to apply water to beneficial use and actual application of the water to beneficial use, is necessary to claim water rights by appropriation in New Mexico for agricultural purposes."  *Id.* at 411.  As discussed herein, the requirements to establish an irrigation water right are different than those concerning beneficial

---

from any surface water source by the applications of water therefrom to beneficial use, may make and file in the office of the state engineer a declaration in a form to be prescribed by the state engineer setting forth the beneficial use to which said water has been applied, the date of first application to beneficial use, the continuity thereof, the location of the source of said water and if such water has been used for irrigation purposes, the description of the land upon which such water has been so used and the name of the owner thereof. Such declaration shall be verified but if the declarant cannot verify the same of his own personal knowledge he may do so on information and belief. Such declarations so filed shall be recorded at length in the office of the state engineer and *may* also be recorded in the office of the county clerk of the county wherein the diversion works therein described are located. Such records or copies thereof officially certified shall be prima facie evidence of the truth of their contents.

use of stock or range water.  Another distinction is that *Miranda* involved a claim of *indirect* appropriation—specifically, the "beneficial use of the grasses grown in and near the wash[.]" *Id.* at 410.  Indirect appropriation evidences only an "intention to reap nature's bounty gratuitously provided by water . . . not to appropriate the water itself." *Id.* at 411.  Therefore, *Miranda* is not dispositive of whether a diversion is required to establish a right to beneficial use of stock water under New Mexico law.  For this reason, the Attorney General of New Mexico advised that *Miranda* "should be limited to the particular facts that were presented to the court [and] stand only for the proposition that . . . under pre-1907 common law, grazing and cutting wild grass was not enough to effect an appropriation."  N.M. Att. Gen. Op. 98-01 at 8–9 (March 27, 1998) (ECF No. 170 Ex. A); *see also* N.M. STAT. ANN. § 72-1-2 (1978) ("all waters appropriated for irrigation purposes, except as otherwise provided by written contract between the owner of the land and the owner of any ditch, reservoir[,] or other works for the storage or conveyance of water, shall be [generally] appurtenant to specified lands[.]") (emphasis added).

Finally, as the New Mexico Supreme Court explained, over a century ago, in *Snow v. Abalos*, 140 P. 1044 (N.M. 1914):

> The appropriation of water consists in the *taking or diversion* of it from some natural stream or other source of water supply . . . with the *intent* to apply it to some beneficial use or purpose.

> *        *        *

> The intention to apply to beneficial use, the diversion works, and the actual diversion of the water necessarily all precede the application of the water to the use intended, *but it is the application of the water, or the intent to apply*, followed with due diligence toward application and ultimate application, which gives to the appropriator the continued and continuous right to take the water.  All the steps precedent to actual application are but preliminary to the same, and designed to consummate the actual application.  Without such precedent steps no application could be made, *but it is the application to a beneficial use which gives the continuing right to divert and utilize the water*.

*Id.* at 1048 (emphasis added).[22]

---

[22] State courts in other western states that have adopted the doctrine of prior-appropriation water rights have reached similar conclusions.  *See, e.g.*, *Phelps Dodge Corp. v. Ariz. Dep't. of Water Res.*, 118 P.3d 1110, 1116 (Ariz. Ct. App. 2005) ("[W]hile diversion may have been necessary to effect a statutory beneficial use prior to the addition of wildlife and recreational use into accepted beneficial uses, it was not a necessity thereafter.") (internal citation omitted); *Town of Genoa v. Westfall,* 349 P.2d 370, 378 (Colo. 1960) ("It is not necessary in every case for an appropriator of water to construct ditches or artificial [diversions]. . . . The only indispensable requirements are that the appropriator intends to use the waters for a beneficial purpose and actually applies them to that use."); *State v. United States*, 996 P.2d 806, 811 (Idaho 2000) ("No

For these reasons, the court has determined that neither state statutes nor case law require a physical diversion to establish the right of beneficial use of stock water. *See Walker*, 162 P.3d at 886 n.3 (N.M. 2007) (citing *First State Bank v. McNew*, 269 P. 56, 62 (N.M. 1928) (overruled on other grounds) (stock-raising "is a beneficial use for which water may be appropriated")).[23]

