# In the United States Court of Federal Claims

No. 04-786
Filed: July 23, 2021

|  |  |
|---|---|
| SACRAMENTO GRAZING ASSOCIATION, INC., *et al.*, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| THE UNITED STATES, | ) ) |
| Defendant. | ) ) ) |

*Michael Joseph Van Zandt*, Hanson Bridgett, San Francisco, CA, for plaintiffs.

*Reuben S. Schifman*, U.S. Department of Justice, Environment and Natural Resources Division, Washington, DC, for defendant.

**OPINION AND ORDER**

***SMITH*, Senior Judge**

This matter is before the Court on defendant's Motion for Reconsideration, pursuant to Rule 54(b) of the Rules of the Court of Federal Claims ("RCFC"). Defendant seeks reconsideration of the Court's 2017 liability determination that the government "effected a [physical] taking . . . of [plaintiffs'] right to beneficial use of stock water sources under New Mexico law in the Sacramento Allotment of the Lincoln National Forest." *Sacramento Grazing Ass'n, Inc. v. United States*, 135 Fed. Cl. 168, 207 (2017) ("2017 Liability Opinion" or "*SGA III*"). In its Motion, defendant asserts that the above determination rests upon fundamental errors of fact and law for the following reasons: (1) plaintiffs' claims are time-barred under the applicable six-year statute of limitations, and (2) plaintiffs have not met their burden to show that as of the date of the alleged taking they possessed a water right recognized under state law. Defendant's Motion for Reconsideration at 16, 26, ECF No. 262 [hereinafter Def.'s Mot. for Reconsideration]. In response, plaintiffs aver that defendant's Motion fails to meet the applicable reconsideration standard and the 2017 Liability Opinion correctly adjudicated their physical takings claim. *See generally* Plaintiffs' Opposition to Defendant's Motion for Reconsideration, ECF No. 265 [hereinafter Pl.'s Resp.]. For the reasons set forth below, defendant's Motion for Reconsideration is denied-in-part and granted-in-part.

## I.    Background

The 2017 Liability Opinion lays out the factual and procedural history of this case in great detail.  *See SGA III*, 135 Fed. Cl. at 173–88.  However, a brief recitation is below.

### A.  The Lincoln National Forest & Sacramento Allotment

In the early 1900s, Congress set aside tracts of land within New Mexico territory to protect the region's timber and water supply, control overstocking the range, and provide a recreational area for the public.  Defendant's Exhibit 504 at 10–11 [hereinafter DX].  These tracts of land were combined to form the Lincoln National Forest.  *Id*. at 11.  The United States Forest Service ("USFS" or "Forest Service") administers federally owned land within the Lincoln National Forest, including the Sacramento Allotment – an approximately 111,000-acre area within the Lincoln National Forest with at least 143 known water sources.  *Id*. at 20; *see also* Plaintiffs' Third Amended Complaint, ECF No. 238 [hereinafter 3rd Am. Compl.].

Pertinent to this case, the Lincoln National Forest can be used for livestock operations such as grazing, guided by the 1986 Lincoln National Forest Land and Resource Management Plan ("Forest Plan").  DX 65; *see also* 16 U.S.C. § 1604.  The Forest Plan takes into account a variety of competing interests, including the protection of endangered species.  DX 65; *see also* Def.'s Mot. for Reconsideration at 4.  Therefore, all site-specific actions, including grazing, must be consistent with the Forest Plan to protect these interests.  16 U.S.C. § 1604(i); 36 C.F.R. § 222.2.

To ensure that grazing is consistent with the Forest Plan, the Forest Service issues various documents specifying whether and how grazing may occur – including term grazing permits and Allotment Management Plans ("AMPs").  AMPs set forth objectives, management requirements, improvements needed, and monitoring and evaluation standards for an allotment.  36 C.F.R. § 222.2.  In implementing term grazing permits, ongoing livestock operations are monitored and adjusted through the issuance of Annual Operating Instructions ("AOIs"), also known as Annual Operating Plans ("AOPs").  *See* Joint Exhibit 17 [hereinafter JX].

### B.  Water and Exclosures on the Sacramento Allotment

In 1983, the United States Fish & Wild Life Service ("FWS") notified the Forest Service of its intent to propose listing the Sacramento Mountains Thistle ("*cirsium vinaceum*" or "thistle"), mainly located in the Lincoln National Forest, as a threatened species under the Endangered Species Act of 1973 ("ESA").  *See generally* DX 36.  The FWS identified threats to the species, including "trampling of the plants and habitat by livestock[,]" and advised that "[p]rotection could be accomplished through . . . fencing populations accessible to livestock."  *Id*. at SG02053.

Thus, to mitigate potential threats to the thistle, the Forest Service constructed fenced exclosures around water bodies designated as critical habitats.[1]  DX 504 at 52.  By 1985, the

---

[1] Prior to 1983, the United States Forest Service ("USFS" or "Forest Service") constructed fenced exclosures around certain water sources in the Sacramento Allotment to achieve general

USFS completed exclosures "around 10 acres at the Silver Springs Cienega, 225 acres at Bluff Springs, 19 acres in Water and Peñasco canyons, and 163 acres in the upper Peñasco." *Id* at 53; *see also* DX 37 at SG02075; DX 40 at SG02080.

In 1986, the goal to protect endangered species and exclude cattle from certain areas was incorporated into the 1986 Forest Plan. DX 65 at SG01092 (directing USFS to "[e]xclude[] livestock grazing to protect other values or eliminate conflicts with other uses."). Consequently, in 1988, the Forest Service prepared an Interim Management Plan to protect the thistle – published publicly in 1989. *See* DX 78; DX 89. The Interim Management Plan formally identified livestock grazing as posing a conflict with the management and protection of endangered species and reaffirmed the use of exclosure fences for protecting the plants and their habitat. DX 78 at SG02234–37. Accordingly, by 1989, additional exclosures were scheduled for construction around the Mauldin Springs Habitat Exclosure, the Hubbell Canyon Exclosure, and the Masterson Springs Habitat Exclosure. *See* DX 504 at 53.

### C. The History of SGA

In April of 1989, plaintiffs, Sacramento Grazing Association, *et al.* ("SGA"), began the purchase of approximately eighty acres of land located in Otero County, New Mexico ("Goss Ranch") from the Sacramento Cattle Company, including its cattle, water rights, range rights and improvements, access rights, and the appurtenant federally administered grazing allotment on the Sacramento Allotment. 3rd Am. Compl. at 3. In relation to the plaintiffs' right to graze on the Sacramento Allotment, the USFS issued SGA a term grazing permit that allowed up to 553 cattle on the Sacramento Allotment for a period of ten years, subject to the terms and conditions of the permit and all applicable laws and regulations. JX 10 ("1989 Grazing Permit").

SGA was aware of certain exclosures when it purchased the Goss Ranch. *See SGA III*, 135 Fed. Cl. at 174. However, from 1989 to 1990, the USFS did not prohibit SGA from leading their cattle to graze and drink water inside certain exclosures. *See* DX 109 (USFS letter allowing plaintiffs' cattle within Upper Penasco Exclosure for a limited time period); *see also* Defendant's Supplemental Brief Regarding Statute of Limitations at 14, ECF No. 278 [hereinafter Def.'s Supp. Brief] ("The Forest Service granted [p]laintiffs' request in 1989, allowing cattle within the exclosure for a short time.").

### D. Subsequent Tensions Between the USFS & SGA

In 1991, tensions began to rise between the parties due to the Forest Service's management of the exclosures in relation to livestock use. On October 20, 1991, the Forest Service denied SGA's request to use the Penasco Exclosure. DX 109. In the letter, the Forest Service explained that the exclosure "was constructed in 1985 . . . to protect the . . . Sacramento Mountain Thistle from livestock grazing[,]" and as such, "no livestock grazing [would be] permitted." *Id*. Shortly afterwards, the Forest Service proposed and constructed the Western

---

"habitat improvements for wildlife." Defendant's Exhibit 24 [hereinafter DX] (indicating that the Wills Canyon exclosure was constructed in 1978); *see also* DX 193; DX 194 (indicating that the Sacramento Lake exclosure was constructed around 1983).