---

diversion from a natural watercourse or diversion device is needed to establish a valid appropriative water right for stock watering.") (internal citations omitted); *In re Adjudication of the Existing Rights to the Use of All the Water*, 55 P.3d 396, 401 (Mont. 2002) ("Common sense rebels against a rigid diversion requirement that would refuse to recognize an acknowledged beneficial use simply because application to the use does not require removal from and depletion of the water source."); *Steptoe Live Stock Co. v. Gulley*, 295 P. 772, 774–75 (Nev. 1931) ("While it was absolutely necessary to divert water from a stream to appropriate it to agricultural uses . . . [if it] could be put to a beneficial use without such diversion . . . we see no reason for holding that such appropriation is not valid."). Given the unique and shared history of water rights in western states, it is not surprising that these doctrines are in agreement.

Assuming *arguendo*, that a diversion is a necessary predicate to ownership under New Mexico law, several of the Gosses' 2003 Declarations of Ownership describe constructed works such as "rocks around spring[s]," to identify livestock watering sources, many of which were placed there a hundred years ago. DX 504 at 115, 126, 138; TR 377 (Carrie Goss) (identifying rocks around the spring as constructive works). Of course, it can be difficult to identify a configuration of rocks within a large area, but Mr. Gallacher's failure to find them does not mean that they did not exist. Gov't 1/2/17 Br. Supp. at 3 ("The historical research conducted by the United States' expert witness, Mr. Daniel Gallagher [sic], confirmed the absence of diversion[s].") (emphasis added). In addition, Mr. Gallacher stated that he was unable to locate Bluff North Springs or even its streambed. DX 504 at 124. Under the Government's logic, such water sources must not exist. Perhaps the best way to locate these sources would be to follow the cattle. In addition, there is no requirement in the statute that the site of a water source must be designated by a constructed work. To provide public notice of asserted ownership of stock watering rights, New Mexico law allows "[a]ny person, firm or corporation claiming to be an owner of a water right which was *vested prior to* [1907]" to file a Declaration of Ownership with the OSE. N.M. STAT. ANN. § 72-1-3 (emphasis added). The Declaration of Ownership must state "the beneficial use to which said water has been applied, the date of first application to beneficial use, the continuity thereof, the location of the source of said water and if such water has been used for irrigation purposes, the description of the land upon which such water has been so used and the name of the owner thereof." *Id.*

**V.      AT TRIAL, PLAINTIFFS ESTABLISHED UNDER THE TAKINGS CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION THAT THE GOVERNMENT EFFECTED A TAKING OF THEIR RIGHT TO BENEFICIAL USE OF STOCK WATER SOURCES WITHIN THE SACRAMENTO ALLOTMENT OF THE LINCOLN NATIONAL FOREST.**

**A.      The Plaintiffs' Argument.**

SGA argues that its right to beneficial use of sources of stock water in the Sacramento Allotment of the Lincoln National Forest physically taken when the USFS denied SGA's cattle access to water sources within the exclosures set up to preserve endangered species. Pls. 6/30/15 Br. at 15–16. In effect, the Government "destroyed SGA's right to exclude and make non-possessory use of its property." Pls. 6/30/15 Br. at 16 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435–36 (1982)).

The record establishes that from May 5, 1998 to March 14, 2014, the USFS engaged in a temporary taking of SGA's right to beneficial use of stock water and a permanent taking of all but 0.185 acre-feet per annum in Sacramento Lake. JX 146, 157–58. Similarly, all but 2.785 acre-feet per annum of SGA's right to beneficial use of stock water permanently was taken in the Peñasco Exclosure, consisting of 12.6 acre-feet from May 5, 1998 to March 14, 2014. JX 146, 147, 156, 158. Therefore, "no subsequent action can relieve [the USFS of its] duty to provide compensation for the period during which the taking was effective." Pls. 6/30/15 Br. at 19 (citing *First English Evangelical Lutheran Church of Glendale v. Cty. of Los Angeles*, 482 U.S. 304, 321 (1987) (holding "where the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective").