Riparian Exclosure. DX 5; DX 165. On October 16, 1992, the Forest Service again denied SGA's request to use the exclosures, reiterating that the purpose of the exclosures are to exclude livestock for the protection of the thistle. DX 124.

On March 1, 1995, the USFS issued an Environmental Assessment, addressing management strategies for livestock grazing in the Sacramento Allotment. DX 165 at PL02620. In that document, the Forest Service stated that the fenced exclosures were constructed and maintained to protect endangered plant species, including the thistle. *Id*. at PL02630, 58. On June 20, 1996, the Forest Service repeated to SGA that livestock use of exclosed areas is not permitted for the protection of thistle, as indicated in the 1986 Forest Plan and other documentation. DX 177. On April 11, 1997, the Forest Service again wrote to SGA, indicating that "[l]ivestock grazing inside the . . . excluded riparian areas is not authorized." DX 184. Likewise, on June 6, 1997, the Forest Service noted that SGA's cattle were observed in an exclosure and stated that "[the] area is not authorized for grazing use." DX 185. On August 31, 1997, in a letter titled "Decisions Made By The Forest Service [] That We Feel Were Detrimental to Our Forage and Natural Resources," SGA complained to the USFS about the fencing of "[their] water in various areas." DX 189.

On May 5, 1998, the Forest Service issued an AOP Amendment ("May 5, 1998 AOP Amendment") that specifically listed six riparian exclosures within the Sacramento Allotment where livestock were not permitted for "livestock grazing activities" and required that SGA remove any livestock that might get into the exclosures. JX 19 at SG00297. The May 5, 1998 AOP Amendment warned that failure to do so could result in suspension or cancellation of SGA's 1989 Grazing Permit. *Id*. at SG00297. Subsequently, on November 23, 1999, the Forest Service issued SGA a new grazing permit ("1999 Grazing Permit") that, like the 1989 Grazing Permit, allowed SGA to graze 553 head of cattle for a ten-year term. JX 70. However, in the early 2000s, the Forest Service reduced the number of SGA cattle allowed to graze on the Sacramento Allotment based on a number of factors, including SGA's noncompliance – ultimately leading to this litigation. *See SGA III*, 135 Fed. Cl. at 178–79.

## II.     Relevant Procedural History

On May 4, 2004, plaintiffs filed their initial Complaint with this Court, alleging both a physical and a regulatory Fifth Amendment Taking by the USFS of the Goss Ranch, which included plaintiffs' appurtenant water rights acquired by their predecessors-in-interest, forage rights, preference grazing rights, and range improvements. *See generally* Complaint, ECF No. 1 [hereinafter Compl.]. On June 30, 2005, the Court dismissed plaintiffs' claims related to its preference grazing rights and range improvements. *Sacramento Grazing Ass'n, Inc. v. United States*, 66 Fed. Cl. 211, 217 (2005) ("*SGA I*"). On September 6, 2005, plaintiffs filed their First Amended Complaint, identifying their specific water rights for their takings claim. *See* First Amended Complaint, ECF No. 15.

On March 27, 2006, the Court stayed the case at bar pending a definitive ruling by the New Mexico Supreme Court in a different case before the prior judge, wherein the Court certified two questions of state law for resolution. Stay Order, ECF No. 23; *see Walker v. United States*, 162 P.3d 882, 888 (N.M. 2007). On June 21, 2007, the New Mexico Supreme Court

issued its decision in *Walker v. United States*, finding that the State of New Mexico does not recognize certain limited forage rights implicit in a vested water right. 162 P.3d at 885. Based on the above, on November 1, 2010, the Court rejected SGA's takings claims based on forage rights, its grazing permit, preference grazing rights, and a right-of-way to move cattle to water sources. *Sacramento Grazing Ass'n, Inc. v. United States*, 96 Fed. Cl. 175, 189–190 (2010) ("*SGA II*"). However, the Court held that the statute of limitations did not bar the Court from adjudicating plaintiffs' takings claims and allowed SGA's case to proceed. *Id*. at 187.

On August 12, 2011, plaintiffs filed their Second Amended Complaint, withdrawing their regulatory takings claim and reiterating their physical takings claim of SGA's right to beneficial use of stock water sources on the Sacramento Allotment. *See generally* Second Amended Complaint, ECF No. 85 [hereinafter 2nd Am. Compl.]. After bifurcating the issues of liability and damages, in February of 2012, the Court held a trial in Albuquerque, New Mexico, on the issue of liability with respect to plaintiffs' physical takings claim. Upon the completion of post-trial briefing, on June 20, 2017, plaintiffs filed a motion, requesting to supplement the trial record with exhibits issued by the New Mexico Office of the State Engineer ("OSE") pertaining to the licensing of SGA's water rights. *See* Michael J. Van Zandt's Declaration in Support of Plaintiffs' Motion to Supplement Trial Evidentiary Record, ECF No. 199. On November 3, 2017, this Court issued an interlocutory Opinion & Order, reaffirming that the statute of limitations does not bar the Court from adjudicating plaintiffs' claims and finding that SGA established a physical taking of their right to beneficial use of stock water sources in the Sacramento Allotment under New Mexico law. *SGA III*, 135 Fed. Cl. at 193, 207.

On January 8, 2019, this case was transferred to the undersigned Judge. *See* Order Transferring Case, ECF No. 223. By leave of the Court, on May 15, 2019, plaintiffs filed their Third Amended Complaint, resurrecting their regulatory takings claim. *See generally* 3rd Am. Compl. Subsequently, defendant moved for summary judgment on plaintiffs' regulatory takings claim. *See* Defendant's Motion for Summary Judgment, ECF No. 250. On May 22, 2020, the Court denied defendant's Motion, holding that, as the standard for assessing regulatory takings is fact-sensitive and case-specific, summary judgment was inappropriate and that a trial on the regulatory takings issue was necessary. Opinion & Order Denying Defendant's Motion for Summary Judgment at 3, ECF No. 254. However, the Court "[r]ecognize[d] that [it] cannot hold the government liable for both a physical and a regulatory taking of the same property." *Id*. Consequently, the Court sought briefing on reconsideration of the 2017 Liability Opinion. *See* Scheduling Order, ECF No. 259.

On August 26, 2020, defendant filed its Motion for Reconsideration pursuant to RCFC 54(b), arguing that the 2017 Liability Opinion rests on fundamental errors of fact and law for the following reasons: (1) plaintiffs' claims are time-barred under the applicable six-year statute of limitations, and (2) plaintiffs have not met their burden to show that as of the date of the alleged taking they possessed a water right recognized under state law. Def.'s Mot. for Reconsideration at 16, 26. On October 2, 2020, plaintiffs filed their Response, asserting that defendant's Motion fails to meet the standard under RCFC 54(b) and the 2017 Liability Opinion correctly adjudicated their physical takings claim. *See generally* Pl.'s Resp. On November 11, 2020, defendant filed its Reply, reiterating its arguments in support of its Motion for Reconsideration.

*See generally* Defendant's Reply in Support of its Motion for Reconsideration, ECF No. 274 [hereinafter Def.'s Reply]. The Court held oral argument on December 7, 2020.

On January 29, 2021, the Court held a status conference to schedule a second oral argument to aid the Court in resolving the issues in this case. Pursuant to discussions held during that conference, the Court directed the parties to file supplemental briefs, limited to the issue of statute of limitations. *See generally* Scheduling Order, ECF 277. On March 3, 2021 and March 17, 2021, the parties filed their respective supplemental briefs and replies – generally reiterating their previously asserted arguments. The Court held a limited oral argument on March 30, 2021. Defendant's Motion for Reconsideration is fully briefed and ripe for review.