Although water sometimes flowed outside the exclosures, which SGA's cattle drank, nevertheless, the USFS is liable for a taking, because a permanent physical occupation "does not require that in every instance the occupation be exclusive, or continuous and uninterrupted." Pls. 6/30/15 Br. at 19 (quoting *Hendler v. United States*, 952 F.2d 1364, 1377 (Fed. Cir. 1991); *see also Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1582 (Fed. Cir. 1993) ("A 'permanent' physical occupation does not necessarily mean a taking unlimited in duration.") (internal citation omitted)). As long as SGA maintains its right of beneficial use, "even if the Government only appropriate[d] a tiny slice of [SGA's] holdings, a taking has occurred, and [SGA] must be provided with just compensation." Pls. 6/30/15 Br. at 19 (quoting *Casitas III*, 543 F.3d at 1288 ("The size and scope of a physical invasion is immaterial to the analysis; even if the government only appropriates a tiny slice of a person's holdings, a taking has occurred, and the owner must be provided just compensation.") (internal citation omitted)).

Prior to 2004, SGA annually placed approximately 130 head of cattle in the Alamo Pasture. Pls. 6/30/15 Br. at 20. The 7/28/04 Record of Decision prevented SGA from using water in the Alamo Pasture during the spring, "when water is available during spring runoff." Pls. 6/30/15 Br. at 20 (citing JX 40; TR 134 (Martinez)). In addition, SGA's access to stock water in the Upper Alamo #1, Mud Springs, Caballero #1, Caballero #2, Caballero #3, Wood Spring #1, and Wood

Spring #2 also was denied. Pls. 6/30/15 Br. at 20 (citing JX 32–36). After 2007, the number of cattle allowed in the Alamo Pasture was again reduced to fifty head. Pls. 6/30/15 Br. at 20; TR 534 (Spike Goss) (confirming that the number of cattle allowed after 2007 "was 50 head after [2007]"). Therefore, instead of purchasing SGA's water rights, the USFS constructed exclosures that denied SGA access to, and beneficial use of, SGA's water for the benefit of the Sacramento Mountains Thistle and then reduced the number of cattle SGA could graze on the allotment. Pls. 6/30/15 Brief at 23–24. As in *Casitas III*, each of the USFS's actions individually and as a whole effected a physical taking and the USFS must provide SGA with just compensation. Pls. 6/30/15 Br. at 24–25.

### B. The Government's Response.

Assuming that the court determines that SGA's physical taking claim is timely and SGA has a property right in the use of water, nevertheless, the Government points out that SGA is entitled only to beneficial use, not a right of access to particular geographical locations or specific water sources. Gov't 9/17/15 Br. at 70 (citing *Walker*, 162 P.3d at 890 ("Water rights are . . . not tied to a particular location or even a particular source. . . . As such, water rights are not considered ownership in any particular water source, but rather a right to use a certain amount of water to which one has a claim via beneficial use[.]")). SGA has not established that the USFS's conduct resulted in a taking of any right to beneficial use of water. Gov't 9/17/15 Br. at 70–71. The appropriate question is "not whether SGA's [cattle] were precluded from drinking directly from water sources or at a particular location, but rather whether SGA was precluded from making beneficial use of water at any location[]" in the Lincoln National Forest. Gov't 9/17/15 Br. at 70. Because Plaintiffs failed to establish at trial that there was insufficient water for their cattle in the Sacramento Allotment, SGA's takings claim should be dismissed. Gov't 9/17/15 Br. at 71 (citing *Estate of Hage*, 687 F.3d at 1290) (observing that plaintiffs could have met their burden of proof by providing "evidence that the fences prevented the water from reaching their land"). The trial record does not support the conclusion that there was insufficient water on the Sacramento Allotment for SGA's cattle in any year, because of the construction of the exclosure fences or any other action taken by the USFS. Gov't 9/17/15 Br. at 73. Therefore, the reduction in the number of cattle that the USFS imposed on SGA's term grazing permit does not constitute a taking of private property rights. Gov't 9/17/15 Br. at 73.