### III.     Standard of Review

This Court's jurisdictional grant is found primarily in the Tucker Act, which gives this Court the power "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, . . . or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2018). Though the Tucker Act expressly waives the sovereign immunity of the United States against such claims, it is "merely a jurisdictional statute and does not create a substantive cause of action" enforceable against the United States for money damages. *Rick's Mushroom Serv. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008) (citing *United States v. Testan*, 424 U.S. 392, 398 (1976)); *Quimba Software, Inc. v. United States*, 132 Fed. Cl. 676, 680 (2017) (citing the same). Instead, "a plaintiff must identify a separate source of substantive law that creates the right to money damages," such as a money-mandating constitutional provision. *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (citing *United States v. Mitchell*, 463 U.S. 206, 216 (1983)); *Loveladies Harbor Inc. v. United States*, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc). "One such money-mandating constitutional provision is the Takings Clause of the Fifth Amendment, which provides, 'nor shall private property be taken for public use, without just compensation.'" *DeJong v. United States*, 149 Fed. Cl. 194, 200 (2020) (citing U.S. Const. amend. V).

Jurisdiction is a threshold issue that "must be resolved before the Court can take action on the merits." *Remote Diagnostic Techs. LLC v. United States*, 133 Fed. Cl. 198, 202 (2017) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)). "[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (citing *United States v. Cotton*, 536 U.S. 625, 630 (2002)) (internal citations omitted). Consequently, courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Id.*; *see also* RCFC 12(b)(1) & 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

The Court "has the power to reconsider its decisions until a judgment is entered." *Exxon Corp. v. United States,* 931 F.2d 874, 877 (Fed. Cir. 1991) (citations omitted). "To the extent that a trial judge can alter a previous ruling, so too can a successor judge." *Id.* at 878 (citations omitted). RCFC 54(b) affords the Court the discretion to modify interlocutory orders before entering a final judgment. ("[A]ny order or other decision . . . that adjudicates fewer than all the claims . . . does not end the action as to any of the claims or parties and may be revised at any

- 6 -

time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."); *see also Marconi Wireless Telegraph Co. v. United States,* 320 U.S. 1, 47–48 (1943) (stating that a court has the power "at any time prior to entry of its final judgment . . . to reconsider any portion of its decision and reopen any part of the case.") (citations omitted). However, there is no uniform standard for evaluating a motion for reconsideration brought under RCFC 54(b). Accordingly, the Court must determine the appropriate standard of review.

## IV. Discussion

### A. RCFC 54(b) Standard of Review Analysis

Unsurprisingly, the parties disagree on the standard of review applicable to a RCFC 54(b) motion for reconsideration. Plaintiffs assert that a party moving for reconsideration of an interlocutory decision under RCFC 54(b) must support its motion by demonstrating "exceptional circumstances." Pl.'s Resp. at 2–3 (citations omitted). In response, defendant avers that reconsideration under the same rule is available simply "as justice requires." Def.'s Reply at 3 (citations omitted). The Court will address the parties' arguments in turn.

Generally, plaintiffs urge this Court to adopt the stringent "exceptional circumstances" standard. *See* Pl.'s Resp. at 1–5. In support of the above, plaintiffs primarily cite to *CANVS Corp. v. United States*, 110 Fed. Cl. 19 (2013), *1100 W. Ewing Assoc., LLC v. United States*, 139 Fed. Cl. 24 (2018) and *Demodulation, Inc. v. United States*, 124 Fed. Cl. 737 (2016). *Id.* at 2–4. In *CANVS Corp.*, the Court determined that a party moving under RCFC 54(b) for reconsideration "must support its motion . . . by a showing of ***exceptional circumstances*** justifying relief, based on a manifest error of law or mistake of fact."[2] *CANVS Corp.*, 110 Fed. Cl. at 24–25 (2013) (citations omitted) (emphasis added). The Court reasoned that a rigorous standard is necessary, as "[a] motion for reconsideration is not intended . . . to give an unhappy litigant an additional chance to sway the court." *Id.* (internal citations omitted). Subsequently, in *1100 W. Ewing Assoc., LLC* and *Demodulation, Inc.*, the Court indicated that while reconsideration under RCFC 54(b) is "available 'as justice requires[,]'" such a motion should only be granted upon the showing of "exceptional circumstances justifying relief." *1100 W. Ewing Assoc., LLC*, 139 Fed. Cl. at 25 (citations omitted); *see also Demodulation, Inc.*, 124 Fed. Cl. at 739 (citations omitted). Further, the Court provided that motions for reconsideration should not be entertained when the movant "merely reasserts . . . arguments previously made[,] . . . [and] all of which were carefully considered by the Court." *1100 W. Ewing Assoc., LLC*, 139 Fed. Cl. at 26 (internal citations omitted). Plaintiffs aver that defendant did exactly that by asserting reconsideration arguments "previously made, considered, and rejected" in the 2017 Liability Opinion. Pl.'s Resp. at 4; *see generally SGA III*. Based on the above, plaintiffs claim that defendant's Motion fails to meet the "exceptional circumstances" standard, and as such, this Court should deny the motion on its face. *Id.* at 4–5.

---

[2] A moving party demonstrates "exceptional circumstances" by "show[ing]: (1) the occurrence of an intervening change in the controlling law; (2) the availability of previously unavailable evidence; or (3) the necessity of allowing the motion to prevent manifest injustice." *CANVS Corp. v. United States,* 110 Fed. Cl. 19, 25 (2013) (citing *Matthews v. United States*, 73 Fed. Cl. 524, 526 (2006) (citations omitted)).

- 7 -

In reply, defendant argues that the appropriate standard under RCFC 54(b) is simply "as justice requires." Def.'s Reply at 3 (citing *L-3 Commc'ns Integrated Sys., L.P. v. United States*, 98 Fed. Cl. 45, 49 (2011)). While admitting that the standard articulated above is imprecise, defendant posits that it "leaves within [its] ambit . . . a good deal of space for the Court's discretion." *Id*. (citing *Martin v. United States*, 101 Fed. Cl. 664, 671 (2011) (quotation omitted); *see also Farmers Coop. Co. v. United States*, 100 Fed. Cl. 579, 581 (2011) (citation omitted). Defendant reasons that this Court should adopt the same in the case at bar, as "[t]he standard for reconsideration of an interlocutory order under RCFC 54(b) . . . has been described as 'less rigorous' than the standards applicable to the reconsideration of final judgments." *Id*. (citing *Loveridge v. United States*, 150 Fed. Cl. 123, 126 (2020) (citation omitted); *see also Wolfchild v. United States*, 68 Fed. Cl. 779, 784 (2005) ("These rules reflect the precept that [c]ourts possess inherent power to modify their interlocutory orders before entering a final judgment.") (internal citations omitted). Finally, defendant claims that because the 2017 Liability Opinion is based on a manifest error of law or mistake of fact, it has certainly met either standard. *See* Def.'s Reply at 4.

After careful review of case precedent and the parties' arguments, the Court declines to adopt the "exceptional circumstances" standard and finds that the applicable standard of review under RCFC 54(b) is simply "as justice requires." *See E&I Glob. Energy Servs., Inc. v. United States*, 152 Fed. Cl. 524, 533 (2021) ("As long as a decision is interlocutory, the Court possesses wide discretion to depart from or stand by it, whatever 'justice requires.'") (quoting *Greene v. Union Mut. Life Ins. Co. of Am.*, 764 F.2d 19, 22 (1st Cir. 1985) (Breyer, J.)). Despite the differing standards, the *majority* of judges on this Court have adopted the less stringent standard of "as justice requires" on reconsideration of interlocutory orders. *See, e.g., Fla. Power & Light Co. v. United States*, 66 Fed. Cl. 93, 97 (2005) ("We thus conclude that . . . non-final order[s] may be revisited and reassessed under the more flexible standards of the 'law of the case.'"); *Wolfchild*, 68 Fed. Cl. at 784 ("At an interlocutory stage, the common law provides that the court has power to reconsider its prior decision on any ground consonant with application of the law of the case doctrine.") (citations omitted); *Pac. Gas & Elec. Co. v. United States*, 114 Fed. Cl. 146, 148 (2013) (providing that "at an interlocutory stage . . . the court has power to reconsider its prior decision on any ground consonant with application of the law of the case doctrine") (citations omitted); *see also L-3 Commc'ns Integrated Sys., L.P.*, 98 Fed. Cl. at 48 ("[R]econsideration under Rule 54(b) . . . is available as justice requires.") (internal citations omitted); *Loveridge*, 150 Fed. Cl. at 126 ("Reconsideration under RCFC 54(b) is available as justice requires.") (internal citations omitted); *E&I Glob. Energy Servs.*, 152 Fed. Cl. at 532–33 ("[R]econsideration under RCFC 54(b) reflects the 'inherent power of the rendering [trial] court to afford such relief from interlocutory [decisions] as justice requires.'") (citing *Greene*, 764 F.2d at 22 (citations omitted)).