Grazing is a privilege, subject to the terms and conditions of a term grazing permit that does not create or convey any private property rights to use National Forest lands or resources located on those lands. Gov't 9/17/15 Br. at 73. Although SGA's cattle business is dependent on the ability to graze the livestock in the Lincoln National Forest, that does not convey a property right to SGA. Gov't 9/17/15 Br. at 73–74. Under New Mexico law, beneficial use of water does not entail a right to traverse federal land to provide SGA's cattle access to SGA's water sources. Gov't 9/17/15 Br. at 74. Therefore, modifications to the terms under which SGA is permitted to graze cattle does not constitute a taking of a property right in the water. Gov't 9/17/15 Br. at 74.

The Government adds that the USFS's compliance with the ESA also did not appropriate SGA's alleged water rights. Gov't 9/17/15 Br. at 77. Neither the 8/28/92 Recovery Plan nor the 2/4/04 BIOLOGICAL OPINION mandated that USFS erect any exclosure fences. Gov't 9/17/15 Br.

at 77–79.  Those documents provided the USFS with information on how to protect endangered species.  Gov't 9/15/15 Br. at 78–79.  Although the 8/28/92 Recovery Plan identified water development as one of many threats to endangered species, the exclosures were not constructed to comply with the 8/28/92 Recovery Plan.  Gov't 9/17/15 Br. at 78–79.  Instead, the exclosures were built between 1983 and 1992—prior to the issuance of both the 8/28/92 Recovery Plan and the 2/4/04 BIOLOGICAL OPINION—because both documents "clearly recognized that [the exclosures] already existed."  Gov't 9/17/15 Br. at 78–79; DX 123; JX 39 at PL002282.  Therefore, USFS's compliance with the ESA did not appropriate SGA's alleged water rights.  Gov't 9/17/15 Br. at 81 ("As part of the proposal, the [USFS] and [USFWS] will jointly monitor livestock . . . use with utilization cages.")

Nor did the USFS appropriate any of SGA's alleged water rights in the Alamo Canyon for the benefit of the Southwestern Prickly Poppy, because the USFS only restricted the number of cattle and days cattle may graze in the Alamo Canyon pasture.  Gov't 9/17/15 Br. at 81.  These restrictions did not involve the taking of SGA's water rights, but reflected a regulatory decision that does not support a Fifth Amendment Takings Clause claim.  Gov't 9/17/15 Br. at 81.

Finally, *Casitas III* does not support SGA's takings claim, because the United States Court of Appeals for the Federal Circuit accepted, only for the purposes of summary judgment, that plaintiff's representation of a water right was correct.  *See Casitas III*, 543 F.3d at 1276.  On remand, the parties presented evidence about the nature and scope of the plaintiff's alleged water rights.  Gov't 9/17/15 Br. at 84.  Subsequently, the United States Court of Appeals for the Federal Circuit approved the trial court's finding that "[t]he holder of an appropriated water right . . . receives nothing more than his right to beneficial use and possesses no legal entitlement to water that is diverted but never beneficially used."  *Casitas V*, 708 F.3d at 1353.  Therefore, *Casitas III* stands for the proposition that "the court must first determine the nature and scope of the alleged water right under applicable state law[,]" then proceed to determine the presence or absence of a taking.  Gov't 9/17/15 Br. at 83.  The trial record in this case, however, shows that "SGA has had access to sufficient quantities of water on the [Sacramento] Allotment for all of its grazing livestock since 1989."  Gov't 9/17/15 Br. at 85.

## C.    The Plaintiffs' Reply.

The court previously determined that "SGA . . . established *prima facie* ownership of vested range stock water rights in seventeen sources within the Sacramento Allotment."  Pls. 11/2/15 Reply at 9 (citing *Sacramento Grazing II*, 96 Fed. Cl. at 193).  United States Supreme Court precedent mandates that the USFS's liability does not "depend on the size of the area permanently occupied[,]" or the degree of the Government's interference "with the landowner's use of the rest of his land."  Pls. 11/2/15 Reply at 19 (quoting *Loretto*, 458 U.S. at 430, 436).  For this reason, the United States Court of Appeals for the Federal Circuit has held that a property owner's retention of some access to his property does not preclude a valid takings claim.  Pls. 11/2/15 Reply at 19 (citing *Skip Kirchdorfer, Inc.*, 6 F.3d at 1583 ("[Plaintiffs] retention of some access rights does not preclude a *per se* taking.")).  The possibility that SGA's cattle watered, or could have watered, at other sources in the Sacramento Allotment is not relevant to a takings issue in this case.  Pls. 11/2/15 Reply at 19 (citing *Hall v. City of Santa Barbara*, 833 F.2d 1270, 1278 (9th

Cir. 1986) ("Whether compensation is adequate is an inquiry separate from whether there has been a taking.")).