It is no coincidence that is the case, as "trial court judges should not be forced to close their doors to novel theories and arguments unless the Clerk has issued Judgment and the unhappy movant is allowed to try his or her luck in the appellate court." *E&I Glob. Energy Servs.*, 152 Fed. Cl. at 533. Further, this Court finds plaintiffs' arguments unpersuasive, as plaintiffs' cited cases explicitly state that reconsideration under RCFC 54(b) is "available 'as justice requires[,]'" and merely *recommend* a more rigorous approach. *1100 W. Ewing Assoc.*, LLC, 139 Fed. Cl. at 25 (citations omitted); *see also Demodulation, Inc.*, Fed. Cl. at 739 (2016)

(citations omitted). Based on the above, this Court finds no reason to impose the rigorous "exceptional circumstances" standard in the interlocutory context, as articulated and applied by very few of its peers. Accordingly, the Court holds that the appropriate standard of review applicable under RCFC 54(b) is simply "as justice requires" and declines to deny defendant's Motion on its face.

### B. Statute of Limitations Analysis

28 U.S.C. § 2501 imposes a six-year statute of limitations upon claims brought in the Court of Federal Claims. 28 U.S.C. § 2501 ("Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."); *see also John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1354 (Fed. Cir. 2006), *aff'd*, 552 U.S. 130 (2008). The above statute of limitations serves as a jurisdictional limitation and therefore may not be waived. *John R. Sand & Gravel Co.*, 457 F.3d at 1354 (citing *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988)); *see also Hart v. United States*, 910 F.2d 815, 817 (Fed. Cir. 1990). As such, a claim over which this Court would have jurisdiction is nevertheless "barred unless the [complaint] is filed within six years after such claim first accrues." *DeJong*, 149 Fed. Cl. at 201 (citing 28 U.S.C. § 2501). As defendant insists that plaintiffs' physical takings claim is time-barred, the Court has "an . . . obligation to determine whether subject-matter jurisdiction exists" in this case. *Arbaugh,* 546 U.S. at 514; *see generally* Def.'s Mot. for Reconsideration.

#### 1. 2017 Liability Opinion Statute of Limitations Determination

Prior to trial, the Court found that the statute of limitations does not bar the Court from adjudicating plaintiffs' takings claims. *SGA II*, 96 Fed. Cl. at 187–89. Specifically, the Court determined that plaintiffs' May 4, 2004 Complaint began to accrue on May 5, 1998, when the Forest Service amended the 1998 AOP for the Sacramento Allotment, because the result of this amendment was to prohibit SGA's cattle from grazing on six riparian exclosures and having access to stock water therein. *Id*. at 187; *see also* JX 19.

Despite the above, during post-trial briefing, defendant argued that plaintiffs' claims were time barred because the alleged taking of water rights within the exclosures accrued between 1983 and 1992 – when the Forest Service constructed fences and warned SGA to not allow cattle within those exclosures. *See* Defendant's Post-Trial Brief at 2, ECF No. 167 (citing *Est. of Hage v. United States*, 687 F.3d 1281 (Fed. Cir. 2012)). In the 2017 Liability Opinion, the Court opined that, while "the record shows that prior to May 5, 1998, SGA received warnings about cattle use of stock water within the exclosures[,]" it was the Forest Service's "May 5, 1998 AOP Amendment that was the ***official action*** that ordered SGA to remove cattle from the exclosures and interfered with SGA's right to beneficial use of water sources within the Sacramento Allotment." *SGA III*, 135 Fed. Cl. at 192–93 (emphasis added). As such, the Court reaffirmed that "the statute of limitations, under 28 U.S.C. § 2501, does not bar the Court from adjudicating SGA's Fifth Amendment Takings Clause claims." *Id*. at 193 (citing *Holmes v. United States*, 657 F.3d 1303, 1317 (Fed. Cir. 2011) (holding that a claim "accrues" for purposes of 28 U.S.C. § 2501 when "*all* the events have occurred that fix the alleged liability of the [G]overnment and entitle the claimant to institute an action") (emphasis added)).

### 2. The Parties' Arguments

In its Motion for Reconsideration, defendant asserts that the 2017 Liability Opinion's statute of limitations determination rests upon fundamental errors of law and fact and, as such, warrants reconsideration. Def.'s Mot. for Reconsideration at 17. To begin with, defendant avers that "a claim alleging a Fifth Amendment taking accrues when the act that constitutes the taking occurs." *Id.* at 16 (citing *Ingrum v. United States*, 560 F.3d 1311, 1314 (Fed. Cir. 2009) (citations omitted)). Thus, defendant's chief argument is that as a matter of law plaintiffs' takings claims began to accrue when the "fences [were] openly and notoriously constructed[,]" between 1983 and 1992. *Id.* at 17; *see also John R. Sand & Gravel Co.*, 457 F.3d at 1355; *Mitchell v. United States*, 41 Fed. Cl. 617 (1988); *Est. of Hage v. United States*, 687 F.3d 1281 (Fed. Cir. 2012). In the alternative, defendant asserts that as a matter of fact, plaintiffs' claims accrued *no later* than 1991 when the Forest Service denied SGA permission to place livestock in the exclosures – referencing correspondence between the parties demonstrating the same between 1991 and 1997. Def.'s Mot. for Reconsideration at 17, 25–26; *see* DX 109 (USFS letter dated October 20, 1992 denying SGA's request to place livestock within the Penasco Exclosure); *see also* DX 124, DX 177, DX 184, DX 185. Based on the above, defendant maintains that plaintiffs' takings claims could not have begun to accrue on May 5, 1998, when the Forest Service amended the 1998 AOP, because SGA was aware well before then that the purpose of the exclosures was to keep livestock out of the fenced areas, and the amended AOP simply did not impose *new* restrictions on livestock. Def.'s Mot. for Reconsideration at 21, 25–26; *see also* JX 19.

In response, plaintiffs posit that a "claim first accrues when *all* the events have occurred that fix the alleged liability of the government." Pl.'s Resp. at 6 (citing *Ingrum*, 560 F.3d at 1314 (emphasis added)). Accordingly, plaintiffs assert that the 2017 Liability Opinion correctly adjudicated the statute of limitations issue because the government did not ***actually*** and ***officially*** restrict SGA's free access to vested stock water rights within the exclosures until the issuance of the May 5, 1998 AOP Amendment. *Id.* at 6–7 (citing *SGA III*, 135 Fed. Cl. at 189); *see* JX 19 (May 5, 1998 AOP Amendment); *see also* Trial Tr. 486:10–487:10 (Jimmy Goss testimony that cattle drank from within the exclosures between 1990 and 1998). Moreover, plaintiffs insist that the correspondence between the parties during the 1990s is unavailing in triggering the statute of limitations, as the Forest Service denied plaintiffs' access to ***graze*** cattle within the exclosures – ***not water***. December 7, 2020 Oral Argument Tr. 25:1–Tr. 25:17; *see* DX 109 (USFS letter stating that "no livestock ***grazing*** [would be] permitted.") (emphasis added).