Nor does it matter that neither the 8/28/92 Recovery Plan nor the 2/4/04 BIOLOGICAL OPINION mandated the USFS's action. Pls. 11/2/15 Reply at 20. The record establishes that the USFS amended the 1998 AOP "to exclude SGA's cattle from the exclosures in an effort to comply with the [8/28/92 Recovery Plan.]" Pls. 11/2/15 Reply at 21 (citing JX 84 at 80–82). In response, the USFS reduced the number of cattle "on the Sacramento Allotment and removed SGA's cattle from the Alamo [P]asture earlier than usual," because of "a desire to protect the [Sacramento Mountains T]histle and [Southwestern P]rickly [P]oppy." Pls. 11/2/15 Reply at 21 (citing Pls. 11/1/15 Reply at 3–7, 20–24).

In addition, *Casitas V* stands for the proposition that the Government's appropriation of water to protect endangered species is a physical taking, if a private party's water rights attach to the Government appropriation. Pls. 11/2/15 Reply at 22. In *Casitas V*, the city's diversion of water for storage was not considered a beneficial use under applicable state law. Pls. 11/2/15 Reply at 21 (citing *Casitas V*, 708 F.3d at 1353–56). Since that diversion did not entail a beneficial use, no water right attached. Pls. 11/2/15 Reply at 21 (citing *Casitas V*, 708 F.3d at 1356–57). In this case, SGA is entitled to have all of its cattle make beneficial use of SGA's water. Pls. 11/2/15 Reply at 22. *Casitas V* does not require a plaintiff to establish whether water from other sources could or would be available to establish liability for a taking. Pls. 11/2/15 Reply at 22. Nor is such an inquiry relevant to whether a plaintiff's water rights in a particular source were taken. Pls. 11/2/15 Reply at 22.

Finally, any access that SGA may have had to water on the Sacramento Allotment, resulting from the parties' cooperation since trial, does not eradicate the USFS's liability for the prior taking. Pls. 11/2/15 Reply at 17.

### D.    The Government's Sur-Reply.

The Government adds that SGA failed to establish a taking claim, because SGA did not show that "but for the government actions . . . , it could have put a greater quantity of water to beneficial use." Gov't 11/17/15 Reply at 11. To establish a taking claim, SGA must demonstrate that "the [G]overnment actually took water that [SGA] could have put to beneficial use." Gov't 11/17/15 Reply at 11 (quoting *Estate of Hage*, 687 F.3d at 1290). The exclosure fences did not take away SGA's right to beneficial use of its stock water sources and therefore there was no taking. Gov't 11/17/15 Reply at 11. Nor was SGA deprived of any beneficial use of the water, because every cow authorized to be on the allotment had access to water. Gov't 11/17/15 Reply at 11–12. Under New Mexico law, "water rights are not considered ownership in any particular water source, but rather a right to use a certain amount of water to which one has a claim via beneficial use." Gov't 11/17/15 Reply at 11 (quoting *Walker*, 162 P.2d at 890). So long as SGA's cattle had access to water, regardless of the location, SGA's water rights were not deprived. Gov't 11/17/15 Reply at 12. This is so, because SGA's cattle were able to drink water that ran outside of the exclosures and from other sources in the same pasture. Gov't 11/17/15 Reply at 11–12.

Finally, limiting the number of livestock authorized to graze on the Sacramento Allotment for the period of use does not evidence a taking of SGA's water rights. Gov't 11/17/15 Reply at 13. SGA had access to alternative water sources in the Alamo Canyon. Gov't 11/17/15 Reply at 13. The exclosures were intended to address concerns regarding livestock eating and trampling the Southwestern Prickly Poppy; not to preserve the water for the Southwestern Prickly Poppy. Gov't 11/17/15 Reply at 13. Accordingly, SGA "has not met its burden of proving a taking of any water right involving water sources in Alamo Canyon[.]" Gov't 11/17/15 Reply at 13.