In its supplemental briefs, defendant generally reiterates its arguments in support of its Motion for Reconsideration.[3] *See generally* Def.'s Supp. Brief; Defendant's Reply Brief

---

[3] In its supplemental briefing, defendant raises an unsolicited statute of limitations argument regarding plaintiffs' newly resurrected regulatory takings claim. *See* Defendant's Supplemental Brief Regarding Statute of Limitations at 6, ECF No. 278 [hereinafter Def.'s Supp. Brief]; *see also* Plaintiffs' Third Amended Complaint, ECF No. 238 [hereinafter 3rd Am. Compl.]. The Court declines to address the above in this Opinion & Order as it is outside of the scope of the Court's reconsideration scheduling orders. *See* Scheduling Order, ECF No. 259; Scheduling Order, ECF No. 277.

Regarding the Statute of Limitations, ECF No. 280. However, defendant adds that the distinction plaintiffs attempt to make between grazing and watering is nonsensical as the purpose of the exclosures is to exclude cattle *entirely*, as evidenced through public Forest Service memorandum and the parties' correspondence, and cattle cannot be trained to only drink and not graze. Def.'s Supp. Brief at 16–17. Similarly, in plaintiffs' supplemental briefs, SGA also generally reiterates its prior arguments but counters that the previous correspondence between the parties was informal and therefore could not trigger the statute of limitations, as plaintiffs' permit could only be modified through formal documentation – pursuant to 36 C.F.R. § 222.4. *See* Plaintiffs' Supplemental Brief Regarding Statute of Limitations at 6, ECF No. 279; Plaintiffs' Corrected Reply Brief Regarding the Statute of Limitations, ECF No. 282.

### 3. Court's Resolution

It is well established that "[a] claim alleging a Fifth Amendment taking accrues when the act that constitutes the taking occurs." *Ingrum*, 560 F.3d at 1314 (citing *Alliance of Descendants of Tex. Land Grants v. United States,* 37 F.3d 1478, 1481 (Fed. Cir. 1994)). Specifically, the claim accrues when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence. *Goodrich v. United States*, 434 F.3d 1329, 1333 (Fed. Cir. 2006) (quoting *Hopland Band of Pomo Indians,* 855 F.2d at 1577); *see also John R. Sand & Gravel Co.*, 457 F.3d at 1356 ("[T]he claim only accrues if the plaintiff knew or should have known of the existence of the events fixing the government's liability." (citations omitted)). When determining whether a claim has accrued, the Court must apply an "objective standard[,]" meaning that "a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue." *Fallini v. United States*, 56 F.3d 1378, 1380 (Fed. Cir. 1995) (citation omitted). As such, determining when such a claim has accrued "require[s] a fact intensive inquiry." *Rio Linda Elverta Cmty. Water Dist. v. United States*, 780 F. App'x 889, 892 (Fed. Cir. 2019); *see also John R. Sand & Gravel Co.*, 457 F.3d at 1357. This Court notes that, as it did not hear the evidence at trial, it has relied on the factual findings of the previous judge.

Defendant primarily cites to *John R. Sand & Gravel Co.* and *Estate of Hage* in support of its chief argument that, as a matter of law, plaintiffs' physical takings claim began to accrue when the "fences [were] openly and notoriously constructed[,]" between 1983 and 1992. Def.'s Mot. for Reconsideration at 17. In the above cases, the Federal Circuit determined that the government's construction of fences around the plaintiffs' respective properties triggered the six-year statute of limitations. *See John R. Sand & Gravel Co.*, 457 F.3d at 1356 ("[T]he claim accrued not later than February of 1994 when the government constructed the fence that cut off JRS & G's access to its plant area."); *Est. of Hage*, 687 F.3d at 1289 ("[A]ny claim based on the fences erected in 1981–1982 is barred by the six-year statute of limitations period[.]"). While this Court acknowledges the weight of the above precedent and agrees that a physical takings claim typically begins to accrue when a governmental physical occupation is constructed on or around a plaintiff's property, the Court finds that the above is simply not applicable to this case. This is because in this case, unlike *John R. Sand & Gravel Co.* and *Estate of Hage*, the Forest Service's fences did not *actually* bar plaintiffs' access to its purported right to beneficial use of stock water within the Sacramento Allotment.

In this case, it is uncontested that the exclosures were constructed over a decade before plaintiffs filed their May 4, 2004 Complaint and that plaintiffs were aware of certain exclosures when it purchased the Goss Ranch in 1989. *SGA III*, 135 Fed. Cl. at 174. However, the record demonstrates, and defendant admits that, from 1989 to 1990, the USFS did not prohibit SGA from leading their cattle to graze and drink water inside certain exclosures. *See* DX 109 (USFS letter allowing plaintiffs' cattle within Upper Penasco Exclosure for a limited time period); *see also* Def.'s Supp. Brief at 14 ("The Forest Service granted [p]laintiffs' request in 1989, allowing cattle within the exclosure for a short time."). Further, the record establishes, through the parties' letter correspondence and trial testimony, that, between 1991 and 1997, SGA received warnings about cattle use of stock water within the exclosures but the USFS did not actually bar SGA from accessing the water therein. *See* Trial Tr. 284:19–285:6, 293:11–15 (Frances Goss testimony that SGA cattle drank from within the exclosures until the issuance of the May 5, 1998 AOP Amendment); Trial Tr. 486:10–487:10 (Jimmy Goss testimony that SGA cattle drank from within the exclosures between 1990 and 1999); Trial Tr. 502:2–4 (Justin Goss testimony that SGA cattle drank from within the exclosures prior to 1999).

Instead, this changed on May 5, 1998, when the USFS issued the May 5, 1998 AOP Amendment, ***actually*** and ***officially*** ordering SGA to remove its cattle from the exclosures and stating that failure to do so would result in suspension or cancellation of SGA's 1989 Grazing Permit. JX 19; *see also Ingrum*, 560 F.3d at 1314 ("A claim first accrues when ***all*** the events have occurred that fix the alleged liability of the government and entitle the claimant to institute an action.") (emphasis added). Further, while not dispositive, the USFS took no action until September 8, 2000 to require SGA to remove its cattle from the exclosures. *See* JX 21 (USFS enforcement action against SGA, suspending 40% of its herd on the Sacramento Allotment.). Based on the above, the Court finds that plaintiffs did not know and could not have known that a physical takings claim existed before May 5, 1998. *See Goodrich*, 434 F.3d at 1333. Thus, the Court rejects defendant's argument that plaintiffs' physical takings claim began to accrue when the Forest Service constructed the fences between 1983 and 1992.

In the alternative, defendant argues that, as a matter of fact, plaintiffs' claims accrued no later than 1991 when the Forest Service first denied SGA permission to place livestock in the exclosures – referencing correspondence between the parties from 1991 and 1997. Def.'s Mot. for Reconsideration at 17, 25–26; *see* DX 109 (USFS letter dated October 20, 1992 denying SGA's request to place livestock within the Penasco Exclosure); *see also* DX 124, DX 177, DX 184, DX 185. However, as indicated above, plaintiffs' access to water within the exclosures was not actually prohibited until the USFS's issuance of the May 5, 1998 AOP Amendment. Accordingly, the Court finds defendant's alternative argument relying on the parties' correspondence prior to that date unavailing.

Based on the above, this Court holds that the 2017 Liability Opinion correctly adjudicated the statute of limitations issue in this case and concludes that plaintiffs' physical takings claim began to accrue on May 5, 1998. *See SGA III*, 135 Fed. Cl. at 192–93; JX 19 (May 5, 1998 AOP Amendment). Accordingly, the Court need not address the parties' remaining arguments. As the Court has found that it possesses the necessary jurisdiction over plaintiffs' May 4, 2004 Complaint, the Court next discusses the 2017 Liability Opinion's physical takings determination.