### E.    The Court's Resolution.

In *Schooner Harbor Ventures, Inc. v. United States*, 569 F.3d 1359 (Fed. Cir. 2009), the United States Court of Appeals for the Federal Circuit held that a physical taking analysis is a two-step inquiry. *Id.* at 1362 (internal citation omitted). First, the trial court must determine whether the interest at issue is a legally protected property right. *Id.* at 1362; *see also Nw. La. Fish & Game Pres. v. United States*, 574 F.3d 1386, 1390 (Fed. Cir. 2009) ("The taking calculus first identifies the private party's property interest[.]"). A legally protected property right is protected by "existing rules and understandings and background principles derived from an independent source, such as state, federal, or common law." *Schooner Harbor Ventures,* 569 F.3d at 1362 (internal citations and quotations omitted). Second, the trial court must determine "whether the governmental action at issue amounted to a compensable taking of that property interest." *Id.* (internal citation omitted).

Since the court has determined that SGA established a right to beneficial use of stock water in the Sacramento Allotment of the Lincoln National Forest, the court's analysis turns to "whether that property has been deprived or abridged sufficiently to qualify as 'taken.'" *Nw. La. Fish & Game Pres.*, 574 F.3d at 1390 (internal citation omitted); *see also Estate of Hage*, 687 F.3d at 1285–86 ("We employ a two-part test to determine whether governmental action constitutes a physical taking without just compensation: 1) we determine whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking, and 2) if so, we determine whether that property interest was taken.") (internal quotation marks and citation omitted).

It is a well-established principle that a physical taking occurs, if the Government denies an owner all access to a property interest. *See Foster v. United States*, 607 F.2d 943, 950 (Ct. Cl. 1979) ("[T]he Government's action here [is not] quite the 'normal' repeated action which . . . physically intrudes upon a plaintiff's property. Rather, the Government is in rightful possession of [the land at issue], but is totally denying plaintiff's access to [the mineral rights on the land] to which [plaintiffs] have a right.") (internal citations omitted). In *Foster*, the appellate court held that a taking occurred where there was "a series of incremental denials sufficient to constitute a permanent taking." *Id.* As previously discussed, the record in this case shows that SGA's right to beneficial use of stock water sources in the Sacramento Allotment was "incrementally" and then finally denied. JX 19 (5/5/98 AOP Amendment); JX 21 (9/8/00 Letter from USFS to SGA); DX 504 at 70 (discussing the 9/8/00 Letter from USFS to SGA). The United States Court of Appeals for the Federal Circuit has held that "the [G]overnment [can] not prevent [plaintiffs] from

accessing water to which they owned rights without just compensation.  The [G]overnment, for example, could not entirely fence off a water source, such as a lake, and prevent a water rights holder from accessing such water."  *Estate of Hage*, 687 F.3d at 1290.  The court agrees.

SGA has established that the USFS prevented SGA from exercising the right to beneficial use of stock water sources within the Sacramento Allotment of the Lincoln National Forest and thereby effected a taking in violation of the Fifth Amendment to the United States Constitution. *See United States v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945) (holding that it is the "*deprivation of the former owner* rather than the accretion of a right or interest to the sovereign [that] *constitutes the taking*.  Governmental action short of acquisition of title or occupancy has been held, if its effects are so complete, as to deprive the owner of all or most of his interest in the subject matter, to amount to a taking") (emphasis added).

## VI.     CONCLUSION.

For these reasons, the court has determined that SGA established that the USFS's May 5, 1998 AOP Amendment effected a taking under the Fifth Amendment to the United States Constitution of SGA's right to beneficial use of stock water sources under New Mexico law that are located within exclosures in the Sacramento Allotment of the Lincoln National Forest.

Before the court determines the amount of "just compensation" due, both parties should undertake a renewed effort to ascertain whether alternative water sources can be made available to SGA to allow this family enterprise to continue in the cattle business on a viable basis.  To facilitate this effort, the court will convene a telephone conference with the parties on or before November 30, 2017.

**IT IS SO ORDERED.**

s/ Susan G. Braden    
**SUSAN G. BRADEN**
**Chief Judge**