### C. Takings Analysis

The Takings Clause of the Fifth Amendment of the Constitution provides "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V. When analyzing a takings claim, the Court will implement a two-step process. *See Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1343 (Fed. Cir. 2002). The Court's first step is to determine "whether the plaintiff possesses a valid interest in the property affected by the governmental action, i.e., whether the plaintiff possessed a stick in the bundle of property rights." *Id.* at 1343 (citing *Karuk Tribe of Cal. v. Ammon*, 209 F.3d 1366, 1374 (Fed. Cir. 2000) (internal citations omitted)). Once the Court has determined that the plaintiff possesses the requisite property right, the Court then decides "whether the governmental action at issue constituted a taking of that stick." *Id.* Upon careful consideration, and with all due sympathy to the plaintiffs' plight, the Court finds that plaintiffs lack the requisite property interest alleged, and thus cannot succeed on their physical takings claim. Consequently, the Court need not reconsider whether the governmental action at issue constituted a taking.

#### 1. Property Rights

The courts have long held that "[f]or a takings claim to succeed under the Fifth Amendment, under either a physical invasion or regulatory takings theory, a claimant must first establish a compensable property interest." *Avenal v. United States*, 33 Fed. Cl. 778, 784–85 (1995) (citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1026–27 (1992) (citations omitted)); *see also Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004) ("If the claimant fails to demonstrate the existence of a legally cognizable property interest, the courts task is at an end.") (citations omitted). In any takings case, "only persons with valid property interests at the time of the taking are entitled to compensation." *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001) (citations omitted). "The Federal Circuit has made clear that "[i]t is plaintiffs' burden to establish cognizable property interests for purposes of their takings . . . claims." *Jackson v. United States*, 135 Fed. Cl. 436, 444 (2017) (citing *Klamath Irrigation Dist. v. United States*, 635 F.3d 505, 519 n.12 (Fed. Cir. 2011) (internal citations omitted)); *see also Est. of Hage v. United States*, 687 F.3d 1281, 1291 (Fed. Cir. 2012).

The Supreme Court has repeatedly held that "state law defines property interests." *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 707 (2010); *see also Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164, (1998) ("Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'") (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)); *Bartz v. United States*, 224 Ct. Cl. 583, 592 (Cl. Ct. 1980) ("[T]he issue of what constitutes a 'taking' is a 'federal question' governed entirely by federal law, but that the meaning of 'property' as used by the Fifth Amendment will normally obtain its content by reference to state law."). Thus, the laws of a given state identify what rights and property interests are constitutionally protected. *See id.* Accordingly, the Court turns to the laws of the State of New Mexico to determine whether plaintiffs met their burden to show that as of the date of the alleged taking SGA

possessed the right to beneficial use of stock water in the Sacramento Allotment, a right which was acquired by their predecessors-in-interest prior to 1907.[4]  *See* 3rd Am. Compl. at 3.

### *i. 2017 Liability Opinion Property Rights Determination*

Before addressing the parties' arguments, the Court begins its discussion with the relevant findings in its 2017 Liability Opinion.  Prior to trial, the Court determined that plaintiffs established a *prima facie* right to beneficial use of stock water under New Mexico law.[5]  *SGA III*, 135 Fed. Cl. at 194–95; *see also SGA II*, 96 Fed. Cl. at 191–93.  In making this determination, the Court utilized the following statutory framework:

> Although not required, any person claiming ownership of a pre-1907 water right may file a Declaration of Ownership[6] with the [Office of the State Engineer] ("OSE"), "setting forth the beneficial use to which said water has been applied, the date of first application to beneficial use, the continuity thereof, [and] the location of the source of said water[.]"  N.M. Stat. Ann. § 72-1-3.  A Declaration of Ownership "may be accompanied by deeds, survey plats, affidavits and other evidence tending to substantiate the claim, . . . [or it] may be filed by the declarant on his personal information and belief."  N.M. Code R. § 19.26.2.8 (West 2005).  Once certified and recorded by the OSE, a Declaration of Ownership becomes, as a matter of New Mexico state law, "*prima facie evidence* of the truth of [its] contents."  N.M. Stat. Ann. § 72-1-3.  (emphasis added).

*SGA III*, 135 Fed. Cl. at 194.  Thus, based upon plaintiffs' Declarations of Ownership filed between 1999 and 2003 and defendant's failure to proffer contradictory evidence, the Court determined that plaintiffs established a *prima facie* right to beneficial use of stock water within the Sacramento Allotment.  *Id*. at 194–95 (referencing Plaintiffs' Exhibit 58–68 [hereinafter PX]; JX 32–36, 56–57, 61).

---

[4]    While "state law defines property interests," *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't. Prot.*, 560 U.S. 702, 707 (2010), federal common law may also identify which property rights are protected under the Constitution.  *See Bartz v. United States*, 224 Ct. Cl. 583, 592 (Cl. Ct. 1980).  However, the Court need not address plaintiffs' purported property rights under federal common law, as the Supreme Court of the United States has determined that "water rights derive from 'local' law, not federal law."  *Andrus v. Charlestone Stone Prod. Co.*, 436 U.S. 604, 612 (1978) (citations omitted).

[5]    A *prima facie* showing means "sufficient in law to raise a presumption of fact or establish the fact in question[,] unless rebutted."  *See Sacramento Grazing Ass'n, Inc. v. United States*, 135 Fed. Cl. 168, 194 (2017) ("2017 Liability Opinion" or "*SGA III*") (citing *Goodman v. Brock*, 498 P.2d 676, 679–680 (N.M. 1972) (internal citations omitted)).

[6]    A Declaration of Ownership is a sworn statement made on a form issued by the Office of the State Engineer ("OSE") in which a purported water right owner describes the nature and extent of his or her water right.  The format of a declaration is similar to an affidavit and must be notarized.  *See* Declaration of Ownership, https://www.ose.state.nm.us/WR/Forms/ WR03%20Declaration%20of%20Ownership_2012-06-14_final.pdf (June 14, 2012).

Additionally, the Court addressed plaintiffs' post-trial submission of an OSE Order, dated June 9, 2017, determining that "while [the license] neither grants nor modifies any water rights, … [it] only further supports the *prima facie* status of [plaintiffs'] Declarations of Ownership." *SGA III*, 135 Fed. Cl. at 198 (internal citations omitted); *see also* Michael J. Van Zandt's Declaration in Support of Plaintiffs' Motion to Supplement Trial Evidentiary Record, ECF No. 199, Ex. 1 at 2. Accordingly, central to the 2017 Liability Opinion's property rights determination is plaintiffs' establishment of a *prima facie* right to beneficial use of stock water.

Next, the Court held that at trial plaintiffs satisfied New Mexico's requirement of continuous beneficial use of water sources within the Sacramento Allotment.[7] *Id.*; *see* N.M. Const. art. XVI, § 3 ("***Beneficial use*** shall be the basis, the measure and the limit of the right to the use of water.") (emphasis added); *see also SGA III*, 135 Fed. Cl. at 197 ("Under New Mexico law, the right to beneficial use of water is a property interest distinct and severable from a right to use land.") (citing *Walker v. United States*, 162 P.3d 882, 888 (N.M. 2007)). In making this determination, the Court relied upon the previously referenced Declarations of Ownership, together with SGA's trial testimony, discussing the following: (1) "the custom of cattlemen to identify stock water rights and access to those sources when property is sold or willed[,]" and (2) SGA and its predecessors' continuous beneficial use of stock water rights prior to 1907 until 2000. *Id.* at 195, 198 (citations omitted). Having established that plaintiffs met their burden to show that, as of the date of the alleged taking, they possessed a right to beneficial use of stock water, the Court subsequently found that the government effected a taking of that right. *Id.* at 203.

### *ii.* **The Parties' Arguments**

In its Motion for Reconsideration, defendant claims that the 2017 Liability Opinion rests on fundamental errors of law and, as such, plaintiffs did not meet their burden to show that as of the date of the alleged taking they possessed a water right recognized in New Mexico. Def.'s Mot. for Reconsideration at 27. Specifically, defendant argues the following: (1) New Mexico law requires conveyances of water rights to be explicit and in writing – which plaintiffs do not possess, and (2) continuous beneficial use alone is insufficient to establish a water right.[8] *Id.* at 27–29, 33.

---

[7] In its post-trial brief, defendant argued that New Mexico law additionally requires a physical diversion to establish the right to use of stock water. *See generally* Defendant's Post-Trial Brief, ECF No. 167. In the 2017 Liability Opinion, the Court determined that "neither state statutes nor case law require a physical diversion to establish the right of beneficial use of stock water." *SGA III*, 135 Fed. Cl. at 202 (citations omitted). Although defendant re-asserts the above argument in its Motion for Reconsideration, the Court need not address its merits for the reasons stated in the next footnote.

[8] Specifically, defendant asserts that, in addition to continuous beneficial use, plaintiffs must also establish a physical diversion – i.e., man-made diversion/constructed works. *See* Def.'s Mot. for Reconsideration at 32–36. However, because the Court agrees with the defendant's first argument and finds that New Mexico law requires conveyances of water rights to be explicit and in writing, there is no occasion to address this alternative argument.

- 15 -

In response, plaintiffs assert that the 2017 Liability Opinion correctly adjudicated the validity of SGA's water rights for the following reasons: (1) a written transfer of a water right based on a ***pre-1907*** right is not a legal requirement under New Mexico law, (2) it is customary practice to implicitly transfer such water rights at the same time as the sale of land, (3) defendant failed to rebut the *prima facie* status of plaintiffs' right to use stock water sources – established by its Declarations of Ownership and June 9, 2017 OSE Licensing Order , and (4) continuous beneficial use alone is sufficient in itself to establish a water right. Pl.'s Resp. at 9–18. In its reply, defendant posits that customary practice is irrelevant when inconsistent with New Mexico law and plaintiffs' reference to its June 9, 2017 OSE Licensing Order is unavailing in establishing a water right as the State Engineer does not have the power to recognize the validity of pre-1907 water rights. Def.'s Reply at 14, 16–17.

For the reasons stated below, the Court agrees with defendant's first argument related to the statute of frauds, and as such, finds that plaintiffs did not possess a water right based on a pre-1907 right. In other words, plaintiffs did not have the right to beneficial use of stock water sources in the Sacramento Allotment under New Mexico law at the time of the alleged taking. Accordingly, the Court need not address defendant's alternative argument related to continuous beneficial use.

### *iii.* **Court's Resolution**

The doctrine of prior appropriation governs water law in New Mexico. *See* N.M. Const. art. XVI, § 2. The New Mexico Constitution recognizes water rights vested prior to March 19, 1907, as acquired through common law prior appropriation. *See* N.M. Const. art. XVI, § 1 ("All existing rights to the use of any waters in this state for any useful or beneficial purpose are hereby recognized and confirmed."). Under the doctrine of prior appropriation, water rights are both established and exercised by ***beneficial use***, which forms "the basis, the measure and the limit of the right to use of the water." N.M. Const. art. XVI, § 3. New Mexico's adoption of the above stems from the scarcity of water in the west, necessitating its "mobility and transferability . . . to meet changing social goals . . . often mean[ing] moving water from one location to another and also from one use to another." *Walker*, 162 P.3d at 890 (citations omitted).

In *Walker v. United States*, 162 P.3d 882 (N.M. 2007), the New Mexico Supreme Court discussed the foundational principles underlying the doctrine of prior appropriation. The court reiterated that under the doctrine of prior appropriation, "the right to use water is considered a property right which is separate and distinct from ownership of the land." *Id*. at 888 (quoting *KRM, Inc. v. Caviness*, 925 P.2d 9, 10 (N.M. 1996) (citations omitted); *see also Posey v. Dove*, 257 P.2d 541, 547 (N.M. 1953). The court reasoned that, under the above doctrine, a water right is derived not from the rights in the land – but "from appropriation for beneficial use." *Id*. (internal citations omitted); *see* N.M. Const. art. XVI, § 3. Thus, "a water right is not an automatic stick in the bundle of rights a landowner receives upon purchasing even a fee interest in land." *Walker,* 162 P.3d at 888. Consequently, the court determined that a water right, "as [a] real property interest[] to which all the rules of real property apply," requires satisfaction of the statute of frauds – that any such conveyance be in writing. *Id*. at 893 (citing *Posey*, 257 P.2d at 547 (1953) ("It is generally conceded by all of the authorities that a water right, or an interest in water, is real property, and it is so treated under all the rules of law appertaining to such

property.")).  Notably, the court acknowledged that the "*sole exception* to the general rule that water rights are separate and distinct from the land is *water used for irrigation*[,]" as carved out by the state legislature.  *Id.* at 889 (emphasis added) (citations omitted); *see also* N.M. Stat. Ann. § 72-1-2 (West 1907) (stating that "all waters appropriated for irrigation purposes . . . shall be appurtenant to specified lands owned by the person, firm or corporation having the right to use the water.").  Taken together, *Walker* solidified that, in New Mexico, under the doctrine of prior appropriation, water rights are generally *not* appurtenant to land – meaning that a conveyance of land will not carry the water right with it.

Following *Walker*, the New Mexico courts continuously reaffirmed the fundamental principles of the doctrine of prior appropriation in relation to appurtenancy.  In *Hydro Resources Corporation,* the New Mexico Supreme Court once again determined that "[t]he central feature of th[e] doctrine is the separate and distinct nature of a water right from ownership of land[,]" and, as such, water rights are not appurtenant to land and must be separately conveyed.  *Hydro Res. Corp. v. Gray*, 173 P.3d 749, 754–55 (N.M. 2007).  The court again recognized the state legislature's sole exception to the general rule in the irrigation context.  *Id*.  Subsequently, in *Roybal*, citing to *Walker* and *Hydro Resources Corporation*, the Court of Appeals of New Mexico held that, "with the exception of water used for irrigation, water rights are not appurtenant to . . . land" and must be specifically conveyed.  *Roybal v. Lujan de la Fuente*, 218 P.3d 879, 882 (N.M. Ct. App. 2009) (citations omitted).  Most recently, in *Elkins*, applying all of the above precedent, the same court reaffirmed that, "except for water used for irrigation, water rights are not appurtenant to the conveyance of land" and, as such, if "[a] deed was 'silent as to water rights,' . . . the water rights were therefore not conveyed."  *Elkins v. Waterfall Cmty. Water Users Ass'n*, No. A-1-CA-33634, 2019 WL 2420050, at *6 (N.M. Ct. App. May 21, 2019).  Based on the above, this Court finds that it is well settled precedent in New Mexico that water rights are *not* appurtenant to land and, as such, require a separate written conveyance – except for water used for irrigation.

Despite the above precedent, plaintiffs maintain that a written transfer of a water right based upon a *pre-1907* right is not a legal requirement under New Mexico law.  Pl.'s Resp. at 14.  Specifically, plaintiffs argue the following: (1) in all of the above referenced cases, the validity of a *pre-1907* water right and/or *stock water* right was not before the Court and therefore do not apply, (2) it is customary practice to impliedly transfer such rights at the same time as the sale of land, and (3) defendant failed to rebut the *prima facie* status of plaintiffs' right to use stock water sources – established by its Declarations of Ownership and June 9, 2017 OSE Licensing Order.[9]  *Id*. at 9–17.  The Court will address plaintiffs' arguments in turn.

---

9       In the alternative, plaintiffs argue that a written transfer of a water right was not a legal requirement *prior to 2007* when *Walker* was decided – i.e., when plaintiffs acquired the ranch.  Pl.'s Resp. at 11.  The Court declines to address this argument as *Walker*, citing to well-established precedent, *reaffirmed* that a water right is a real and separate property interest to which all the rules of real property apply.  *See Walker v. United States*, 162 P.3d 882, 893 (N.M. 2007) (citing *Posey v. Dove*, 257 P.2d 541, 547 (N.M. 1953) ("It is generally conceded by all of the authorities that a water right, or an interest in water, is real property, and it is so treated under all the rules of law appertaining to such property.")).

- 17 -

As an initial matter, the Court is unpersuaded by plaintiffs' first argument, purporting to distinguish the above cases from its own. As previously stated, the New Mexico Constitution recognizes water rights vested pre-1907 and post-1907, as acquired through common law prior appropriation. *See* N.M. Const. art. XVI, §§ 1, 2. Thus, it follows that the doctrine's requirements are to be imposed upon those asserting a water right – irrespective of its pre- or post-1907 status. *State ex rel. Martinez v. City of Las Vegas*, 89 P.3d 47 (N.M. 2004), a case heavily relied upon by plaintiffs, bolsters the same.[10] In that case, the New Mexico Supreme Court invalidated pueblo water rights originating from the **1800s** because such rights "directly conflict[ed] with the doctrine of prior appropriation, . . . [and] pose[d] a direct obstacle to the realization of important objectives embodied in New Mexico water law." *Id*. at 62 (citations omitted). Thus, it is evident that under New Mexico law, **all** water rights must be consistent with the doctrine of prior appropriation – rendering the previously cited cases applicable irrespective of a pre-1907 discussion.

Further, the New Mexico courts and legislature have repeatedly indicated that the sole exception to the general rule that water rights are not appurtenant to land is water used for irrigation. *See Walker,* 162 P.3d at 889; *see also* N.M. Stat. Ann. § 72-1-2 (West 1907). In *Hydro Resources Corporation*, the New Mexico Supreme Court explicitly stated that "[it] would be for the legislature, ***not this Court***, to add . . . an additional exception." *Hydro Res. Corp.*, 173 P.3d at 755. Accordingly, and in line with New Mexico law, this Court declines to create an additional exception to the general rule in New Mexico and finds plaintiffs' pre-1907 and stock watering distinctions from the above precedent unpersuasive.

Next, the Court rejects plaintiffs' custom argument. Plaintiffs argue that it is customary practice in New Mexico to impliedly transfer a pre-1907 water right at the same time as the sale of land. Pl.'s Resp. at 9–10 (citing *SGA III*, 135 Fed. Cl. at 173–74). As evidence of such custom, plaintiffs reference prior deeds where water rights were specifically mentioned and transferred to subsequent holders of the Goss Ranch. *Id*. at 10 (referencing PX 018 at PL 01295; PX 024 at PL 01809–10; PX 028 at PL 03170,72; PX 026 at PL 01971). As an initial matter, the

---

[10] Plaintiffs cite to *State ex rel. Martinez* to argue that the New Mexico Supreme Court has implemented a prospective application of law in the context of water rights when a retroactive application "would work an extreme injustice and hardship." Pl.'s Resp. at 16; *see generally State ex rel. Martinez v. City of Las Vegas*, 89 P.3d 47 (N.M. 2004). In that case, the New Mexico State Engineer challenged the City of Las Vegas' pueblo water rights, obtained through colonization grants. *State ex rel. Martinez*, 89 P.3d at 49. After a comprehensive review, the New Mexico Supreme Court invalidated pueblo water rights in New Mexico at large because such rights were inconsistent with the doctrine of prior appropriation. *Id*. at 58. However, the Court utilized its discretion to apply its ruling on a "***limited*** prospective basis with respect to the City[,]" as a "retroactive application … would place the City in just such an 'untenable position.'" *Id*. at 66–67 (emphasis added) (citations omitted). This Court declines to do the same in this case as plaintiffs have not cited to any authority giving the Court the discretion to apply a prospective application of state law and, in any event, plaintiffs' hardships cannot be equated to an entire city's. *See id*. at 63 (quoting *Lopez v. Maez,* 651 P.2d 1269, 1276 (N.M. 1982) ("It is within the inherent power of a ***state's highest court*** to give a decision prospective or retrospective application without offending constitutional principles.") (emphasis added)).

Court finds plaintiffs' references to the record unpersuasive in establishing such custom as multiple prior owners of plaintiffs' ranch, even those in the 1800s, *specifically* conveyed water rights to one another in explicit written instruments. Additionally, even assuming such custom exists in New Mexico, the New Mexico Supreme Court has repeatedly held that "customary practice is irrelevant when inconsistent with New Mexico law." *Walker*, 162 P.3d at 895 (citing *State ex rel. Martinez*, 89 P.3d at 58). Accordingly, as this Court has already determined that implied transfers of stock water rights are inconsistent with the doctrine of prior appropriation under New Mexico law, the Court finds that customary practice cannot salvage plaintiffs' claim to a water right.

Finally, plaintiffs' retreat to the Declarations of Ownership, accepted by the OSE, and the June 9, 2017 OSE Licensing Order in an attempt to establish plaintiffs' right to beneficial use stock water sources. Pl.'s Resp. at 16–17; *see also SGA III*, 135 Fed. Cl. at 197–99. Specifically, plaintiffs aver that the "effect of th[e] [OSE] license . . . recognize[s] the validity of SGA's water rights after [the] review[] of all the supporting materials[;] including [accepted] [D]eclarations of [O]wnership, deeds, bills of sale, mortgages, grazing permits, grazing cards." Pl.'s Resp. at 17; *see also* Michael J. Van Zandt's Declaration in Support of Plaintiffs' Motion to Supplement Trial Evidentiary Record, ECF No. 199, Ex. 1 at 2. Unfortunately, the Court is unpersuaded by the above documentation as the 2017 Liability Opinion correctly determined that pre-1907 water rights acquired pursuant to the doctrine of prior appropriation are in no way dependent on the existence of an application to or a permit from the State Engineer. *See SGA III*, 135 Fed. Cl. at 194 (citing *May v. Torres*, 19 P.2d 298, 300 (N.M. 1974).

Moreover, upon a comprehensive review of New Mexico law, this Court has uncovered no case or statute granting the State Engineer the authority to recognize the validity of pre-1907 water rights.[11] Further, plaintiffs fail to cite to any authority demonstrating the same. *See generally* Pl.'s Resp. While this Court acknowledges that Declarations of Ownership accepted by the OSE become, as a matter of New Mexico state law, "*prima facie evidence* of the truth of [its] contents[,]" N.M. Stat. Ann. § 72-1-3 (West 1961), the New Mexico Administrative Code explicitly states that "such acceptance does not constitute *validation* of the right claimed." N.M. Code R. § 19.26.2.8(D) (West 2005) (emphasis added). Consequently, in light of *Walker* and its progeny, the Court finds that plaintiffs' Declarations of Ownership and June 9, 2017 OSE Licensing Order cannot rescue plaintiffs' claim to a pre-1907 water right.

For the reasons set forth above, the Court is unpersuaded by plaintiffs' arguments and finds that SGA did not possess a right to beneficial use of stock water sources in the Sacramento Allotment under New Mexico law at the time of the alleged taking. Under the doctrine of prior appropriation, water rights, even those based upon pre-1907 rights, are simply not appurtenant to land and, as such, require a separate written conveyance – which plaintiffs do not possess. Accordingly, the 2017 Liability Opinion's property rights determination must be modified pursuant to RCFC 54(b).

---

[11] Under New Mexico law, "[a]gencies are created by statute, and limited to the power and authority expressly granted or necessarily implied by those statutes." *Qwest Corp. v. NMPRC*, 143 P.3d 478, 484 (N.M. 2006), *as revised* (Sept. 25, 2006) (citing *PNM Elec. Servs. v. Pub. Util. Comm'n*, 961 P.2d 147, 150 (N.M. 1998) (internal citations omitted).

## V.     Conclusion

For the reasons set forth above, defendant's Motion for Reconsideration is hereby **DENIED-IN-PART and GRANTED-IN-PART.**  Accordingly, the 2017 Liability Opinion's physical takings determination is hereby **MODIFIED**, and plaintiffs' physical takings claim is **DISMISSED**.  The Clerk is directed to enter judgment in favor of defendant, consistent with this Opinion and Order.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge